KATTEN MUCHIN ROSENMAN LLP
Craig A. Barbarosh (SBN 160224)
craig.barbarosh@kattenlaw.com
650 Town Center Drive, Suite 700
Costa Mesa, CA 92626-7122
Telephone: (714) 966-6822

Jessica M. Mickelsen (SBN 277581)
jessica.mickelsen@kattenlaw.com
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
Telephone: (310) 788-4425
Facsimile: (310) 788-4471

Peter A. Siddiqui (*pro hac vice*)
peter.siddiqui@kattenlaw.com
525 W. Monroe Street
Chicago, IL 60661-3693
Telephone: (312) 902-5455
Facsimile: (312) 902-1061

Counsel for Debtors and Debtors-In-Possession
Hashfast Technologies LLC and HashFast LLC

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# (SAN FRANCISCO DIVISION)

| | |
|---|---|
| In re:<br><br>HASHFAST TECHNOLOGIES LLC, a California limited liability company,<br><br>    Debtor and Debtor-In-Possession<br><br>☒ Affects HASHFAST LLC, a Delaware limited liability company,<br><br>    Debtor and Debtor-In-Possession | Case No. 14-30725<br><br>(Substantively Consolidated with In re HashFast LLC, Case No. 14-30866)<br><br>Chapter 11 |
| HASHFAST TECHNOLOGIES LLC, a California limited liability company, and HASHFAST LLC, a Delaware limited liability company,<br><br>    Plaintiffs,<br><br>    vs.<br><br>MARC A. LOWE, an individual, *aka* | Adversary Case No. 15-03011<br><br>**MOTION FOR ISSUANCE OF RIGHT TO ATTACH ORDER AND WRIT OF ATTACHMENT; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION IN SUPPORT THEREOF**<br><br>[Cal. Code. Civ. P. § 484.090(a) and (b); Cal. |

MOTION FOR ISSUANCE OF RIGHT TO ATTACH ORDER AND WRIT OF ATTACHMENT

| | |
|---|---|
| Cypherdoc and/or Cipherdoc, <br><br> DEFENDANT. | ) Civ. Code § 3439.07(a)(2)] <br> ) <br> ) <br> ) <u>Hearing</u>: <br> ) Date: TBD <br> ) Time: TBD <br> ) Place: Courtroom 22 <br> ) U.S. Bankruptcy Court <br> ) 235 Pine Street <br> ) San Francisco, CA 94104 <br> ) <br> ) <br> ) |

HashFast Technologies LLC, a California limited liability company ("<u>HFT</u>"), and HashFast LLC, a Delaware limited liability company ("<u>HF</u>", collectively with HFT, the "<u>Debtors</u>" and each a "<u>Debtor</u>") hereby moves the above-referenced court (the "<u>Court</u>") for the issuance of a right to attach order and writ of attachment pursuant to California Code of Civil Procedure ("<u>CCP</u>") § 484.090(a) and (b) and California Civil Code ("<u>CC</u>") § 3439.07(a)(2) as to certain Bitcoins ("<u>BTC</u>") fraudulently transferred to MARC A. LOWE (the "<u>Defendant</u>" or "<u>Lowe</u>") on or about September 2013 (the "<u>Motion</u>"). In support of the Motion, the Debtors respectfully submit the following:

<b><u>MEMORANDUM OF POINTS AND AUTHORITIES</u></b>

**I.  INTRODUCTION**

In exchange for minimal and potentially ineffectual services, HashFast Technologies transferred 3000 BTC to the Defendant through a series of transfers in or about September 2013 (the "<u>Transfers</u>") per the terms of a memorandum of understanding dated August 5, 2013 (the "<u>MOU</u>"). At the time of the Transfers, the BTC tendered to the Defendant had a value in excess of $360,000—a value far exceeding the reasonable value of the services provided by the Defendant. The Defendant presently holds the BTC subject to the Transfers (the "<u>MOU Payment</u>") in a BTC wallet bearing account number xUDJ9 (the "<u>Wallet</u>").

