BRIAN E. KLEIN (SBN 258486)
BAKER MARQUART LLP
10990 Wilshire Boulevard, Fourth Floor
Los Angeles, California 90024
Telephone: (424) 652-7800
Facsimile: (424) 652-7850
Email: bklein@bakermarquart.com

DAVID M. POITRAS, APC (SBN 141309)
JEFFER MANGELS BUTLER & MITCHELL LLP
1900 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-4308
Telephone: (310) 203-8080
Facsimile: (310) 203-0567
Email: dpoitras@jmbm.com

Attorneys for Defendant Dr. Marc A. Lowe

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br>HASHFAST TECHNOLOGIES LLC,<br>a California limited liability company,<br><br>        Debtor and Debtor in Possession<br><br>☐   Affects HASHFAST LLC,<br>        a Delaware limited liability company,<br><br>        Debtor and Debtor in Possession | Case No. 14-30725<br><br>(Substantively Consolidated with<br>In re HashFast LLC, Case No. 14-30866)<br><br>Chapter 11<br>Adversary Case No. 15-03011 |
| HASHFAST TECHNOLOGIES LLC,<br>a California limited liability company, and<br>HASHFAST LLC, a Delaware limited liability<br>company,<br>        Plaintiffs,<br>vs.<br><br>MARC A. LOWE, an individual, aka<br>Cypherdoc and/or Cipherdoc,<br><br>        Defendant. | **DEFENDANT DR. MARC A. LOWE'S<br>MEMORANDUM OF POINTS AND<br>AUTHORITIES IN SUPPORT OF MOTION<br>TO DISMISS COMPLAINT**<br><br>**Hearing Date:**<br>Date:  April 24, 2015<br>Time:  10:00 a.m.<br>Place: 235 Pine St., 22nd Floor<br>           San Francisco, CA 94104<br>Judge: Honorable Dennis Montali |

JMBM | Jeffer Mangels
Butler & Mitchell LLP

# TABLE OF CONTENTS

PAGE

I.   PRELIMINARY STATEMENT ................................................................2

II.  THE LEGAL STANDARD.....................................................................5

III. FIRST CLAIM: THE PREFERENCE CLAIM IS INADEQUATELY ALLEGED ..........6

    A.   Statutory Elements of the Preference Claim....................................6

    B.   The First Claim Fails For At Least Two Reasons: The Allegations of
        Insolvency and Insider Status Are Both Inadequate..............................7

        1.   Solvency. ....................................................................7

        2.   Insider Status. ..............................................................8

IV.  THE FRAUDULENT TRANSFER CLAIMS ARE INADEQUATELY ALLEGED......10

    A.   The Statutory Elements of the Fraudulent Transfer Claims. ................10

    B.   Allegations of the Complaint Regarding Insolvency.........................11

        1.   Balance Sheet Insolvency. ..............................................11

        2.   The Unreasonably Small Capital Test. ....................................12

        3.   Equitable Insolvency. ....................................................13

    C.   Allegations of Complaint Regarding Reasonably Equivalent Value. ...................15

V.   THE FIFTH AND SIXTH CLAIMS MUST BE ALSO BE DISMISSED ......................16

VI.  IF THE COMPLAINT IS NOT DISMISSED, THE COURT SHOULD ORDER A
    MORE DEFINITE STATEMENT PURSUANT TO RULE 12(E) .............................16

VII. CONCLUSION....................................................................................17

PRINTED ON
RECYCLED PAPER
LA 11819823v1

# TABLE OF AUTHORITIES

**CASES**                                                             **PAGE(S)**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)............................................................................................ Passim

*Associated Builders, Iinc. V. Alabama Power Co.,*
    505 F.2d 97 (5th Cir. 1974) ................................................................................. 6

*Atlanta Shipping Corporation, Inc. v. Chemical Bank,*
    818 F.2d 240 (2d Cir. 1987) ...............................................................................15

*Bank of California v. Virtue & Scheck, Inc.*
    *190 Cal.Rptr. 54 (1983)*.......................................................................................*15*

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)..................................................................................... Passim

*Gersten v. Rundle,*
    833 F.Supp. 906 (S.D. Fla. 1003) ....................................................................... 6

*In re Carmerica,*
    409 B.R. 737 (Bankr. E.D.N.C. 2008)................................................................. 7

*In re David Jones Builder, Inc.,*
    129 B.R. 682 (Bankr. S.D. Fla. 1991) ................................................................. 7

*In re Enterprise Acquisition Partners, Inc.,*
    319 B.R. 626 (BAP 9th Cir. 2004) ...................................................................... 8

*In re Friedman,*
    126 B.R. 63 (BAP 9th Cir. 1991) .....................................................................8, 9

*In re Koubourlis,*
    869 F.2d 1319 (9th Cir. 1989) ............................................................................. 7

*In re McLaughlin,*
    415 B.R. 23 (Bankr. D.N.H. 2009) ..................................................................... 7

*In re Newman,*
    15 B.R. 658 (S.D.N.Y. 1981) .............................................................................16

*In re Ozark Restaurant Equipment Co., Inc.,*
    850 F.2d 342 (8th Cir. 1988) ..............................................................................16

*In re Pajaro Dunes Rental Agency, Inc.,*
    174 B.R. 557 (Bankr. N.D.Cal. 1994) ...............................................................16

*In re U.S. Medical, Inc.,*
    531 F.3d 1272 (10th Cir. 2008) ........................................................................... 8

PRINTED ON
RECYCLED PAPER
LA 11819823v1

JMBM | Jeffer Mangels Butler & Mitchell LLP

*In re United Energy Corporation,*
    102 B.R. 757 (BAP 9th Cir. 1989) ................................................................15

*In re Weis,*
    92 B.R. 816 (Bankr. W.D. Wis. 1988) ...........................................................7

*Mayors v. Commissioner of Internal Revenue,*
    785 F.2d 757 (9th Cir. 1986) .......................................................................15

*Pefras v. Coca-Cola Co.,*
    456 F.Supp. 2d 1262 (N.D. Ga. 2006) ...........................................................6

**CODES AND STATUTES**
11 U.S.C.
    Section 101(31)................................................................................................8, 9
    Section 544 .....................................................................................................4, 10
    Section 547 ...........................................................................................................6
    Section 547(b) ......................................................................................................6
    Section 547(b)(3) .................................................................................................7
    Section 548(a)(1)(B) .......................................................................................4, 10
    Section 548(a)(1)(B)(II).................................................................................11, 12
    Section 548(a)(1)(B)(III)....................................................................................13
    Section 548(c).......................................................................................................16
    Section 548(d)(2)(A) ..........................................................................................15
    Section 550 ...........................................................................................................4

California Civil Code
    Section 3439.04(a)(2) .......................................................................................4, 10
    Section 3439.04(a)(2)(A) .....................................................................................12
    Section 3439.04(a)(2)(B) .....................................................................................13
    Section 3439.05 ......................................................................................4, 10, 11
    Section 3439.07 ....................................................................................................4
    Section 3439.08 ..................................................................................................16

Federal Rule of Civil Procedure 12(b)(6) .....................................................2, 5, 6
Federal Rule of Civil Procedure 12(e) ..........................................................5, 16

**OTHER AUTHORITIES**

4 *Collier* ¶ 548.09 at 548-116 ................................................................................16
5 Wright & Miller, Federal Practice and Procedure § 1376 ...............................16
5B Wright & Miller, Federal Practice and Procedure § 1357 ...............................6
http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2263707 ...........................3

JMBM | Jeffer Mangels Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER
LA 11819823v1

**PRELIMINARY STATEMENT**

The Complaint should be dismissed.[1]  Plaintiffs HashFast Technologies, LLC and HashFast LLC, both Plaintiffs and Debtors and Debtors in Possession (collectively, "Plaintiffs") have failed to state claims upon which relief can be granted in connection with the six claims they have brought against Defendant Dr. Marc A. Lowe ("Defendant"), as Federal Rule of Civil Procedure 12(b)(6) requires.

Defendant, a longtime and well-regarded ophthalmologist, is one of bitcoin's earliest adopters and most prominent and respected advocates.  In April 2011, he registered as a user with Bitcointalk, the world's leading online forum for discussion of all things bitcoin, securing the user name of "Cypherdoc".  As Defendant became more and more interested in bitcoin, he began posting on Bitcointalk and he got involved in mining bitcoins.  Bitcoin mining works in essence like this: bitcoin miners use special software and hardware to try to solve a complex math problem, and if they are the first to do so, they are issued a certain number of bitcoins in exchange.