The Debtors commenced the above-captioned adversary proceeding to recover the MOU Payment for the benefit of the Estate. The Debtors hereby seeks to attach the BTC transferred to

the Defendant and presently held in the Wallet[1] to secure any potential judgment obtained against Lowe in the AP. Absent the issuance of a writ of attachment, the bankruptcy estates and their creditors may be unable to recover the fraudulently transferred BTC, which are now worth in excess of $650,000 and which would provide a substantial benefit to the creditors. Accordingly, the Committee respectfully requests that the Court issue a right to attach order and writ of attachment pursuant to CCP § 484.090(a) and (b) and CC § 3439.07(a)(2).

## II. STATEMENT OF FACTS

1. Prior to the commencement of the above-captioned bankruptcy cases (collectively, the "Bankruptcy Cases"), the Debtors were engaged in the business of designing, manufacturing, and selling special purpose semiconductors and computers utilized to "mine" BTC.

2. The Debtors are informed and believe that the Defendant has been at all relevant times a medical doctor apparently engaged in the mining of BTC. The Debtors are also informed and believe that the Defendant frequently utilizes the alias "Cypherdoc" and/or "Cipherdoc" when posting comments on Bitcoin-related forums and message boards.

3. On or about July 29, 2013, the Defendant visited the Debtors' headquarters to tour the facility and meet the members and employees of HFT prior to purchasing one or more the BTC "mining" computers manufactured by HFT (the "BabyJet"). During the visit, the Defendant met with Eduardo de Castro, the chief executive officer of HFT in July 2013 and co-owner of HF.

4. Immediately following the Defendant's visit to the Debtors' facility, the Defendant and HFT entered into the MOU. By and through the MOU, the Defendant agreed to endorse the Debtors and their products by posting comments and responding to certain inquiries on Bitcoin-related forums and/or message boards, including Bitcointalk.org. In exchange for these purported "services", the Defendant was to receive ten percent (10%) of the base sale price (i.e., gross sale proceeds) in BTC for the first 550 BabyJets sold by the Debtors. According to the MOU, the Defendant was entitled to such payment regardless of whether the "endorsement" contributed in any way to the sale of any BabyJet. A true and correct copy of the MOU is attached to the

---

[1] At present, the Wallet contains 2999.00041 BTC, consisting of the originally transferred BTC net of a small withdrawal.

- 3 -

MOTION FOR ISSUANCE OF RIGHT TO ATTACH ORDER AND WRIT OF ATTACHMENT

Declaration of Victor Delaglio (the "Delaglio Declaration") as **Exhibit A** and is incorporated herein by reference. At the time the MOU was executed, HFT was offering the BabyJets for sale with a base price of approximate $5,600 or 56 BTC.

5. On or about August 8, 2013, the Defendant began posting comments regarding HFT and the Debtors' products on Bitcointalk.org under a thread titled "HashFast Endorsement." Between August 8, 2013, and September 9, 2013, the Defendant posted a total of 160 comments and updates (an average of five posts per day) regarding, among other topics, the roll-out and sale of the BabyJet. The Defendant's posts, however, were not limited to salient matters; rather, the Defendant also engaged "trolls" in irrelevant and lengthy debate regarding numerous topics, including, but not limited to, economics and the philosophy underlying Bitcoin. The irrelevant commentary accounts for a substantial portion of the approximately 160 posts, a true and correct sample of which is attached to the Delaglio Declaration as **Exhibit B** and incorporated herein by reference. A review of the "HashFast Endorsement" thread suggests that few individuals utilized the forums and/or reviewed the Defendants' postings in deciding whether to purchase the Debtors' products.

6. In or about early September 2013, the Debtors pre-sold the first 550 BabyJets.

7. On or about September 4, 2013, the Defendant requested payment in accordance with the MOU. A true and correct copy of the correspondence is attached to the Delaglio Declaration as **Exhibit C** and is incorporated herein by reference. The Defendant calculated that he was owed a total of $308,000 in BTC at the exchange rate applicable on August 8, 2013 (the date of the first post), and, thus, requested payment of 3242.1 BTC within seven days.