In late July 2013, Defendant became aware of Plaintiffs through Plaintiffs' public announcement on Bitcointalk's hardware forum.  In that post, Plaintiffs announced that they were a new business located in San Jose and that they had the premier hardware processing capability necessary to enable miners to work at the highest level.  Within a week, Defendant visited Plaintiffs' facility, and because he believed in Plaintiffs (based on what he saw of and heard from Plaintiffs), he placed the company's very first order for their mining equipment called the BabyJet.  While there, based upon Defendant's stature and influence in the bitcoin marketplace, Plaintiffs (in the exercise of their business judgment to help ensure a successful rollout of the BabyJet) solicited Defendant to publicly endorse the BabyJet in the bitcoin marketplace.  By that time, Defendant had become well-respected on Bitcointalk for, among other things, a series of posts accurately predicting that the price of gold and silver would collapse while the value of bitcoin rose.  In fact, at the time, Defendant was the number three poster, overall in terms of frequency, on Bitcointalk.

---

[1]  A copy of the Complaint (without exhibits) is attached as Exhibit 1 to this Motion.  Capitalized terms not otherwise defined in this Motion have the meanings ascribed to them in the Complaint.

JMBM

Jeffer Mangels
Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER
LA 11819823v1

1  Today, Defendant is the number two poster on Bitcointalk, out of approximately 50,000 Bitcointalk

2  participants.

3      These are not a trivial statistics. In May 2013, an important academic paper that analyzed

4  the Bitcoin community cited Defendant as an "influential member of the Bitcoin community,"

5  http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2263707. That paper, by prominent European

6  academics, notes that Defendant is one of the five most influential members of the Bitcoin

7  community after Bitcoin's pseudonymous founder, Satoshi Nakamoto.[2]

8      Based on the foregoing, Defendant agreed, in good faith, to endorse the initial rollout (batch

9  one of four) of Plaintiffs' first product, the BabyJet. In exchange for Defendant's endorsement and

10  the activities described below, Plaintiffs offered and agreed to pay Defendant a commission set

11  forth in a memorandum of understanding (the "MOU"). Defendant accepted Plaintiffs' offer, and in

12  reliance upon the arms'-length agreement between the parties, Defendant undertook to endorse the

13  BabyJet hardware in accordance with the MOU.

14      On August 8, 2013, Defendant started a new posting thread dedicated to the BabyJet in

15  Bitcointalk's hardware forum, in which, among other things, he posted detailed endorsements of the

16  BabyJet hardware and disclosed that he would be paid for his endorsement. This thread represented

17  the official opening of Plaintiffs' sales of the BabyJet.

18      Defendant's prolific postings on the BabyJet were extremely valuable to Plaintiffs in

19  marketing the BabyJet – he posted hundreds of times in the forum, spread across at least five

20  separate threads. (Bitcointalk represented almost exclusively the extent of Plaintiffs' advertising.)

21  In addition, Defendant informed several subscribers to his Bitcoin newsletter, "Financial Risk

22  Analytics", about Plaintiffs and the BabyJet, a number of whom purchased the BabyJet. He also

23  fielded personal messages and emails from several Bitcointalk followers, a number of whom

24  decided to buy the BabyJet on that basis. Further, throughout this time period, Defendant was

25  advising Plaintiffs on their advertising interactions with the forum. Plaintiffs repeatedly

26  _____

27  [2] *Id.* at 16. Defendant is not explicitly named in the paper because at the time he was only known as
   "Cypherdoc"; however, he is identifiable because the paper acknowledges and references his "Hero

28  member" status on Bitcointalk and his first forum posting date (without identifying him). *Id.* at 12.

PRINTED ON
RECYCLED PAPER
LA 11819823v1

JMBM | Jeffer Mangels
Butler & Mitchell LLP

1  acknowledged the value of his endorsement.  Indeed, as a result, Plaintiffs wanted Defendant to join
2  their "Board of Advisors" after the completion of the sales of the first batch of BabyJets, which
3  occurred in late August, although he did not do so.

4      As a result of Defendant's manifold and extensive efforts, the initial run of 550 BabyJets
5  sold out in 17 days (from August 8-25), and Defendant received payment for his services per the
6  terms of the MOU, albeit late and spread out during September 2013.  Rather than dollars, he
7  accepted 3,000 bitcoins.  During this time period, one bitcoin was worth approximately $100,[3] and
8  thus he received approximately $300,000 in bitcoins.  This was a 10% commission on total sales
9  completed, not a flat fixed payout unrelated to performance or estimated sales.

10     Throughout this time period, Defendant believed Plaintiffs would deliver the BabyJet on
11 time and that they would perform at the level Plaintiffs said they would.  It was not until late
12 December 2013 that Defendant became concerned that Plaintiffs would not be able to deliver the
13 BabyJet in a timely manner, and he voiced those concerns, both on Bitcointalk and directly to
14 Plaintiffs.  (December 31, 2013 was the previously publicly announced delivery/refund date.)
15 Ultimately, when it became clear that Plaintiffs would not meet the delivery deadline, in accordance
16 with the broadly known refund policy, Defendant requested a refund in January 2014 of the $36,000
17 he had paid to purchase his four BabyJets.  Like a number of others, Defendant received a full
18 refund shortly after requesting one.

19     The claims at issue in the Complaint are: (1) Avoidance of Preferential Transfers; (2)
20 Avoidance of Fraudulent Transfers, 11 U.S.C. Section 544 and Cal. Civil Code Section
21 3439.04(a)(2); (3) Avoidance of Fraudulent Transfers (Constructive Fraud), 11 U.S.C. § 544 and
22 California Civil Code § 3439.05; (4) Avoidance of Fraudulent Transfers (Constructive Fraud), 11
23 U.S.C. § 548(a)(1)(B); (5) Recovery of Avoided Transfers, 11 U.S.C. § 550; and (6) Recovery of
24 Avoided Transfers, California Civil Code § 3439.07.  Each of these claims fails to state a claim
25 upon which relief can be granted and thus each is fatally defective.  The first claim does not
26 properly allege either insolvency or insider status.  The second through fourth claims have a number

27

28  [3] The price of bitcoin fluctuated a lot during this time period.

JMBM | Jeffer Mangels Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER
LA 11819823v1

1  of failings, including failing to allege adequately balance sheet insolvency, unreasonably small

2  capital, equitable insolvency, and reasonably equivalent value. The last two claims fail because

3  they are dependent on the success of the first four claims, which are all fundamentally defective.

4      For these reasons, the Complaint should be dismissed, pursuant to Rule 12(b)(6). Absent an

5  outright dismissal, Plaintiffs should be required, pursuant to Rule 12(e), to provide a more definite

6  statement as to, at a minimum, solvency, Defendant's alleged insider status, and reasonably

7  equivalent value.

## II.

## THE LEGAL STANDARD

10      The purpose of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is to test

11  the legal sufficiency of the Complaint. Rule 12(b)(6) requires dismissal of a claim when the party

12  has "failed to state a claim upon which relief can be granted."

13      The applicable standard regarding a Rule 12(b)(6) motion to dismiss is found in *Bell Atl.*

14  *Corp. v. Twombly,* 550 U.S. 544 (2007), and *Ashcroft v. Iqbal,* 556 U.S. 662 (2009) (collectively,

15  the "*Twombly/Iqbal* Standard"). Under *Twombly,* to survive a Rule 12(b)(6) motion, a complaint

16  must state enough facts to state a cause of action that is "plausible on its face." *Twombly,* 550 U.S.

17  at 570. A plaintiff must "nudge his claim across the line from conceivable to plausible." *Id.* "A

18  claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

19  the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S.

20  662, 678 (citing *Twombly,* 550 U.S. at 556). A complaint that contains only "labels and

21  conclusions" or a "formulaic recitation of the elements or cause of action" or "naked assertions

22  devoid of further factual enhancement" is insufficient to withstand a Rule 12(b)(6) motion. *Id.* at

23  678 (quoting *id.* at 555, 557). Under the *Twombly/Iqbal* Standard, "the tenet that a court must

24  accept as true all of the allegations contained in a complaint is inapplicable to a legal conclusion."

25  *Id.*

26      Pursuant to the *Twombly/Iqbal* Standard, a court is required to apply a two-prong test when

27  evaluating a Rule 12(b)(6) motion. First, a court should accept as true all well-pled factual

28  allegations, but the court also must disregard all legal conclusions "clothed in factual garb."