8. The Debtors thereafter transferred a total of 3000 BTC to the Defendant (the so-called "MOU Payment") from two different Bitcoin wallets belonging to HFT. The Debtors made the MOU Payment via four transfers into a Bitcoin wallet specified by the Defendant[2] bearing account number xUDJ9 (the so-called "Wallet")—specifically: (a) 2000 BTC on September 5, 2013; (b) 250 BTC on September 14, 2013; (c) 250 BTC on September 22, 2013;

---

[2] A true and correct copy of the correspondence in which the Defendant specifies the BTC wallet for payment is attached to the Delaglio Declaration as **Exhibit D** and is incorporated herein by reference.

- 4 -

and (d) 500 BTC on September 23, 2013 (collectively, the "Transfers"). A true and correct copy of the transaction record for the Wallet is attached to the Delaglio Declaration as **Exhibit E** and is incorporated herein by reference. With the exception of one BTC, the transferred BTC remain in the Wallet and, to the best of the Debtors' knowledge, have never been moved out of the Wallet. *See* Ex. E. The Debtors' are informed and believes that the Defendant has access to the Wallet and the BTC contained therein, and possesses the authority to transfer such BTC.

9. At the time of the Transfers, the BTC were worth approximately $363,000.[3] Thus, under the MOU, the Defendant received approximately $11,370 per day or $2,274 per post.

10. At or about the time the Defendant was "endorsing" the Debtors and their products, the Debtors attempted to recruit other persons to provide the same or similar services. A true and correct copy of an example of such correspondence is attached to the Delaglio Declaration as **Exhibit F** and is incorporated herein by reference. However, in stark contrast to the MOU Payment, the other parties were offered $150 or approximately one (1) BTC *per week* (approximately 0.0014% of the compensation paid to the Defendant) to post two to four comments per a day on certain online discussion boards or forums—roughly $21.43 per day or $10.71 per post (based on two comments per day). *See* Ex. F.

11. After accepting numerous orders (including the 550 orders upon which the MOU Payment was purportedly based), the Debtors were unable to fulfill many of the orders on or before the guaranteed delivery date, which led to demands for refunds in early 2014. As the Debtors lacked sufficient funds to pay all the refunds requested and remained unable to fill customer orders, multiple lawsuits were commenced against the Debtors.[4]

12. Ultimately, the failure to fulfill customer orders and the commencement of multiple lawsuits resulted in the commencement of an involuntary bankruptcy case under chapter

---

[3] On September 5, 2013, one BTC was worth $120.5333 (US). On September 14, 2013, one BTC was worth $124.0813 (US). On September 22, 2013, one BTC was worth $122.651 (US). On September 23, 2013, one BTC was worth $122.2235 (US). See Historical Bitcoin Price Index, available at http://www.coindesk.com/price/ (last visited Dec. 22, 2014).

[4] Like many other customers, the Defendant requested a refund of the $36,000 he paid in association with his order for four terra-hash per second of hashing power by the acquisition of eight Golden Nonce processors or three to four fully assembled BabyJets. The Defendant received a full refund of the purchase price plus a five percent (5%) bonus on or about January 10, 2014.

7 of title 11 of the United States Code (the "Bankruptcy Code") against HFT (the "HFT Bankruptcy") on or about May 9, 2014 (the "HFT Petition Date"). On or about June 3, 2014, HFT consented to entry of an order for relief and converted the HFT Bankruptcy to one under chapter 11. HF filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "HF Bankruptcy") on or about June 6, 2014 (the "HF Petition Date").

13. The Court entered an order substantively consolidating the bankruptcy estates in the Bankruptcy Cases (collectively, the "Estate") on or about September 28, 2014.

14. The Debtors commenced the Adversary Proceeding to recover the 3000 BTC transferred to the Defendant pursuant to the MOU on or about February 17, 2015. In the complaint (the "Complaint"), the Debtors seek to avoid the Transfers under multiple theories, including as a constructive fraudulent transfer under California law.[5] Docket Entry ("D.E.") 1 at Count 3.

## III. DISCUSSION

Fed. R. Civ. P. 64 provides in pertinent part that "[a]t the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment." Fed. R. Civ. P. 64(a). Attachment and sequestration are among the remedies within the gamut of Fed. R. Civ. P. 64. *See* Fed. R. Civ. Pro. 64(b).