JMBM | Jeffer Mangels Butler & Mitchell LLP

1    Second, a court should determine whether the well-pled factual allegations state a plausible claim

2    for relief. *Id.* Further, any well-pled factual allegations, while assumed to be true, "must be enough

3    to raise a right to relief above the speculative level." *Twombly,* 550 U.S. 545.[4]

## III.

5    <u>**FIRST CLAIM: THE PREFERENCE CLAIM IS INADEQUATELY ALLEGED**</u>

6         A.    <u>**Statutory Elements of the Preference Claim.**</u>    Plaintiffs' first claim for relief is for

7    Avoidance of Preferential Transfers, pursuant to 11 U.S.C. § 547(b) (the "<u>First Claim</u>"). In the First

8    Claim, Plaintiffs seek to avoid an alleged $37,800 payment made to Defendant on or about January

9    10, 2014, on a date that Plaintiffs admit is outside the 90 day period prior to the petition date (but

10    within one year of the petition date). (Compl. ¶¶ 25-33.) To properly establish a claim under

11    Section 547, which Plaintiffs fail to do, the Complaint must contain well-pled factual allegations

12    that establish the following elements, per Section 547:

13         (b)    Except as provided in subsection (c) and (i) of this section the trustee may avoid any

14                 transfer of an interest of the debtor in property –

15             (1)    to or for the benefit of a creditor;

            (2)    for or on account of an antecedent debt owed by the debtor before such

16                 transfer was made;

            (3)    **made while the debtor was insolvent;**

17             (4)    made –

18                     (A)    on or within 90 days before the date of the filing of the petition; or

                (B)    **between 90 days and one year before the date of the filing of the**

19                            **petition, if such creditor at the time of such transfer was an**

                       **insider; and**

---

[4]   While a court, in considering a Rule 12(b)(6) motion must view the allegations in a light most favorable to plaintiffs, "it is clear that the [] judge does not have to accept each and every allegation in the complaint as true in considering its sufficiency." 5B Wright & Miller, Federal Practice and Procedure § 1357; *see also Gersten v. Rundle,* 833 F.Supp. 906, 910 (S.D. Fla. 1003) (noting exceptions to the general rule that allegations in the complaint are accepted as true "such as when the facts alleged are internally inconsistent or when they run counter to facts of which the Court can take judicial notice." Conclusory allegations and unwarranted deductions of fact also are not accepted as true"); *Pefras v. Coca-Cola Co.,* 456 F.Supp. 2d 1262, 1269 (N.D. Ga. 2006) ("conclusory allegations and unwarranted deductions of fact are not admitted as true.") (quoting *Associated Builders, Inc. v. Alabama Power Co.,* 505 F.2d 97, 100 (5th Cir. 1974)).

PRINTED ON
RECYCLED PAPER
LA 11819823v1

JMBM | Jeffer Mangels Butler & Mitchell LLP

|     | (5) | that enables such creditor to receive more than such creditor would receive if |
| --- | --- | --- |
|     | (A) | the case were a case under chapter 7 of this title; |
|     | (B) | the transfer had not been made; and |
|     | (C) | such creditor received payment of such debt to the extent provided by the provisions of this title. |

(Emphasis added).

**B.    The First Claim Fails For At Least Two Reasons: The Allegations of Insolvency and Insider Status Are Both Inadequate.**    Taken together, or separately, there are at least two reasons that the First Claim fails.  These two grounds concern the inadequate allegations regarding solvency and insider status.

**1.    Solvency.**    The Complaint fails to allege adequately that one or both Plaintiffs were insolvent on the date of the transfer (January 10, 2014).  To prevail on the First Claim, Plaintiffs must allege specific facts to establish that Plaintiffs were balance sheet insolvent on the date of the alleged preferential transfer, which Plaintiffs do not do.

"Inability to pay debts in the ordinary course of business is insufficient to establish insolvency [under 547(b)(3)] – there must be evidence that assets, at fair valuation, * * * are exceeded by the debts." *In re Koubourlis,* 869 F.2d 1319, 1322 (9th Cir. 1989): *see also In re McLaughlin,* 415 B.R. 23 (Bankr. D.N.H. 2009).  In addition to the need to establish balance sheet insolvency, "[i]nsolvency must be established on the dates of each transfer or continuously for the periods of the transfers."  *In re David Jones Builder, Inc.,* 129 B.R. 682, 689 (Bankr. S.D. Fla. 1991); *see also In re Carmerica,* 409 B.R. 737, 752 (Bankr. E.D.N.C. 2008) ("The avoidance of a preferential transfer is contingent on the debtor being insolvent on the date of the transfer."); *In re Weis,* 92 B.R. 816, 819 fn.5 (Bankr. W.D. Wis. 1988) (requiring the trustee to "establish the debtor's insolvency on the date the transfer which he seeks to avoid was made").

The last sentence of paragraph 20 of the Complaint sets forth the sum total of Plaintiffs' factual allegations concerning balance sheet solvency/insolvency.  There, Plaintiffs baldly allege that "[a]s of September 30, 2013, [Plaintiffs'] balance sheet had a negative equity balance of about

PRINTED ON
RECYCLED PAPER
LA 11819823v1

1   $5 million."[5] On its face, this unsupported conclusory statement ("negative equity balance **of about**

2   **$5 million**" (emphasis added)), does not satisfy the first prong of the *Twombly/Iqbal* Standard.

3   Moreover, the naked statement says nothing about Plaintiffs' purported insolvency as of the date of

4   the alleged transfer, January 10, 2014.

5          Accordingly, the First Claim should be dismissed on these grounds.

6          **2.      Insider Status.**   Insider is defined in Section 101(31) of the Bankruptcy

7   Code.  As is apparent from the statute, Defendant is not a statutory insider.   To be considered a

8   "non-statutory insider," Plaintiffs must allege facts to establish the parties did not deal with each

9   other at arms-length and that the parties had such a close business or personal relationship "[c]lose

10  enough to gain an advantage attributable simply to affinity rather than to the course of business

11  dealings between the parties." *In re Friedman,* 126 B.R. 63, 70 (BAP 9th Cir. 1991); *In re*

12  *Enterprise Acquisition Partners, Inc.,* 319 B.R. 626, 631 (BAP 9th Cir. 2004) (to be considered a

13  non-statutory insider a plaintiff must show " . . . [a] sufficiently close relationship with the debtor

14  that . . . conduct is made subject to closer scrutiny than those dealing at arm's length with the

15  debtor.") (internal citation omitted).  "So long as the parties transact their business at arm's length,

16  such circumstances do not necessarily give rise to insider status even though there was some degree

17  of personal relationship with the debtor." *In re U.S. Medical, Inc.,* 531 F.3d 1272, 1278 (10th Cir.

18  2008).

19         The purported factual allegations set forth in the Complaint concerning Defendant being an

20  insider are set forth at paragraphs 13 and 29 of the Complaint and are as follows:

21         13.     In addition to the business relationship established by the MOU,
            the Defendant also purports to have joined HFT's board of advisors in late-July or
22          early-August 2013.  As the Defendant stated in a post dated August 8, 2013: 'I
            have been asked to join [HFT's] Board of Advisors.' * * * [Plaintiffs] allege
23          that the Defendant had direct and regular contact with [Plaintiffs] members,
            principals, directors, and employees – individuals generally unavailable to
24          ordinary customers and creditors.

25

26  _____

27  [5]  Paragraph 32 of the Complaint states, in part, that "[Plaintiffs] were and still are insolvent and
    unable to pay general unsecured creditors in full . . ."  This allegation is simply an unsupported legal
28  conclusion and states no temporal relationship to the alleged transfer at issue in the First Claim.

PRINTED ON
RECYCLED PAPER
LA 11819823v1

JMBM | Jeffer Mangels
Butler & Mitchell LLP

29. By virtue of his involvement with one or both of [Plaintiffs], including their members, principals, directors and employees, the Defendant constituted an insider within the meaning of 11 U.S.C. § 101(31) at the time of the Refund as the Defendant possessed authority and/or influence over [Plaintiffs] and their principals, and was previously engaged in a joint venture with [Plaintiffs] pursuant to the MOU for the sale of the first 550 BabyJets.

The foregoing allegations do not satisfy the first-prong of the *Twombly/Iqbal* Standard for the following four important reasons. First, the Complaint does not state that Defendant was in fact a member of Plaintiffs' Board of Advisors (nor could it because there is no written board agreement and Defendant never attended any board meetings). And even if Defendant was (of which there is no proof offered nor could there be), such an allegation, in and of itself, does not establish that Defendant was an insider at the time of the January 10, 2014 transfer (or any time for that matter). Second, whether or not the Defendant "had direct and regular contact with [Plaintiffs'] members, principals, directors, and employees – individuals generally unavailable to ordinary customers and creditors", as Plaintiffs allege in paragraph 13, does not plausibly establish that Defendant was an insider of Plaintiffs within the meaning of Section 101(31). Contact/access to insiders does not equal being an insider, and Plaintiffs can offer no credible legal support otherwise.[6] Third, the allegation in paragraph 29 that "by virtue of his involvement with one or both of [Plaintiffs], including their members, principals, directors and employees, the Defendant constituted an insider within the meaning of 11 U.S.C. § 101(31) at the time of the refund since Defendant possessed authority and/or influence over [Plaintiffs] and their principals" is nothing more than a legal conclusion that is not supported by the misdirected allegation set forth in paragraph 13 of the Complaint. In fact, all of Plaintiffs' customers were able to request refunds after December 31, 2013, with Defendant requesting his in January 2014. Accordingly, it cannot be accepted as true. Fourth, the allegation that Defendant "**was previously engaged in a joint venture** with [Plaintiffs] pursuant to the MOU for the sale of the 550 BabyJets", as Plaintiffs claim in paragraph 29 (emphasis added), has no factual or legal basis to support that Defendant and Plaintiffs were ever

---

[6] "[C]loseness alone does not give rise to insider status." *Friedman* at 274.