Under California law, a pre-judgment attachment is "a provisional remedy to aid in the collection of a money demand." *Blastrac, N.A. v. Concrete Solutions & Supply*, 678 F.Supp.2d 1001, 1004 (C.D. Cal. 2012) (citations omitted). To warrant the issuance of an attachment, the movant must establish:

1. The claim(s) alleged support issuance of an attachment order;
2. Probable validity of the claim(s) substantiating the issuance of the attachment order;
3. The attachment is not sought for a purpose other than the recovery on the claim(s) upon which the attachment is based; and

---
[5] The claims asserted in the Adversary Proceeding are not subject to any automatic stay under the Bankruptcy Code and have not been discharged or otherwise waived. *See* Cal. Civ. P. Code §484.020(d).

- 6 -

MOTION FOR ISSUANCE OF RIGHT TO ATTACH ORDER AND WRIT OF ATTACHMENT
605883610.1
US_102134604v2
Case: 15-03011  Doc# 5  Filed: 02/19/15  Entered: 02/19/15 10:45:47  Page 6 of 12

4. The amount to be secured by the attachment is greater than zero.

Cal. Civ. P. Code § 484.090(a). Each element is satisfied here.

### A. California Fraudulent Transfer Claim Permits Attachment

Pursuant to CC § 3439.07(a), "[i]n an action for relief against a transfer or obligation under this chapter, a creditor ... may obtain: ... (2) [a]n attachment or other provisional remedy against the asset transferred or its proceeds in accordance with the procedures" described in CCP § 481.010, *et seq*. The third cause of action in the Complaint seeks to recover the Transfers (i.e., the actual BTC paid to the Defendant in accordance with MOU) under 11 U.S.C. § 544 and CC §§ 3439.05 and 3439.07. Accordingly, attachment is an available remedy.

### B. The Fraudulent Transfer Claim is Valid

In order to establish the "probable validity of the claim upon which the attachment is based," the Debtors need only show that it is more likely than not that it will obtain a judgment against Defendant. *See* Cal. Code Civ. Proc. §§ 481.190 and 484.090(a)(2); *see also Blastrac*, 678 F.Supp.2d. at 1005; *Kemp Bros. Const. Inc. v. Titan Elec. Corp.*, 146 Cal.App.4th 1474, 1476 (2007). Here, the Debtors assert causes of action to avoid the Transfers under CCP §§ 3439.04 and 3439.05.

    1. The Debtors are Likely to Succeed on a Constructive Fraud Theory Pursuant to Cal. Civ. Code § 3439.05

In order to sustain a claim for constructive fraudulently transfer under CC § 3439.05, the claimant must prove by a preponderance of the evidence that: (1) the debtor held an interest in the property transferred; (2) the transfer occurred within four years of the petition date; (3) the transferor was insolvent at the time of the transfer or became insolvent as a result of the transfer; and (4) the transferor received less than reasonably equivalent value for the property transferred. Cal. Civ.Code §§ 3439.05 and 3439.09; *Greenspan v. Orrick, Herrington & Sutcliffe LLP, et al. (In re Brobeck, Phleger & Harrison LLP)*, 408 B.R. 318, 340-341, 347 (Bankr. N.D. Cal. 2009).

It is beyond dispute that the BTC transferred to the Defendant belonged to the Debtors and that the Transfers occurred within four years of the HFT Petition Date. It is also beyond dispute

that at the time of the Transfers, the Debtors were unable to meet their obligations to creditors and vendors, and were insolvent based on their assets and outstanding liabilities. Indeed, as of September 30, 2013, the Debtors' balance sheet had a negative equity balance of about $5 million.

Thus, the remaining issue is whether the "services" provided by the Defendant were worth 3000 BTC. "Determining whether a debtor received a reasonably equivalent value is a two-step process." *Greenspan*, 408 B.R. at 341. First, the Court must determine whether the debtor received any "value" in exchange for the transfer. *Id.* Under California law, the satisfaction of an antecedent debt constitutes "value." Cal. Civ. Code § 3439.03. In the instant case, the Transfer was paid to satisfy the amount owing under the MOU (an antecedent debt). Thus, the Debtors received "value" for the MOU Payment.