- 9 -

1   engaged in a joint venture. Even if they were (which there is no proof nor could there be), such a

2   joint venture (without more) did not cause Defendant to become an "insider" of Plaintiffs.

3          The First Claim should also be dismissed on these grounds.

4                                          **IV.**

5   **THE FRAUDULENT TRANSFER CLAIMS ARE INADEQUATELY ALLEGED**

6          **A.     The Statutory Elements of the Fraudulent Transfer Claims.**  Plaintiffs' second

7   claim for relief is for Avoidance of Fraudulent Transfers [11 U.S.C. § 544 and Cal. Civil Code

8   § 3439.04(a)(2)] (the "Second Claim").   Plaintiffs' third claim for relief is for Avoidance of

9   Fraudulent Transfers (Constructive Fraud) [11 U.S.C. § 544 and Cal. Civil Code § 3439.05] (the

10  "Third Claim").   Plaintiffs' fourth claim for relief is for Avoidance of Fraudulent Transfers

11  (Constructive Fraud) [11 U.S.C. § 548(a)(1)(B)] (the "Fourth Claim") (collectively, the "Fraudulent

12  Transfer Claims").   Through the Fraudulent Transfer Claims, Plaintiffs seek to avoid alleged

13  payments to Defendant totaling $308,000, which payments were made on September 5, 14, 22, and

14  23, 2014 (the "Payments").   As set forth below, Plaintiffs have failed to plead the necessary

15  elements to state a fraudulent transfer claim (for any of the Fraudulent Transfer Claims) upon which

16  relief can be granted.

17         Under 11 U.S.C. § 548(a)(1)(B) (the Fourth Claim), a plaintiff may avoid a transfer if the

18  debtor:

19     (i)     received less than a reasonably equivalent value in exchange for such transfer or
20             obligation; and

       (ii)    (I)    was insolvent on the date that such transfer was made or such obligation was
21                    incurred, or became insolvent as a result of such transfer or obligation;

22             (II)   was engaged in a business or a transaction, or was about to engage in
                     business or a transaction, for which any property remaining with the debtor
23                    was an unreasonably small capital;

               (III)  intended to occur, or believed that the debtor would incur, debts that would
24                    be beyond the debtor's ability to pay as such debts matured; or

25             (IV)   made such transfer to or for the benefit of an insider, or incurred such
                     obligation to or for the benefit of an insider, under an employment contract
26                    and not in the ordinary course of business (this IVth provision is not pled or
                     otherwise applicable herein).

27         Similarly, under California Civil Code § 3439.04(a)(2) (the Second Claim), a transfer is

28  fraudulent as to present and future creditors if it was made:

PRINTED ON
RECYCLED PAPER
LA 11819823v1

JMBM | Jeffer Mangels Butler & Mitchell LLP

(i)      without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either:

(ii)    (A)    was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

         (B)    intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

And under California Civil Code § 3439.05 (the Third Claim), a transfer is fraudulent as to a present creditor of the debtor:

(i)      if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

**B.**     **Allegations of the Complaint Regarding Insolvency.**

     **1.**      **Balance Sheet Insolvency.** As set forth above, balance sheet insolvency is an element of the Third and Fourth Claims, pursuant to California Civil Code § 3439.05 and 11 U.S.C. § 548(a)(1)(B)(ii). Plaintiffs' failure to properly plead balance sheet insolvency should result in the Third Claim being dismissed in its entirety, since the only test for insolvency set forth in 3439.05 is the balance sheet test.

     Regarding the allegations in the Complaint concerning balance sheet insolvency, Defendant incorporates the argument set forth above concerning the preference claim in full. In sum, Plaintiffs' unsupported conclusory statement that "[a]s of September 30, 2013, the [Plaintiffs'] balance sheet had a negative equity balance **of about** $5 million (emphasis added)" does not satisfy the first prong of the *Twombly/Iqbal* Standard. Plaintiffs are required to provide more detail and support to pass the first prong of the *Twombly/Iqbal* Standard. Is the balance sheet referred to a consolidated balance sheet? How did it value the assets? Did the referenced balance sheet include the substantial sales that the Complaint admits occurred during August 2013? Plaintiffs fail to answer all of these necessary questions and more in the Complaint. Moreover, similar to the

PRINTED ON RECYCLED PAPER
LA 11819823v1

1  preference claim, the naked statement says *nothing* about Plaintiffs' purported insolvency as of the

2  date of the payments.[7]

3       Thus, the Third Claim should be dismissed, along with the Fourth Claim, to the extent

4  intended to plead balance sheet insolvency.

5       **2.**    <u>**The Unreasonably Small Capital Test**</u>.    As set forth above, the

6  "unreasonably small capital test" is an element of the Second and Fourth Claims, pursuant to

7  California Civil Code § 3439.04(a)(2)(A) and 11 U.S.C. § 548(a)(1)(B)(II).    Regarding

8  unreasonably small capital, paragraph 40 of the Complaint sets forth the sum total of the factual

9  allegations concerning the unreasonably small capital test for the Second Claim, and it states as

10  follows:

11      40.    At the time of the Transfers, [Plaintiffs] were engaged in the
   designing, manufacture and sale of the GN1 and BabyJet. [Plaintiffs], however,
12  lacked sufficient capital to maintain operations and, as a result, resorted to
   utilizing customer, pre-purchase funds and selling BTC in an effort to maintain
13  operations. Following the payment of the MOU Payment, [Plaintiffs] possessed
   (and still possess) unreasonably small assets in relation to the business and the
14  scale of the transactions required to maintain productivity – a deficiency that
   ultimately led to the failure of the business and bankruptcy.

15
16  The allegation is, on its face, an unsupported legal conclusion, and does not satisfy the first

17  prong of the *Twombly/Iqbal* Standard.    How much capital did Plaintiffs need to maintain

18  operations?    How much capital did Plaintiffs have on the date of the Transfers?    What was the

19  "scale of the transactions required to maintain productivity"?    What specific effect, if any, did the

20  MOU Payment have on Plaintiffs' capital position?    In reality, the MOU Payment had little effect as

21  the payment was merely 10% of the income brought into Plaintiffs' coffers as a result of the

22  services rendered by Defendant on Plaintiffs' behalf.

23

24

---

25  [7]  Paragraph 51 of the Complaint states that "[Plaintiffs] were insolvent at the time of or became
26  insolvent as a result of the Transfers to the Defendant – namely, at the time of or as a result of the
   Transfers, [Plaintiffs] were unable to meet all their obligations as they became due and/or were
27  insolvent on a balance sheet basis due to the fact that their liabilities were greater than their assets."
   This allegation (which includes the only allegation to suggest that the Payments rendered both
28  Plaintiffs to be insolvent) is on its face an unsupported conclusion and does not satisfy the first
   prong of the *Twombly/Iqbal* Standard.

PRINTED ON
RECYCLED PAPER
LA 11819823v1

JMBM | Jeffer Mangels Butler & Mitchell LLP

1  Regarding unreasonably small capital, paragraph 59 of the Complaint sets forth all of the

2  factual allegations concerning the unreasonably small capital test for the Fourth Claim, and it states,

3  in part, as follows:

4      59.    *   *   * As a result of the Transfers, [Plaintiffs] possessed
       unreasonably small capital to continue its business venture, especially in light of
5      [Plaintiffs'] liabilities.

6  This allegation also is, on its face, an unsupported legal conclusion, and it does not satisfy the first

7  prong of the *Twombly/Iqbal* Standard.

8      Accordingly, the Third and Fourth Claims should be dismissed, to the extent such claims

9  intended to plead unreasonably small capital.

10     **3.    Equitable Insolvency.**  As set forth above, "equitable insolvency" is an

11 element of the Second and Fourth Claims, pursuant to California Civil Code § 3439.04(a)(2)(B) and

12 11 U.S.C. § 548(a)(1)(B)(III).   The sum total of Plaintiffs' allegations concerning equitable

13 insolvency is set forth in paragraphs 21, 41, and 60 of the Complaint, and they are inadequate.