Second, "if there was value in exchange, the court must determine whether the value of what was transferred was reasonably equivalent to what the debtor received." *Greenspan*, 408 B.R. at 341. "Reasonable equivalence does not require exact equality in value, but means 'approximately equivalent' or 'roughly equivalent.'" *Id.* "Because the policy behind fraudulent transfer law is to preserve assets of the estate, reasonably equivalent value is determined from the standpoint of creditors; it is not determined from the defendant's perspective." *Brandt v. nVidia Corp. (In re 3dfx Interactive, Inc.)*, 389 B.R. 842, 863 (Bankr. N.D. Cal. 2008), *citing Frontier Bank v. Brown (In re Northern Merch., Inc.)*, 371 F.3d 1056, 1059 (9th Cir. 2004) (proper focus is on the net effect of the transfers on debtor's estate and the funds available to unsecured creditors); *see Kirkland v. Risso*, 98 Cal.App.3d 971, 977, 159 Cal.Rptr. 798 (1979) (California courts apply same standard). "The determination of reasonable equivalence must be made as of the time of the transfer." *Greenspan*, 408 B.R. at 342, *citing BFP v. Resolution Trust Corp.*, 511 U.S. 531, 546 (1994).

As with the other elements, it is beyond reasonable dispute that the Debtors did not receive "value" "reasonably equivalent" to the 3000 BTC paid to the Defendant. Simply put, the "services" provided by the Defendant were minimal while the compensation was astronomical.

Over the period of approximately one month, the Defendant "endorsed" HFT by posting comments on Bitcointalk.org relating to HFT and the Debtors' products as well as numerous irrelevant topics. In exchange for these often brief and irrelevant comments, the Defendant received 3000 BTC in or about September 2013. At the time of the Transfers, the BTC transferred to the Defendant were worth $363,861.43.[6] In other words, the Defendant received approximately ***$11,370 per day*** or ***$2,274 per post***.

In addition to the fact that the compensation was astronomical, the compensation paid to the Defendant was completely out of line with the compensation offered to other Bitcoin commentators to provide the same or similar services. At or about the time the Defendant was posting his "endorsements," the Debtors sought to employ other parties to endorse HFT and the Debtors' products on Bitcoin-related forums. As consideration, the Debtors offered these other parties $150 or approximately 1 BTC *per week*—approximately *0.0014% of the compensation paid to the Defendant*. The disparity between the MOU Payment and the compensation offered to others to provide the same service(s) as the Defendant demonstrates that the "services" provided by the Defendant were not reasonably equivalent in value to the MOU Payment. Indeed, based on the offers to other endorsers, it appears that the <u>MOU Payment was approximately **700 times** the reasonable value of the Defendant's endorsement</u>.

Finally, there is no evidence that the Defendant's "endorsement" resulted in any of the 550 BabyJet sales that purportedly substantiate the MOU Payment and, in fact, the MOU payment was not even predicated on any connection to the 550 sales. Moreover, based on a review of the relevant message board, it appears that few individuals reviewed the message board or relied upon the Defendant's "endorsement" when purchasing a BabyJet—further evidencing the *de minimis* value of the "services" the Defendant rendered.

In sum, the Defendant received more than 3000 BTC (which were worth more than $360,000 at the time of the Transfers and are now worth more than $650,000) from the Debtors while providing little, if any, benefit at a time when the Debtors were insolvent. Thus, based on

---

[6] *See* n. 2, *supra*. At the time of the MOU Payment, the annual salaries for all employees of HFT totaled $852,000 or $71,000 per month (approximately one-fifth of the MOU Payment).

the information available, the Debtors are more likely than not to prevail on the constructive fraudulent transfer claim underlying the request for issuance of a writ of attachment.

2. The Debtors are Also Likely to Succeed on a Constructive Fraud Theory Under Cal. Civ. Code § 3439.04(a)(2)

The Debtors are also likely to succeed on the fraudulent transfer claim asserted under CC § 3439.04(a)(2), which provides:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows: [¶] (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either: (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonable small in relation to the business or transaction. (B) Intended to incur, or believed or reasonably should have believed that he or she [or it] would incur, debts beyond his or her [or its] ability to pay as they became due.