14     Paragraph 21, which sets forth substantially all of the factual allegations concerning

15 equitable insolvency, states as follows:

16     21.    Additionally, at or about the time of the Transfers, [Plaintiffs] were
       incurring significant liabilities in the course of their operations that ultimately
17     exceeded [Plaintiffs'] ability to repay.  More precisely, despite an inability to
       deliver the BabyJet or GN1, [Plaintiffs'] continued to accept orders for these
18     products and promised guaranteed delivery date that [Plaintiffs] failed to meet.  In
       an effort to meet these timelines, [Plaintiffs] ordered products on expedited
19     delivery schedules, which substantially increased the production costs of the GN1
       and BabyJet.   Due to the increased costs and other associated overhead,
20     [Plaintiffs] were unable to realize a profit from their operations or meet their
       financial and/or delivery obligations.

21     In paragraph 21, Plaintiffs concede that any inability to generally pay their debts as they
22
   became due had nothing to do with the transfers which are the subject of the Complaint, but rather,
23
   were due solely to market factors.  Moreover, the allegation set forth in paragraph 21 is directly at
24
   odds with paragraph 9, which states, in part:
25
26     9.    *   *   * The BabyJet and GN1 chip sold well from the time they
       were launched – specifically, between July and December 2013, [Plaintiffs] sold
       approximately $18,000,000 in computers, chips, and accessories.
27

28

JMBM | Jeffer Mangels
Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER
LA 11819823v1

As set forth in the Complaint, Defendant commenced work for Plaintiffs in early August 2013. (Compl. ¶¶ 11, 14-15.) The "batch one" BabyJet sales subject to the MOU sold out by August 25, 2013, at which point Defendant's services were complete (although he continued to render services in good faith, and without further pay, to see the project through). (Compl. ¶ 15.) Defendant received payment in accordance with the MOU in September 2013. (Compl. ¶¶ 16–17.) According to the Complaint, between September and December 2013, Plaintiffs sold an additional $15,000,000 of product. (Compl. ¶ 9.) In December 2013, Plaintiffs allegedly determined that they could not deliver the BabyJet in time (by the end of December). (Compl. ¶ 22.) Customers then, in January 2014, purportedly began demanding repayment. (Compl. ¶¶ 22-23.) Involuntary bankruptcy cases were filed against Plaintiffs in May 2014, over seven months after the alleged Payments were made, and over four months after Plaintiffs allegedly determined that they could not timely deliver the BabyJet. Based upon the very allegations of the Complaint, no court could, or should, find that Plaintiffs were not generally paying their debts as they came due as of the date of the Payments at issue, or that Plaintiffs believed or reasonably should have believed that they would incur debts beyond their ability to pay as such debts became due. Instead, from August to December 2013, sales were flooding in, and but for the determination some months later that Plaintiffs could not deliver the product on time, there is nothing in the Complaint to support any claim of equitable insolvency on the date of the payments at issue.

In addition, paragraph 21 raises more questions than it answers. At what point in time was the "ultimate" date that Plaintiffs could not generally pay their debts as they came due? When did Plaintiffs determine that they could not make some/all of the guaranteed delivery dates? How does inability to realize a profit translate into equitable insolvency? The answers to these questions are necessary for a properly pled complaint.

The same infirmities set forth in the allegations above are set forth in paragraphs 41 and 60 of the Complaint, in that they are unsupported conclusions that have no temporal connection to the payments at issue. The allegations set forth in paragraphs 21, 41 and 60 simply do not satisfy the first prong of the *Twombly/Iqbal* Standard.

PRINTED ON
RECYCLED PAPER
LA 11819823v1

- 14 -

1    For all of these reasons, the Second and Fourth Claims should be dismissed, to the extent

2    such claims intended to plead equitable insolvency.

3    **C.**   **Allegations of Complaint Regarding Reasonably Equivalent Value.** As set forth

4    above, to prevail on any of the Fraudulent Transfer Claims, Plaintiffs must adequately allege that

5    they did not receive reasonably equivalent value in exchange for such transfer or obligation. For the

6    following reasons, Plaintiffs have not pled the appropriate standard, and based thereon, each of the

7    Fraudulent Transfer Claims should be dismissed.

8    The MOU created a valid and binding contract between Plaintiffs and Defendant. The

9    Complaint does not allege otherwise. According to the Complaint, the triggering event for payment

10   under the MOU (sale of the first 550 "batch one" BabyJets) occurred on August 25, 2013. (Compl.

11   ¶ 15.) Based on the Complaint's allegations, Defendant's performance in accordance with the terms

12   of the MOU created a valid and binding debt in favor of Defendant, payable by Plaintiffs.

13   According to the Complaint, the debt was not paid when due, creating an antecedent debt. (¶¶ 15-

14   17.) It is generally held and understood that payments on account of antecedent debts are not

15   fraudulent transfers under both State and Federal law.[8] "Payment on an antecedent debt is

16   ordinarily not recoverable as a fraudulent transfer, the debt being deemed valid consideration for

17   such payment. 11 U.S.C. § 548(d)(2)(A)." *In re United Energy Corporation*, 102 B.R. 757, 763

18   (BAP 9th Cir. 1989); *see also Mayors v. Commissioner of Internal Revenue*, 785 F.2d 757, 761 (9th

19   Cir. 1986) (quoting *Bank of California v. Virtue & Scheck, Inc.*, 190 Cal.Rptr. 54, 65

20   (1983)(applying California law) ("[t]he essential issue before the jury was whether the entire

21   transaction was enacted in good faith. If the parties in good faith believed that the promise was

22   binding, then the consideration was good")); *Atlanta Shipping Corporation, Inc. v. Chemical Bank*,

23   818 F.2d 240, 249-50 (2d Cir. 1987) ("[f]air consideration is given for an obligation '[w]hen in

24   exchange for such . . . obligation, as a fair equivalent therefor, and in good faith . . . an antecedent

25   debt is satisfied . . . .' In general, repayment of an antecedent debt constitutes fair consideration

26   unless the transferee is an officer, director or major shareholder of the transferor."). Thus, the

---

27

28   [8] Moreover, 11 U.S.C. §548(d)(2)(A) specifically provides that "value" means the satisfaction or a present or antecedent debt.

JMBM

Jeffer Mangels
Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER
LA 11819823v1

1  Payment itself cannot be a fraudulent transfer (and the Complaint does not seek avoidance of the

2  obligation), and each of the Fraudulent Transfer Claims should be dismissed.

3       Moreover, it is unclear from the Complaint whether Plaintiffs are seeking the return of the

4  bitcoins themselves or the amount the parties otherwise agreed as reasonable consideration, the

5  $308,000 paid pursuant to the MOU. If Plaintiffs are entitled to any recovery, which they are not,

6  they may only recover the dollar value on the date of transfer which the Court may find exceeds the

7  value received by Plaintiffs. "All assets involved in the contested transfer should be measured at

8  their market value at the time of transfer. *In re Ozark Restaurant Equipment Co., Inc.,* 850 F.2d

9  342, 344-45 (8th Cir. 1988). Neither appreciation nor depreciation in the value of the assets after

10  the transfer affects the calculation of consideration. *In re Newman,* 15 B.R. 658, 660 (S.D.N.Y.

11  1981); 4 *Collier* ¶ 548.09 at 548-116." *In re Pajaro Dunes Rental Agency, Inc.,* 174 B.R. 557, 578

12  (Bankr. N.D.Cal. 1994); *see also* Cal. Civil Code §3439.08 and 11 U.S.C. §548(c).

13       For all of the above reasons each of the Fraudulent Transfer Claims should be dismissed,

14  since the Complaint does not adequately plead the element concerning reasonably equivalent value.

## V.

### THE FIFTH AND SIXTH CLAIMS MUST BE ALSO BE DISMISSED

17       The remaining two claims are state and federal claims for recovery of any avoided

18  transfer(s). These claims are dependent upon the success or failure of the preceding four claims.

19  Since the first four claims fail, so do these final two claims. Accordingly, the Court should dismiss

20  these claims too.

## VI.

### IF THE COMPLAINT IS NOT DISMISSED, THE COURT SHOULD ORDER A MORE

### DEFINITE STATEMENT PURSUANT TO RULE 12(E)

24       Under Federal Rule of Civil Procedure 12(e), "[a] party may move for a more definite

25  statement of a pleading to which a responsive pleading is allowed but which is so vague or

26  ambiguous that the party cannot reasonably prepare a response." In the event the Complaint is not

27  dismissed, Defendant respectfully requests the Court to order a more definite statement pursuant to

28  Rule 12(e) because the Complaint is "so vague or ambiguous that [Defendant] cannot respond, even

JMBM | Jeffer Mangels Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER
LA 11819823v1

with a simple denial, in good faith without prejudice to [it]self." 5 Wright & Miller, Federal Practice and Procedure § 1376. In large part, the Complaint is a form of "shotgun pleading" generally disfavored by the Courts. Defendant is therefore at least entitled to a more definite statement of the facts and claims alleged against him.