Cal. Civ. Code § 3439.04(a)(2).

The Debtors clearly transferred 3000 BTC to the Defendant in or about September 2013. And the Debtors were indebted to certain creditors at the time of the Transfers and are currently indebted to a number of individuals and entities—a fact that precipitated the Bankruptcy Case.

Accordingly, the questions remain (1) whether the Debtors received "reasonably equivalent value" for the Transfers and (2) whether at the time of the Transfers the Debtors (a) were engaged in a business with unreasonably small capital or (b) intended to incur or reasonably should have anticipated incurring debts beyond its ability to repay as they became due.

As to the first element, and as discussed more fully above, the Debtors received little if any benefit from the Defendant's purported "services" while the Defendant received more than $360,000 in BTC—an amount approximately 700 times more than that offered to others to provide the same or similar "endorsements." Accordingly, the Debtors respectfully submit that the MOU Payment substantially exceeded the value of the "services" rendered.

The present circumstances also satisfy the second element. At the time of the Transfers, the Debtors' operations were in full swing. The Debtors were continuing to take new orders for ASIC processors and BabyJets. The Debtors were also incurring substantial liability to vendors

- 10 -
MOTION FOR ISSUANCE OF RIGHT TO ATTACH ORDER AND WRIT OF ATTACHMENT
Case: 15-03011   Doc# 5   Filed: 02/19/15   Entered: 02/19/15 10:45:47   Page 10 of 12

in an effort to obtain the components necessary to fulfill the orders. Based on the volume of sales and the costs associated with the manufacture of the ASIC and BabyJets, the Debtors had insufficient capital to effectively operate the business—a fact demonstrated by the Debtors' inability to deliver customer orders or pay the refunds and the resulting litigation and bankruptcy as well as the fact that, as of September 30, 2013, the Debtors' balance sheet had a negative equity balance of about $5 million.

Despite unreasonably small capital to operate the enterprise, the Debtors continued to incur debts to customers and vendors in an effort to salvage the operation. More specifically, the Debtors continued to accept customer orders for ASIC processors and BabyJets at a time they were unable to fulfill existing orders and, more importantly, unable to fulfill the orders being accepted. Additionally, in an effort to "right the ship," the Debtors continued to place orders for necessary components without the financial wherewithal to pay such vendors as the invoices became due—a fact that resulted in vendors refusing to deliver or continue manufacturing essential components, including, but not limited to, the ASIC processors themselves.

In sum, the Debtors received less than reasonably equivalent value for the Transfers and paid the MOU Payment at a time that the Debtors were unable to fulfill their other financial obligations and were grossly undercapitalized. Accordingly, the Committee is likely to succeed on its CC § 3439.04(a)(2) cause of action.

C. **The Attachment is not Sought for an Improper Purpose**

By and through the Adversary Proceeding, the Debtors seek to recover the MOU Payment in BTC. Accordingly, the Debtors seek to attach the 3000 BTC in the Wallet to ensure that 3000 BTC are available to satisfy any judgment obtained in the Adversary Proceeding. The Debtors are not seeking to attach the BTC in the Wallet for any other purpose.

D. **The Amount to be Secured is Greater than Zero**

The Debtors seek to attach the 3000 BTC fraudulently transferred to the Defendant pending the adjudication of the Adversary Proceeding. At the time of the Transfers, the BTC

fraudulently transferred to the Defendant were worth more than $350,000. At present, 3000 BTC are worth more than $650,000. Accordingly, the amount to be attached is greater than zero.

## IV. CONCLUSION

Based on the preceding, the Debtors respectfully request that the Court enter an order: (1) granting the Motion in its entirety; (2) issue a right to attach order and authorize the Debtors to attach 2999 BTC held in the Wallet; and (3) granting such further and additional relief the Court deems just and appropriate.

Dated: February 19, 2015

KATTEN MUCHIN ROSENMAN LLP
Jessica M. Mickelsen
Peter A. Siddiqui

By:/s/ Jessica M. Mickelson
Counsel for Debtors and Debtors-In-Possession
HashFast Technologies LLC and HashFast LLC