## VII.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed in its entirety for failure to state a claim upon which relief can be granted. Alternatively, the Court should order Plaintiffs to produce a more definite statement of their alleged claims. Defendant prays for relief in accordance with the foregoing and for such other and further relief as the Court may deem just and proper.

Respectfully submitted,

BRIAN E. KLEIN
BAKER MARQUART LLP

- and -

Dated: March 27, 2015

DAVID M. POITRAS, APC
JEFFER MANGELS BUTLER & MITCHELL LLP


By: /s/ David M. Poitras
    DAVID M. POITRAS
    Attorneys for Defendant
    Dr. Marc A. Lowe

PRINTED ON
RECYCLED PAPER
LA 11819823v1

# EXHIBIT 1

KATTEN MUCHIN ROSENMAN LLP
Craig A. Barbarosh (SBN 160224)
craig.barbarosh@kattenlaw.com
650 Town Center Drive, Suite 700
Costa Mesa, CA 92626-7122
Telephone: (714) 966-6822

Jessica M. Mickelsen (SBN 277581)
jessica.mickelsen@kattenlaw.com
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
Telephone: (310) 788-4425
Facsimile: (310) 788-4471

Peter A. Siddiqui (*pro hac vice*)
peter.siddiqui@kattenlaw.com
525 W. Monroe Street
Chicago, IL 60661-3693
Telephone: (312) 902-5455
Facsimile: (312) 902-1061

Counsel for Debtors and Debtors-In-Possession
Hashfast Technologies LLC and HashFast LLC

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**(SAN FRANCISCO DIVISION)**

| | |
|---|---|
| In re:<br><br>HASHFAST TECHNOLOGIES LLC, a California limited liability company,<br><br>    Debtor and Debtor-In-Possession<br><hr><br>☒ Affects HASHFAST LLC, a Delaware limited liability company,<br><br>    Debtor and Debtor-In-Possession<br><hr>HASHFAST TECHNOLOGIES LLC, a California limited liability company, and HASHFAST LLC, a Delaware limited liability company,<br><br>    Plaintiffs,<br><br>    vs.<br><br>MARC A. LOWE, an individual, *aka* Cypherdoc and/or Cipherdoc, | Case No. 14-30725<br><br>(Substantively Consolidated with In re HashFast LLC, Case No. 14-30866)<br><br>Chapter 11<br><br><br><br><br><br><br><br>Adversary Case No. _____<br><br>**COMPLAINT FOR:**<br><br>1.  **AVOIDANCE OF PREFERENTIAL TRANSFERS;**<br>2.  **AVOIDANCE OF FRAUDULENT TRANSFERS;**<br>3.  **AVOIDANCE OF FRAUDULENT TRANSFERS (CONSTRUCTIVE FRAUD); AND**<br>4.  **RECOVERY OF AVOIDED** |

| | |
|---|---|
| 1  Defendant. | ) **TRANSFERS** |
| 2  | ) [11 U.S.C. §§ 544, 547; 548, and 550 and Cal. |
| 3  | ) Civil Code §§ 3439.04, 3439.05, and 3439.07] |
| 4  | ) Status Conference: |
|   | ) Date:    TBD |
| 5  | ) Time:    TBD |
|   | ) Place: Courtroom 22 |
| 6  | ) U.S. Bankruptcy Court |
|   | ) 235 Pine Street |
| 7  | ) San Francisco, CA 94104 |

8                                    **COMPLAINT**

9          HashFast Technologies LLC, a California limited liability company ("HashFast

10   Technologies"), and HashFast LLC, a Delaware limited liability company ("HashFast",

11   collectively with HashFast Technologies, the "Debtors" and each a "Debtor"), by and through its

12   undersigned counsel, bring this complaint (the "Complaint") against Defendant Marc A. Lowe, an

13   individual, a/k/a Cypherdoc and/or Cipherdoc (the "Defendant"), and in support of this Complaint

14   state as follows:

15                                    **JURISDICTION**

16          1.       This adversary proceeding arises out of and is related to the above-captioned,

17   substantively consolidated bankruptcy cases (collectively, the "Bankruptcy Cases") of *In re*

18   *HashFast Technologies, LLC*, case no. 14-30725 DM (the "HFT Bankruptcy Case"), and *In re*

19   *HashFast, LLC*, case no. 14-30866 DM (the "HF Bankruptcy Case"), pending before the United

20   States Bankruptcy Court for the Northern District of California, San Francisco Division (the

21   "Court"), and/or the claims alleged herein arise under title 11 of the United States Code (the

22   "Bankruptcy Code"). This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

23          2.       The causes of action set forth herein constitute core proceedings pursuant to 28

24   U.S.C. § 157(b)(2)(A), (H), and/or (O), and/or relate to the Bankruptcy Cases. To the extent the

25   Court determines that any claim and/or cause of action alleged herein does not constitute a core

26   proceeding, the Debtors hereby consent to this Court's adjudication of the claims and/or causes of

27   action and to the entry of final orders and judgments in this adversary proceeding.

28

2

Case: 15-03011   Doc# 1   Filed: 02/17/15   Entered: 02/17/15 08:51:34   Page 2 of 12
Exhibit 1 - 19
Case: 15-03011   Doc# 16   Filed: 03/27/15   Entered: 03/27/15 16:25:04   Page 23 of 33

3.      Venue is appropriate pursuant to 28 U.S.C. §§ 1391, 1408, and 1409 as this is the district in which the Bankruptcy Cases are pending and in which the relevant conduct complained of herein took place.

4.      On May 9, 2014 (the "Petition Date"), certain petitioning creditors filed a chapter 7 Involuntary Petition in the Court against Hashfast Technologies under title 11 of the Bankruptcy Code [Lead Case Doc. No. 1].

5.      On June 3, 2014, HashFast Technologies filed its Conditional Consent to an Order for Relief [Doc. No. 36] and its Motion to Convert to Chapter 11 [Lead Case Doc. No. 35].

6.      The Bankruptcy Court entered its order converting HashFast Technologies' case to one under chapter 11 of the Bankruptcy Code on June 5, 2014 [Lead Case Doc. No. 40].

7.      On June 6, 2014, HashFast filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

## BACKGROUND

8.      The Debtors design, develop, manufacture and sell certain computer chips and equipment, including Application Specific Integrated Circuit, or ASIC, semiconductors, for the sole purpose of auditing transaction data for the Bitcoin networks, also known as "Bitcoin mining." On or about June 2013, the Debtors began designing their first generation Golden Nonce (the "GN1"), with the assistance of Sandgate Technologies ("Sandgate") and Uniquify, Inc. ("Uniquify"). Following the development of the GN1, the Debtors worked with DXCorr Design (the "DXC") to design and develop subsequent generations of the GN1.

9.      On or about July 2013, HFT began advertising a special purpose computer system built around the GN1 (the "BabyJet") for sale and started accepting orders for the "batch one" BabyJets in early August 2013. The BabyJet and GN1 chip sold well from the time they were launched—specifically, between July and December 2013, the Debtors sold approximately $18,000,000 in computers, chips, and accessories.

10.     On or about July 29, 2013, Defendant Marc A. Lowe ("Defendant") visited the Debtors' headquarters to ostensibly tour the facility and meet the members and employees of HFT prior to purchasing one or more of the Debtors' products. During the tour, the Defendant met with

3

Katten

1  Eduardo de Castro, the Chief Executive Officer of HFT and co-owner of HF. As a result of the
2  visit, the Defendant purchased four terra-hash per second of hashing power through the acquisition
3  of eight GN1 chips or three to four fully assembled BabyJets (the "Computers") for the sum of
4  $36,000, inclusive of sales tax—a $7,150 discount off of the list price (the "Sale"). The Defendant
5  paid the discounted purchase price for the Computers by personal check dated July 29, 2013.

6      11.    Subsequent to the visit, a memorandum of understanding dated August 5, 2013 (the
7  "MOU") was executed by the Defendant and HFT. By and through the MOU, the Defendant
8  agreed to endorse the Debtors and their products by posting comments and responding to certain
9  inquiries on various Bitcoin-related forums and/or message boards, including Bitcointalk.org. In
10 exchange for such "services", the Defendant was to receive ten percent (10%) of the base sale
11 price (i.e., gross sale proceeds) for the first 550 "batch one" BabyJets sold by the Debtors, payable
12 in BTC (the "MOU Compensation"). According to the MOU, the Defendant was entitled to the
13 MOU Compensation regardless of whether the "endorsement" contributed in any way to the sale
14 of any BabyJet or other HFT product. A true and correct copy of the MOU is attached hereto as
15 Exhibit A and is incorporated herein by reference. At the time the MOU was executed, HFT was
16 offering the BabyJets for sale at a base price of approximately $5,600 or 56 BTC.

17     12.    The Debtors are informed and believe and based thereon allege that the Defendant
18 is a medical doctor without any experience marketing or advertising BTC mining hardware or
19 hardware manufacturers.

20     13.    In addition to the business relationship established by the MOU, the Defendant also
21 purports to have joined HFT's board of advisors in late-July or early-August 2013. As the
22 Defendant stated in a post dated August 8, 2013: "I have also been asked to join [HFT's] Board of
23 Advisors." A true and correct copy of the August 8, 2013 post is attached hereto at pages 1-3 of
24 Exhibit B and incorporated herein by reference. The Debtors allege that the Defendant had direct
25 and regular contact with the Debtors' members, principals, directors, and employees—individuals
26 generally unavailable to ordinary customers and creditors.

27     14.    On or about August 8, 2013, the Defendant began posting commentary regarding
28 HFT and the Debtors' products on Bitcointalk.org under a thread titled "HashFast Endorsement."

Katten
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel  310.788.4471 fax

4

1   Between August 8, 2013, and September 9, 2013, the Defendant posted approximately 160

2   comments and updates (an average of 5 posts per day) regarding, among other things, the roll-out

3   and sale of the BabyJet.  The Defendant's posts, however, were not limited to salient matters;

4   rather, the Defendant also engaged "trolls" in irrelevant and lengthy debate regarding numerous

5   topics, including, but not limited to, economics and the philosophy underlying BTC.  The

6   irrelevant commentary accounts for a substantial portion of the approximately 160 posts, a sample

7   of which is attached hereto at pages 3-227 of Exhibit B and incorporated herein by reference.

8       15.    In or about early September 2013, HFT pre-sold the first 550 BabyJets.  Thereafter,

9   on or about September 4, 2013, the Defendant requested payment in accordance with the MOU.  A

10  true and correct copy of the request is attached hereto as Exhibit C and incorporated herein by

11  reference.  The Defendant calculated that he was owed a total of $308,000 in BTC at the exchange

12  rate applicable on August 8, 2013, and requested payment of 3242.1 BTC within seven (7) days.

13      16.    The Debtors were unable to pay immediately the requested amount due to the

14  limited availability of funds and BTC.  Indeed, the Debtors did not make the first distribution of

15  BTC to the Defendant on account of the MOU until September 5, 2013.

16      17.    In total, the Debtors transferred 3000 BTC to the Defendant (the "MOU Payment")

17  from two different BTC wallets belonging to HFT.  The Debtors transferred the MOU Payment to

18  the Defendant via four deposits into a BTC wallet specified by and belonging to the Defendant[1]

19  bearing account number xUDJ9 (the "Wallet")—specifically: (a) 2000 BTC on September 5,

20  2013; (b) 250 BTC on September 14, 2013; (c) 250 BTC on September 22, 2013; and (d) 500

21  BTC on September 23, 2013 (collectively, the "Transfers").  A true and correct copy of the

22  transaction record is attached hereto as Exhibit D and incorporated herein by reference.  With the

23  exception of one BTC, the Transfers are currently in the Wallet and, to the best of the Debtors'

24  knowledge, have never been moved out of the Wallet.

25      18.    At the times of the Transfers, the BTC transferred to the Defendant were worth

26

27

---

[1] A true and correct copy of correspondence from the Defendant identifying the Wallet is attached
hereto as Exhibit E and incorporated herein by reference.

5

Case: 15-03011   Doc# 1   Filed: 02/17/15   Entered: 02/17/15 08:51:34   Page 5 of 12
Exhibit 1 - 22
Case: 15-03011   Doc# 16   Filed: 03/27/15   Entered: 03/27/15 16:25:04   Page 26 of
33

1  $363,861.43. [2]  Based on the value of the BTC at the time of the transfers, the Defendant received

2  approximately $11,370 per day or $2,274 per post on the "HashFast Endorsement" thread on

3  Bitcointalk.org. By contrast, the highest salary paid to any principal or employee of HFT and/or

4  HF was $144,000 for the entire calendar year of 2013.

5      19.    At or about the time the Defendant was "endorsing" the Debtors and their products,

6  the Debtors attempted to recruit other persons to provide the same or similar services. A true and

7  correct copy of such correspondence is attached hereto as Exhibit F and incorporated herein by

8  reference. However, in stark contrast to the MOU Payment, the other parties were offered $150 or

9  a little more than 1 BTC per week (approximately 0.0014% of the compensation paid to the

10 Defendant) to post two to four comments per day on certain online discussion boards or forums—

11 roughly $21.43 per day or $10.71 per post (based on two comments per day).

12     20.    At the time of the Transfers, the Debtors owed substantial sums of money and/or

13 equipment to numerous customers and/or vendors. Many of these obligations remain unpaid and

14 constitute general unsecured claims against the Estate. As of September 30, 2013, the Debtors'

15 balance sheet had a negative equity balance of about $5 million.

16     21.    Additionally, at or about the time of the Transfers, the Debtors were incurring

17 significant liabilities in the course of their operations that ultimately exceeded the Debtors' ability

18 to repay. More precisely, despite an inability to deliver the BabyJet or GN1, the Debtors

19 continued to accept orders for these products and promised guaranteed delivery dates that the

20 Debtors failed to meet. In an effort to meet these timelines, the Debtors ordered products on

21 expedited delivery schedules, which substantially increased the production costs of the GN1 and

22 BabyJet. Due to the increased costs and other associated overhead, the Debtors were unable to

23 realize a profit from their operations or meet their financial and/or delivery obligations.

24 ─────────────────────
[2] On September 5, 2013, one BTC was worth $120.5333 (US). On September 14, 2013, one BTC

25 was worth $124.0813 (US). On September 22, 2013, one BTC was worth $122.651 (US). On
   September 23, 2013, one BTC was worth $122.2235 (US). See Historical Bitcoin Price Index,

26 available at http://www.coindesk.com/price/ (last visited Dec. 22, 2014). As of January 14, 2015,
   the Transfers are worth approximately $555,000, which is based on a value of $185.00 (US) per

27 BTC. See Historical Bitcoin Price Index, available at http://www.coindesk.com/price/ (last visited
   Jan. 14, 2015). As of the commencement of the HF Bankruptcy on May 9, 2014, the Transfers

28 were worth approximately $1,344,705. Id. At the 1-year height in the BTC market in early-
   December 2013, the Transfers had a value in excess of $3,400,000. Id.

22.     Ultimately, the Debtors were unable to fulfill many of the orders on or before the guaranteed delivery date (December 31, 2013), including, but not limited to, many of the "batch one" orders upon which the MOU Payment was premised. As a result, many customers began demanding refunds for their purchases in or about January 2014. As the Debtors lacked sufficient funds and/or BTC to pay all the refunds requested and remained unable to fill customer orders, multiple customers commenced lawsuits against the Debtors in an effort to obtain a refund in currency and/or BTC.

23.     Like many other customers, the Defendant requested a refund of the $36,000 he paid in association with the Sale in or about January 2014. The Defendant received a full refund of the $36,000 purchase price plus a five percent (5%) bonus, for a total of $37,800, on January 10, 2014 (the "Refund"). The Refund was paid from HFT's account at Silicon Valley Bank via a wire transfer to the Defendant.

24.     The Debtors are informed and believe and based thereon alleges that the Defendant currently holds the specific BTC paid by HFT in the Wallet.

## FIRST CLAIM FOR RELIEF

### AVOIDANCE OF PREFERENTIAL TRANSFERS

### [11 U.S.C. § 547(b)]

25.     The Debtors repeat and reallege the allegations contained in Paragraphs 1 through 24 as if fully set forth herein.

26.     At the time of the Refund, the Defendant was a creditor of one or both of the Debtors by virtue of the Sale.

27.     The currency used to pay the Refund constituted property belonging to one or both of the Debtors at the time of its payment.

28.     The Refund was paid on account of an antecedent debt owing to the Defendant as a result of Debtors' inability to fulfill the Sale. More precisely, upon the Debtors' failure to deliver the Computers on or before December 31, 2013, the Defendant became a creditor of the Debtors.

29.     By virtue of his involvement with one or both of the Debtors, including their members, principals, directors and employees, the Defendant constituted an insider within the

7

1  meaning of 11 U.S.C. §§ 101(31) at the time of the Refund as the Defendant possessed authority

2  and/or influence over the Debtors and their principals, and was previously engaged in a joint

3  venture with the Debtors pursuant to the MOU for the sale of 550 BabyJets.

4      30.   The Refund was paid on or about January 10, 2014, within one year of the HFT

5  Petition Date and HF Petition Date (the "Preference Period").

6      31.   As a result of the Refund, the Defendant received payment in full on account of an

7  antecedent debt that would have constituted a general unsecured claim against the Estate if not

8  paid prepetition.

9      32.   If the Refund had not been paid within the Preference Period, the Defendant would

10  not have received the full Refund in the context of a chapter 7 liquidation as the Debtors were and

11  still are insolvent and unable to pay all general unsecured creditors in full, including, but not

12  limited to, the claims relating to refund requests of creditors otherwise similarly-situated to the

13  Defendant.

14      33.   By reason of the foregoing, the Refund is avoidable pursuant to 11 U.S.C. § 547.

15                    **SECOND CLAIM FOR RELIEF**

16               **AVOIDANCE OF FRAUDULENT TRANSFERS**

17            **[11 U.S.C. § 544 and Cal. Civil Code § 3439.04(a)(2)]**

18      34.   The Debtors repeat and reallege the allegations contained in Paragraphs 1 through

19  33 as if fully set forth herein.

20      35.   The Transfers occurred within the four-year period immediately preceding the HFT

21  Petition Date and HF Petition Date.

22      36.   The Defendant received the Transfers, and he continues to hold the BTC

23  transferred in the Wallet.

24      37.   The BTC that comprised the Transfers constituted property belonging to one or

25  both of the Debtors at the time of the Transfers.

26      38.   The Debtors received less than reasonably equivalent value in exchange for the

27  Transfers. More precisely, the value of the "services" provided by the Defendants and received by

28  the Debtors (i.e., posting 160 comments on Bitcoin-related forums over a period of approximately

8

Katten
Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

one month) was less valuable than the consideration provided in exchange for such "services"—namely, BTC worth more than $350,000 at the time of the Transfers.

39.    Several customers and/or vendors held claims against the Debtors at the time of the Transfers, including, but not limited to, Pete Morici.

40.    At the time of the Transfers, the Debtors were engaged in the designing, manufacture and sale of the GN1 and BabyJet. The Debtors, however, lacked sufficient capital to maintain operations and, as a result, resorted to utilizing customer, pre-purchase funds and selling BTC in an effort to maintain operations. Following the payment of the MOU Payment, the Debtors possessed (and still possess) unreasonably small assets in relation to the business and the scale of the transactions required to maintain productivity—a deficiency that ultimately led to the failure of the business and bankruptcy.

41.    Additionally, at the time of the Transfers, the Debtors were incurring substantial liabilities in the operation of their business that exceeded their ability to repay. More precisely, the Debtors were unable to fulfill existing orders for the BabyJets and/or GN1 chip, or remain current with the vendors that manufactured the component parts and/or assembled the Debtors' products at the time of the Transfers. As a result, the Debtors were incurring substantial liabilities, and they lacked the financial capability to repay.

42.    At present, the claims against the Estate total approximately $40,754,674. The total assets presently held are insufficient to pay all the claims against the Estate. Recovery of the Transfers is necessary to satisfy the claims of creditors asserted against the Estate.

43.    By reason of the foregoing, the Transfers are avoidable pursuant to 11 U.S.C. § 544 and Cal. Civil Code § 3439.04.

## THIRD CLAIM FOR RELIEF

### AVOIDANCE OF FRAUDULENT TRANSFERS (CONSTRUCTIVE FRAUD)

### [11 U.S.C. § 544 and Cal. Civil Code § 3439.05]

44.    The Debtors repeat and reallege the allegations contained in Paragraphs 1 through 43 as if fully set forth herein.

45.    The Transfers occurred within the four-year period immediately preceding the HFT

9

Petition Date and HF Petition Date.

46.      The Defendant received the Transfers, and he continues to hold the BTC transferred in the Wallet.

47.      The BTC that comprised the Transfers constituted property belonging to one or both of the Debtors at the time of the Transfers.

48.      The Debtors received less than reasonably equivalent value in exchange for the Transfers.

49.      Several customers and/or vendors held claims against the Debtors at the time of the Transfers, including, but not limited to, Pete Morici.

50.      At present, the claims against the Estate total approximately $40,754,674. The total assets presently held are insufficient to pay all the claims against the Estate. Recovery of the Transfers is necessary to satisfy the claims of creditors asserted against the Estate.

51.      The Debtors were insolvent at the time of or became insolvent as a result of the Transfers to the Defendant—namely, at the time of or as a result of the Transfers, the Debtors were unable to meet all their obligations as they became due and/or were insolvent on a balance sheet basis due to the fact that their liabilities were greater than their assets.

52.      By reason of the foregoing, the Transfers are avoidable pursuant to 11 U.S.C. § 544 and Cal. Civil Code § 3439.05.

## FOURTH CLAIM FOR RELIEF

## AVOIDANCE OF FRAUDULENT TRANSFERS (CONSTRUCTIVE FRAUD)

### [11 U.S.C. § 548(a)(1)(B)]

53.      The Debtors repeat and reallege the allegations contained in Paragraphs 1 through 52 as if fully set forth herein.

54.      The Transfers occurred within the two-year period immediately preceding the HFT Petition Date and HF Petition Date.

55.      The Defendant received the Transfers, and he continues to hold the BTC transferred in the Wallet.

56.      The BTC used to pay the MOU Payment constituted property belonging to one or

10

Case: 15-03011    Doc# 1    Filed: 02/17/15    Entered: 02/17/15 08:51:34    Page 10 of
12
Exhibit 1 - 27
Case: 15-03011    Doc# 16    Filed: 03/27/15    Entered: 03/27/15 16:25:04    Page 31 of
33

Katten
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel  310.788.4471 fax

both of the Debtors at the time of the Transfers.

57.    The Debtors received less than reasonably equivalent value in exchange for the Transfers.

58.    The Debtors were insolvent at the time of or became insolvent as a result of the Transfers to the Defendant.

59.    At the time of the Transfers, the Debtors were engaged or were about to engage in a business and/or transaction relating to the design, manufacture and sale of special purpose BTC mining processors and computers.    As a result of the Transfers, the Debtors possessed unreasonably small capital to continue its business venture, especially in light of the Debtors' liabilities.

60.    At the time of the Transfers, the Debtors incurred further liabilities associated with their business enterprise beyond the Debtors' ability to repay as such debts matured.

61.    By reason of the foregoing, the Transfers are avoidable pursuant to 11 U.S.C. § 548(a)(1)(B).

### FIFTH CLAIM FOR RELIEF

### RECOVERY OF AVOIDED TRANSFERS

### [11 U.S.C. § 550]

62.    The Debtors repeat and reallege the allegations contained in Paragraphs 1 through 61 as if fully set forth herein.

63.    By reason of the foregoing, the Debtors are entitled to recover the Transfers and the Refund for the benefit of the Estate pursuant to 11 U.S.C. § 550(a)(1).

### SIXTH CLAIM FOR RELIEF

### RECOVERY OF AVOIDED TRANSFERS

### [Cal. Civil Code § 3439.07]

64.    The Debtors repeat and reallege the allegations contained in Paragraphs 1 through 63 as if fully set forth herein.

65.    By reason of the foregoing, the Debtors are entitled to recover the Transfers and the Refund for the benefit of the Estate pursuant to California Civil Code § 3439.07.

11

**PRAYER FOR RELIEF**

2     WHEREFORE, the Debtors pray as follows:

3     66.    As to the First Claim for Relief, that the Refund be avoided for the benefit of the

4     Estate;

5     67.    As to the Second Claim for Relief, that the Transfers be avoided for the benefit of

6     the Estate;

7     68.    As to the Third Claim for Relief, that the Transfers be avoided for the benefit of the

8     Estate;

9     69.    As to the Fourth Claim for Relief, that the Transfers be avoided for the benefit of

10    the Estate;

11    70.    As to the Fifth Claim for Relief, that the Estate recover the Transfers and Refund

12    and be awarded damages, and judgment be entered in the Estate's favor against the Defendant,

13    plus interest at the maximum legal rate from the date of each of these payments, or such other

14    amount as shall be shown by proof prior to judgment herein;

15    71.    As to the Sixth Claim for Relief, that the Estate recover the Transfers and Refund

16    and be awarded damages and judgment be entered in the Estate's favor against the Defendant, plus

17    interest at the maximum legal rate from the date of each of these payments, or such other amount

18    as shall be shown by proof prior to judgment herein; and

19    72.    Any and all additional and further relief as this Court may deem just and proper.

20

21    Dated: February 17, 2015           KATTEN MUCHIN ROSENMAN LLP

22                                Jessica M. Mickelsen
                                   Peter A. Siddiqui

23

24                               By:/s/ Jessica M. Mickelsen

25                                 Counsel for Debtors and Debtors-In-Possession
                                 HashFast Technologies LLC and HashFast LLC

26

27

28

Katten

12

Case: 15-03011   Doc# 1   Filed: 02/17/15   Entered: 02/17/15 08:51:34   Page 12 of
12
Exhibit 1 - 29
Case: 15-03011   Doc# 16   Filed: 03/27/15   Entered: 03/27/15 16:25:04   Page 33 of
33