1  BRIAN E. KLEIN (SBN 258486)
   BAKER MARQUART LLP
2  10990 Wilshire Boulevard, Fourth Floor
   Los Angeles, California 90024
3  Telephone: (424) 652-7800
   Facsimile: (424) 652-7850
4  Email:     bklein@bakermarquart.com
5
   DAVID M. POITRAS, APC (SBN 141309)
6  JEFFER MANGELS BUTLER & MITCHELL LLP
   1900 Avenue of the Stars, 7th Floor
7  Los Angeles, California 90067-4308
   Telephone: (310) 203-8080
8  Facsimile: (310) 203-0567
   Email:     dpoitras@jmbm.com
9
10 Attorneys for Defendant Dr. Marc A. Lowe

11            **UNITED STATES BANKRUPTCY COURT**
12            **NORTHERN DISTRICT OF CALIFORNIA**
                 **SAN FRANCISCO DIVISION**
13

| | |
|---|---|
| In re:<br>HASHFAST TECHNOLOGIES LLC,<br>a California limited liability company,<br><br>       Debtor and Debtor in Possession<br><br>☐  Affects HASHFAST LLC,<br>    a Delaware limited liability company,<br><br>       Debtor and Debtor in Possession | Case No. 14-30725<br><br>(Substantively Consolidated with<br>In re HashFast LLC, Case No. 14-30866)<br><br>Chapter 11<br>Adversary Case No. 15-03011 |
| HASHFAST TECHNOLOGIES LLC,<br>a California limited liability company, and<br>HASHFAST LLC, a Delaware limited liability<br>company,<br>       Plaintiffs,<br>vs.<br><br>MARC A. LOWE, an individual, aka<br>Cypherdoc and/or Cipherdoc,<br><br>       Defendant. | **DEFENDANT DR. MARC A. LOWE'S OPPOSITION TO DEBTORS' MOTION FOR ISSUANCE OF RIGHT TO ATTACH ORDER AND WRIT OF ATTACHMENT**<br><br>**Hearing Date:**<br>Date: April 24, 2015<br>Time: 10:00 a.m.<br>Place: 235 Pine St., 22nd Floor<br>      San Francisco, CA 94104<br>Judge: Honorable Dennis Montali |

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

Page(s)

INTRODUCTION ................................................................................................2

FACTUAL BACKGROUND ..............................................................................4

LEGAL STANDARD .......................................................................................10

ARGUMENT ....................................................................................................11

I.     HashFast Has Not Submitted Any Admissible Evidence To Support Attachment ..........11

II.    HashFast Has Not Carried Its Burden to Establish the Probable Validity of its Constructive Fraudulent Transfer Claims................................................................14

        a.    HashFast Has Not Shown Insolvency At The Time Of Transfer (The First Prong)................................................................15

        b.    HashFast Has Not Shown It Did Not Receive Reasonably Equivalent Value (The Second Prong) ................................................................15

      1.    There is No Evidence to Support Lack of Reasonably Equivalent Value.............15
      2.    The Value Exchanged Only Needs to be Approximately Equivalent ..................15
      3.    Satisfaction of an Antecedent Debt is Not a Fraudulent Transfer .........................16
      4.    The Facts Do Not Support Any Claim That Reasonably Equivalent Value Was Not Exchanged ................................................................16

        c.    HashFast Has Not Shown The Existence of Creditors (The Third Prong) ................................................................19

III.    Any Judgment or Attachment is Limited to the Value of the Transfers as of the Date of Transfers................................................................19

CONCLUSION.................................................................................................20

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Atlanta Shipping Corporation, Inc. v. Chemical Bank,*
    818 F.2d 240 (2d Cir. 1987) .................................................................................16

*Bank of California v. Virtue & Scheck, Inc.,*
    *190 Cal.Rptr. 54 (1983)*.......................................................................................*16*

*BFP v. Resolution Trust Corp.,*
    511 U.S. 531 (1994).............................................................................................19

*Blastrac, N.A. v. Concrete Solutions & Supply,*
    678 F. Supp. 2d 1001 (C.D. Cal. 2010) .........................................................10, 11

*Chomakos v. Allard Jr.,*
    170 B.R. 585 (Bankr. E.D. Mich. 1993)..............................................................15

*In re Brobeck, Phleger & Harrison, LLP,*
    408 B.R. 340 (Bankr. N.D. Cal. 2009) .................................................................19

*In re Carbaat,*
    357 B.R. 553 (Bankr. N.D. Cal. 2006) .................................................................15

*In re Newman,*
    15 B.R. 658 (S.D.N.Y. 1981) ...............................................................................19

*In re Ozark Restaurant Equipment Co., Inc.,*
    850 F.2d 342 (8th Cir. 1988) ................................................................................19

*In re Pajaro Dunes Rental Agency, Inc.,*
    174 B.R. 557 (Bankr. N.D.Cal. 1994) ..................................................................19

*In re United Energy Corporation,*
    102 B.R. 757 (BAP 9th Cir. 1989) ........................................................................16

*Martin v. Aboyan,*
    148 Cal. App. 3d 826 (1983) ................................................................................10

*Mayors v. Commissioner of Internal Revenue,*
    785 F.2d 757 (9th Cir. 1986) ................................................................................16

*Pet Food Express, Ltd. V. Royal Canin USA Inc.,*
    2009 WL 2252108 (N.D. Cal. 2009) ....................................................................10

**STATUTES**

11 U.S.C. § 544.................................................................................................14

11 U.S.C. § 548(a)(1)(B)...................................................................................14

11 U.S.C. §548(c)..............................................................................................19

11 U.S.C. § 548(d)(2)(A)...................................................................................16

Cal. Civ. Code § 3439.03..................................................................................16

Cal. Civil Code § 3439.04(a)(2)........................................................................14

Cal. Civil Code § 3439.08..................................................................................19

Cal. Civil Code § 3439.05..................................................................................14

Cal. Code Civ. Proc. § 482.020.........................................................................12

Cal. Code Civ. Proc. § 484.020.........................................................................12

Cal. Code Civ. Proc. § 484.030....................................................................11, 12

Cal. Code. Civ. Proc. § 484.090(a)....................................................................10

**OTHER AUTHORITIES**

4 *Collier* ¶ 548.09 at 548-116.........................................................................19

Federal Rule of Evidence 602...........................................................................11

http://en.wikipedia.org/wiki/Bitcoin................................................................5, 6

http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2263707..........................6

https://en.bitcoin.it/wiki/BitcoinTalk_Forum....................................................5

www.bitcoin.org..................................................................................................5

www.bitcointalk.org............................................................................................5

**INTRODUCTION**

Defendant Dr. Marc A. Lowe ("Dr. Lowe") opposes the *Motion for Issuance of Right to Attach Order and Writ of Attachment* (the "Motion to Attach")[Docket No. 5] filed by HashFast Technologies, LLC and HashFast, LLC, both plaintiffs and debtors and debtors in possession (collectively, "HashFast"). The Court should deny the Motion to Attach because neither the facts nor the law support the granting of such an extraordinary pre-judgment remedy. HashFast unjustifiably seeks a windfall of the digital currency (i.e., the bitcoins) properly paid to Dr. Lowe for important and valuable services he rendered to HashFast per its request. In the Motion to Attach, HashFast makes sweeping and wholly unsubstantiated claims and, not surprisingly, fails to come close to meeting the stringent legal standard required to obtain a right to attach order under California law.

HashFast hired Dr. Lowe to promote its first product, bitcoin mining hardware called the BabyJet, on Bitcointalk.org ("Bitcointalk"), the world's leading forum for discussion, news, and advertisement for all things related to bitcoin, including mining hardware. Dr. Lowe, using a pseudonym (in this case, "Cypherdoc") as is a common practice on forums like Bitcointalk, had become one of Bitcointalk's most respected and prolific posters during the relevant timeframe. As such, Dr. Lowe's endorsement carried tremendous weight with the large and vibrant Bitcoin community that flocked to Bitcointalk and it made sound business sense for HashFast to engage him to endorse the rollout of the BabyJet. As history shows, a successful rollout of the BabyJet was critical to the success or failure of HashFast's business. In the exercise of its reasonable business judgment, and to put its best foot forward regarding the critical rollout of the BabyJet, HashFast engaged Dr. Lowe and agreed to pay him the amount at issue as set forth in the Memorandum of Understanding (the "MOU"). *See,* Exhibit 1 to Lowe Decl. The Motion to Attach includes no admissible evidence (or even persuasive argument) whereby a Court can or should second guess HashFast's business judgment concerning the compensation agreed to and paid to Dr. Lowe.

Per the arms-length negotiated agreement with HashFast, Dr. Lowe did precisely what was asked of him (i.e., he posted extensively about BabyJets) and even more (i.e., he promoted BabyJets repeatedly in his bitcoin newsletter and in personal messages to fellow bitcoiners). He did so

1  because he reasonably believed (based on what he saw and heard from HashFast) that HashFast
2  would deliver a great product within the time frame promised. As a result of his efforts, in part, the
3  initial batch of BabyJets sold out in less than three weeks, generating millions in revenue for
4  HashFast. Thereafter, approximately $15 million more in BabyJets were sold, again, in part due to
5  Dr. Lowe's input and efforts. For his valuable services, HashFast paid Dr. Lowe approximately
6  $300,000[1] in accordance with the terms of the MOU, in the form of the digital currency bitcoins (in
7  this case, 3,000 bitcoins), which equates to a 10% commission on sales of the first 550 BabyJets
8  (not a flat fixed payout unrelated to performance or estimated sales).

9      As even HashFast is forced to acknowledge in its Motion to Attach (but underplays),
10  attachment is a harsh remedy that deprives a defendant of its property before a plaintiff's claim is
11  proven. For that reason, it is disfavored and every requirement is construed strictly against a
12  plaintiff. Here, HashFast utterly fails to meet the stringent burden it bears – it cannot show that it is
13  likely to succeed on its fraudulent transfer claims for numerous reasons discussed below.
14  Moreover, HashFast has failed to submit any admissible evidence to support its position (let alone
15  credible evidence), and Dr. Lowe has numerous defenses to HashFast's unsubstantiated allegations.

16      The thrust of the Motion to Attach is that HashFast is entitled to attach Dr. Lowe's 3,000
17  bitcoins based on unsupported contentions that he (Dr. Lowe) received the bitcoins while HashFast
18  was insolvent and that the services he rendered "may have been ineffective" and did not constitute
19  value reasonably equivalent compared to the amount paid. HashFast's position is problematic for a
20  number of reasons. First, the Motion to Attach contains no admissible evidence to support the
21  alleged claims. The Motion to Attach can and should be denied on this basis alone. Second,
22  HashFast makes no effort to show that Dr. Lowe did not adequately perform the duties that
23  HashFast contracted with him to perform (nor could it succeed in doing so). Third, HashFast relies
24  solely on its own unfounded opinion that the services Dr. Lowe performed for HashFast were

---

26  [1] During the time period in question the price of a bitcoin fluctuated tremendously,
    particularly depending on which exchange you looked to for pricing information. HashFast's
27  approximation of $360,000 in its motion is on the high end. $300,000 represents a more reasonable
    middle point.

1  "minimal and ***potentially*** ineffectual." (Mot. at 2:18. (emphasis added).) Rather than provide

2  actual, credible evidence to support its allegations (of which there is none), HashFast offers up a

3  series of tautological statements whereby whatever it underlines="alleges" is purportedly "indisputable" or

4  "beyond dispute." (*See, e.g.,* Mot. at 7:26.) Such unsupported and self-serving statements are

5  patently insufficient, particularly in light of the heightened legal standard required to obtain a right

6  to attach order. Fourth, HashFast also unjustifiably seeks a windfall by seeking to attach the digital

7  currency (i.e., the 3,000 bitcoins) Dr. Lowe was paid versus the conceded value of the amount

8  transferred on the transfer date. As conceded in the Motion to Attach and the Complaint, Dr. Lowe

9  was owed approximately $308,000 for his services. The medium of exchange for payment of this

10  amount was 3,000 bitcoins. The value of a bitcoin happens to have risen in value from

11  approximately $100 on the date of transfer to approximately $250 as of this filing, and those 3,000

12  bitcoins therefore have a current value of approximately $750,000. Thus, although the amount in

13  dispute, at most, is approximately $300,000, HashFast seeks to attach bitcoins worth approximately

14  $750,000 (more than double what is in dispute). Lastly, although it is not his burden here, the

15  evidence will show that Dr. Lowe did in fact make substantial contributions to HashFast's sales

16  through his advertising posts on Bitcointalk, his newsletter, and by reaching out to other bitcoiners

17  personally. Dr. Lowe therefore fully earned the money HashFast paid him and such amount was

18  reasonably equivalent to the value of the services he rendered to HashFast.

19      HashFast does not meet, and cannot meet, the stringent burden necessary to secure

20  attachment of the money HashFast paid Dr. Lowe for his valuable services. Because the evidence

21  and the law do not support HashFast's position, the Court must deny the Motion to Attach.

22                          **FACTUAL BACKGROUND**

23      • **Dr. Lowe's Involvement with Bitcoin and Bitcointalk**

24      1.      Dr. Lowe is a well-respected and experienced ophthalmologist, who first heard of

25  and became interested in bitcoin in January 2011. (Declaration of Dr. Lowe ("Lowe Decl.") ¶ 2.)

26  This was only two years after the first bitcoin was issued in January 2009. At the time, very few

27  people were paying attention to bitcoin, and thus Dr. Lowe is one of bitcoin's earliest adopters.

28

1      2.     Bitcoin is an online ledger invented by Satoshi Nakomoto (a pseudonym) in a 2008

2   white paper.[2]  (Lowe Decl. Ex. B.)  The ledger (i.e., Bitcoin) was launched online in January

3   2009.[3]  The ledger allows for the proof and transfer of ownership without the need for a trusted third

4   party.[4]  The unit of account the ledger uses are bitcoins.[5]  Bitcoins are a digital currency, and new

5   bitcoins are created through "mining," which involves the use of specialty hardware that verifies

6   and records the transactions on the online ledger (and which is explained in greater detail below in

7   paragraph 9).[6]

8      3.     In 2011, Bitcointalk was launched.[7]  In July 2012, Bitcointalk reached its one

9   millionth post.[8]  From its launch through the present, it has been the world's leading online forum

10  for discussion of all things related to bitcoin.

11     4.     From the time Dr. Lowe first learned of bitcoin in 2011 through the events at issue in

12  2013, bitcoin was not well covered by the mainstream media, so those interested in it, like Dr.

13  Lowe, had to look for information elsewhere on the internet.  Online forums like Bitcointalk sprang

14  up to serve as clearinghouses and modern day think tanks for news, commentary, and advertising

15  related to bitcoin and bitcoin products.  Bitcointalk's influence is more widely felt in the bitcoin

16  world than one would expect of a typical message board or online forum because it was one of the

17  first places in the world for people to discuss bitcoin.  As such, Bitcointalk was and remains an

18  important and reliable source of information for companies looking to promote bitcoin-related

19  products to an interested target demographic.

20  _____

21      [2] http://en.wikipedia.org/wiki/Bitcoin (The forum had resided on www.bitcoin.org before
    moving to www.bitcointalk.org in July 2011).  See, Exhibit 2 to Lowe Decl.

22      [3] Id.

23      [4] Id.

24      [5] Id.

25      [6] Id.

26      [7] https://en.bitcoin.it/wiki/BitcoinTalk_Forum

27      [8] Id.

28

5. In 2011, Dr. Lowe learned of Bitcointalk. Initially, he was a casual reader of the forum and did not post. (Lowe Decl. ¶ 3.) In April 2011, he registered as a user, securing the user name of "Cypherdoc", and he began posting on the forum. (Lowe Decl. ¶ 4.)

6. Since his first post, Dr. Lowe has become one of the most prominent and well-respected posters on Bitcointalk. In August 2011, he started the "Gold" thread, which has almost 1 million views and which averages 4,000 views a day. (Lowe Decl. ¶ 5.) The thread has become so popular, in large part to Dr. Lowe's accurate predictions that the price of gold and silver would collapse, while the value of bitcoin rose. (Lowe Decl. ¶ 5.)

7. During the time period he was dealing with HashFast, Dr. Lowe was the number three poster, overall in terms of frequency, on Bitcointalk. (Lowe Decl. ¶ 6.) Today, he is the number two poster out of approximately 500,000 Bitcointalk participants. (Lowe Decl. ¶ 7.)

8. These are not a trivial statistics. In May 2013, an important academic paper that analyzed the Bitcoin community cited Dr. Lowe as an "influential member of the Bitcoin community," (http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2263707.) That paper, by prominent European academics, notes that Dr. Lowe is one of the five most influential members of the Bitcoin community after Bitcoin's pseudonymous founder, Satoshi Nakamoto.[9]

9. As Dr. Lowe became more and more interested in bitcoin, he got involved in mining bitcoins. (Lowe Decl. ¶ 8.) Bitcoin mining works in essence like this: bitcoin miners use special software and hardware to try to solve a complex math problem, and if they are the first to do so, they are issued a certain number of bitcoins in exchange.[10] Bitcoin mining is decentralized so anyone with an internet connection and the proper software and equipment can try to mine bitcoins.[11] As more and more people and companies flocked to bitcoin mining as the value has

_____

[9] Id. at 16. Dr. Lowe is not explicitly named in the paper because at the time he was only known as "Cypherdoc"; however, he is identifiable because the paper acknowledges and references his "Hero member" status on Bitcointalk and his first forum posting date (without identifying him). Id. at 12.

[10] http://en.wikipedia.org/wiki/Bitcoin.

[11] Id.

LA 11852101v1

risen, the hardware required to mine successfully has become very sophisticated and specialized because miners all compete against each other and the bitcoin protocol creates more difficult math problems for the miners to solve.[12]

10.    In 2011, Dr. Lowe mined his first bitcoins using custom GPU miners. (Lowe Decl. ¶ 8.) By 2013, to successfully mine, Dr. Lowe needed more powerful hardware, and he began looking to purchase bitcoin mining hardware that various companies were beginning to manufacturer. (Lowe Decl. ¶ 8.)

- **Dr. Lowe's Involvement with HashFast (July 2013 – January 2014)**

11.    On July 24, 2013, Dr. Lowe became aware of HashFast through HashFast's public announcement on Bitcointalk in the hardware forum. (Lowe Decl. ¶ 9.) In that post, HashFast announced that it was a new business located in San Jose and that it had the premier hardware processing capability necessary to enable bitcoin miners to work at the highest level. (Lowe Decl. ¶ 9.) The post further invited any interested parties to visit the HashFast facility and evaluate HashFast's business. (Lowe Decl. ¶ 9.) Dr. Lowe immediately became intrigued, for a variety of reasons, including the stated power of the equipment and the fact that HashFast was located in Northern California (a relatively easy day trip from his home). (Lowe Decl. ¶ 10.) The most important reason, however, was the opportunity to be amongst the first purchasers of the system. (Lowe Decl. ¶ 10.) For a miner, being an early purchaser of the latest mining hardware is an important key to mining successfully. (Lowe Decl. ¶ 10.)

12.    On July 28, 2013, Dr. Lowe responded to HashFast's thread on Bitcointalk, stating that he would be in town on July 29 and would like to tour the HashFast facilities. (Lowe Decl. ¶ 11.) A HashFast representative set up a tour. (Lowe Decl. ¶ 11.) On July 29, Dr. Lowe traveled to HashFast's San Jose facility. (Lowe Decl. ¶ 11.) There, he met Chief Executive Officer Eduardo de Castro ("de Castro") and Chief Technology Officer Simon Barber ("Barber"). (Lowe Decl. ¶ 11.) While there, Dr. Lowe placed an order for approximately $36,000 worth of HashFast's BabyJet bitcoin mining hardware that were then due for release in October 2013. (Lowe Decl. ¶

---

[12] *Id.*

12.) This was the very first confirmed order for the BabyJet. (Lowe Decl. ¶ 12.) Dr. Lowe placed his order based on his tour of the facilities, Barber's and de Castro's detailed representations concerning the performance of the system, and his desire to be amongst the first to order the new system (again, a key factor in successful bitcoin mining). (Lowe. Decl. ¶ 12.)

13.     While there, Barber and de Castro mentioned that they would like for Dr. Lowe to help with HashFast's launch of the BabyJet. (Lowe Decl. ¶ 13.) Specifically, they mentioned that they needed marketing and endorsements help from prominent members of the bitcoin community, and that he was such a member. (Lowe Decl. ¶ 13.) As set forth above, by that time, Dr. Lowe had become well-respected on Bitcointalk.   (See paragraphs 7-8 above.)

14.     Following the July 29 meeting at HashFast's facility, Dr. Lowe and HashFast representatives discussed how Dr. Lowe could help with the launch of the BabyJet. (Lowe Decl. ¶ 14.) Ultimately, an arms-length agreement was reached whereby Dr. Lowe agreed to endorse the BabyJet in the bitcoin community in exchange for a percentage of sales. (Lowe Decl. ¶ 14.) The MOU was signed on or around August 7, 2013, and in it Dr. Lowe agreed to endorse the BabyJet in return for payment of 10% of the proceeds of the first 550 BabyJets sold. (Lowe Decl. ¶ 15, Ex. A.) In turn, HashFast agreed to pay Dr. Lowe 10% of actual sales because, in its reasonable business judgment, it recognized that Dr. Lowe's endorsements and postings on Bitcointalk would be critical to a successful launch of the BabyJet and the future of the company in general. (Lowe Decl. ¶ 15, Ex. A.) Dr. Lowe agreed to endorse the BabyJet because he reasonably believed in the technology and HashFast's ability to timely deliver the product to market, as evidenced by his own purchase of four BabyJets. (Lowe Decl. ¶ 16.)

15.     On August 8, 2013, Dr. Lowe started a new thread dedicated to the BabyJet in Bitcointalk's hardware forum, in which, among things, he posted detailed endorsements of the BabyJet and disclosed that he would be paid for his endorsement. (Lowe Decl. ¶ 17.) This thread represented the official opening of HashFast's sales of the BabyJet. (Lowe Decl. ¶ 17.) Crucially, like most online forums, posts only stay towards the top of the forum (and thus are relevant from a marketing prospective) to the extent that other users read or post on a given thread. In essence, continued traffic to a given thread keeps it on the front-page. (Lowe Decl. ¶ 18.) Thus, Dr. Lowe's

postings on the BabyJet were especially valuable in driving traffic and keeping the thread towards the top of the forum during the initial sales period. (Lowe Decl. ¶ 19.) Dr. Lowe posted hundreds of times in the forum, spread out across at least five separate threads, and of course even so-called "unrelated" threads contributed to driving traffic and keeping the HashFast thread front and center before its target audience. (Lowe Decl. ¶ 19.) Posts on Bitcointalk represented almost the totality of HashFast's marketing strategy. (Lowe Decl. ¶ 20.)

16.     In addition to his postings on Bitcointalk, Dr. Lowe informed several subscribers to his newsletter, "Financial Risk Analytics" about HashFast, a number of whom decided to buy the BabyJet on that basis. (Lowe Decl. ¶ 21.) Dr. Lowe also fielded personal messages from several users on Bitcointalk, a number of whom decided to purchase one or more BabyJets for that reason. (Lowe Decl. ¶ 22.)

17.     Further, throughout this time period, Dr. Lowe was advising HashFast on its marketing interactions with the forum. (Lowe Decl. ¶ 23.) HashFast repeatedly acknowledged the value of his endorsement. (Lowe Decl. ¶ 23.) Indeed, as a result, HashFast wanted Dr. Lowe to join its "Board of Advisors" after the completion of the sales of the first batch of BabyJets, which occurred on August 25, although he did not do so.[13] (Lowe Decl. ¶ 23.)

18.     As a result of Dr. Lowe's manifold and extensive efforts, the initial run of 550 BabyJets sold out in 17 days (from August 8–25), and Dr. Lowe received payment for his services per the terms of the MOU, albeit spread out during September 2013. (Lowe Decl. ¶ 24.) Rather than dollars, he accepted 3,000 bitcoins. (Lowe Decl. ¶ 24.) During this time period, one bitcoin was worth approximately $100,[14] and thus he received approximately $300,000 in bitcoins. This was a 10% commission on total sales completed, not a flat fixed payout unrelated to performance or estimated sales. (Lowe Decl. ¶ 25.)

19.     The sale of the initial batch of 550 BabyJets had brought in over $3.0 million in revenue (550 x $5,600 = $3.08 million). Future BabyJet sales brought in an additional $15 million.

---

[13] Dr. Lowe never joined any Board of Advisors.

[14] As noted in footnote 1, the price of bitcoin fluctuated a lot during this time period.

LA 11852101v1

20.     Throughout this time period, Dr. Lowe believed HashFast would deliver the BabyJet on time and that it would perform at the level HashFast said it would.  (Lowe Decl. ¶ 27.)  It was not until late December 2013 that Dr. Lowe became concerned that HashFast would not be able to deliver the BabyJet in a timely manner, and he voiced those concerns, both on Bitcointalk and directly to HashFast.  (Lowe Decl. ¶ 28.)  December 31, 2013 was the previously publicly announced delivery/refund date.  (Lowe Decl. ¶ 29.)

## LEGAL STANDARD

Attachment is a "harsh remedy because it causes the defendant to lose control of his property before the plaintiff's claim is adjudicated." *Martin v. Aboyan,* 148 Cal. App. 3d 826, 831 (1983); *Blastrac, N.A. v. Concrete Solutions & Supply,* 678 F. Supp. 2d 1001, 1004 (C.D. Cal. 2010).  For that reason, "the requirements for the issuance of a writ of attachment are strictly construed against the applicant." *Id.*  Accordingly, the burden is on the applicant to establish each element necessary for an attachment order by a preponderance of the evidence." *Id.* at 1004-05.

A court may not issue a writ of attachment unless a plaintiff meets the following four factors:

1.     The claim upon which the attachment is based is one upon which an attachment may be issued;

2.     Probable validity of the claim(s) substantiating the issuance of an attachment order;

3.     The attachment is not sought for a purpose other than the recovery on the claim upon which the attachment is based; and

4.     The amount to be secured by the attachment is greater than zero.

Cal. Code. Civ. Proc. § 484.090(a).  In determining the probable validity of a claim, a court must consider the relative merits of the positions of the respective parties and make a determination as to the probable outcome of the litigation. *Blastrac,* 678 F.Supp.2d at 1005.  Not only must a plaintiff make out a *prima facie* case for its claim, the plaintiff must also show that the defenses raised are less than likely to succeed. *See Pet Food Express, Ltd. V. Royal Canin USA Inc.,* 2009 WL 2252108 at *5 (N.D. Cal. 2009).  If an applicant fails to do this, it has not established the probable validity of the claim, and a right to attach order cannot issue. *Id.*

1

**ARGUMENT**

2      The Motion to Attach, which is exclusively tied to the fraudulent transfer claims[15] (the

3   second through fourth causes of action in the Complaint), fails primarily for the following reasons.

4   First, HashFast, despite having the burden here, has submitted no credible or admissible evidence

5   whatsoever that, even if proven, would support a right to attach order. Second, HashFast is unlikely

6   to prevail on any fraudulent transfer theory.

7   **I.    HashFast Has Not Submitted _Any_ Admissible Evidence To Support Attachment**

8      Under California law, the burden is on HashFast to establish each element necessary for an

9   attachment order by a preponderance of the evidence. _Blastrac_, 678 F. Supp. 2d at 1001. This is to

10   be done by sworn affidavit. _Id._ The law requires that the declaration or affidavit in support of a

11   request for a writ of attachment show, on the facts presented, that the applicant is entitled to

12   judgment on which the claim is based. Cal. Code Civ. Proc. § 484.030. HashFast has failed to

13   submit either admissible evidence or evidence that is credible to carry the burden showing it is

14   entitled to a right to attach order.

15      The only evidence HashFast submitted in support of the Motion to Attach is the page and a

16   half declaration of Victor Delaglio (the "Delaglio Declaration"), who is described as a "Director of

17   Province, Inc." who is "assisting" the CRO of HashFast. The declaration states that it is "[b]ased on

18   [declarant's] own personal knowledge of the facts." (Delaglio Declaration ¶2.) As set forth in detail

19   in Dr. Lowe's concurrently filed _Evidentiary Objections and Motion to Strike Delaglio Declaration_,

20   Mr. Delaglio does not have personal knowledge of any of the "facts" set forth in his declaration, as

21   required by Federal Rule of Evidence 602 (among the many evidentiary problems with his

22   declaration). An application to employ Peter Kravitz "and others at Province, Inc."[16] as CRO was

23   not filed with the Court until November 21, 2014, over 14 months after the events at issue in the

24   Complaint and the Motion to Attach. Accordingly, it cannot be disputed that Mr. Delaglio does not

25

[15] HashFast has not sought a right to attach order for the preference claim, which is the first
26   claim for relief. If HashFast had sought attachment based on the preference claim, it would fail to
meet the attachment standard for similar reasons as set forth herein.

27   [16] Such as Mr. Delaglio.

28

| | |
|---|---|
| 1 | have personal knowledge of matters pertaining to HashFast that occurred more than 14 months |
| 2 | before he was introduced to HashFast. |
| 3 | Moreover, the Delaglio Declaration references six documents in support of the Motion to |
| 4 | Attach, yet the declaration does nothing to authenticate the documents or even attempt to set forth |
| 5 | any foundation to admit these documents as business records of HashFast. Therefore, the entirety |
| 6 | of the Delaglio Declaration and its referenced exhibits are inadmissible in this proceeding and the |
| 7 | Court should strike them altogether. |
| 8 | Even more telling, perhaps, is that, admissible or not, the Delaglio Declaration makes no |
| 9 | reference whatsoever to: (i) the solvency of HashFast on the date of the transfers at issue (neither |
| 10 | balance sheet, equitable nor unreasonably small capital); (ii) the existence of creditors of HashFast |
| 11 | before or after the transfers at issue; or (iii) the issue of reasonably equivalent value. Based upon |
| 12 | HashFast's failure to provide any admissible evidence concerning the facts and claims at issue in |
| 13 | this proceeding, the Motion to Attach must be denied.[17] |
| 14 | Notwithstanding the foregoing, and assuming any part of the Delaglio Declaration is deemed |
| 15 | admissible (which it is not), none of the Delaglio Declaration's exhibits (which are Exhibits A-F) or |
| 16 | "factual assertions" come remotely close to carrying HashFast's heavy burden here. |
| 17 | Exhibits A-E are the MOU between HashFast and Dr. Lowe, a selective/incomplete |
| 18 | sampling of some of Dr. Lowe's posts, and documentation showing Dr. Lowe asked for and |
| 19 | received payment in accordance with the MOU. These exhibits and the related statements of Mr. |
| 20 | Delaglio (¶¶ 4-9) only show that Dr. Lowe complied with the terms of the MOU, which HashFast |
| 21 | does not dispute, and that he was compensated in accordance with the MOU. This obviously does |
| 22 | not meet HashFast's burden of showing that Dr. Lowe was overpaid. As HashFast implicitly |
| 23 | concedes in the Delaglio Declaration, Dr. Lowe entered into an arms-length agreement with |
| 24 | |
| 25 | [17] Moreover, it bears mentioning that the Delaglio Declaration fails to comply with the most basic factual provisions of the attachment statute, which require that an applicant swear under oath |
| 26 | (either by declaration or verified complaint) that the attachment is not sought for a purpose of other than a recovery, a precise statement of the amount to be secured by the attachment, and the factual |
| 27 | basis for the right to attach. *Cal. Code Civ. Proc.* §§ 482.020, 484.020, 484.030. None of the required statements are included in the Delaglio Declaration. |
| 28 | |

LA 11852101v1

1    HashFast, did what the contract asked of him, and was compensated in accordance with the terms of

2    the MOU. All of this is certainly not evidence that Dr. Lowe was paid more than his services were

3    worth, which HashFast must show. Quite the opposite, it is evidence of properly paid for

4    performance.

5          Without the proper context, the only portion of the Delaglio Declaration that arguably might

6    support HashFast's claim regarding value is the last paragraph (¶ 10) and its related exhibit (Exhibit

7    F). There, Mr. Delaglio states that "at or about the time" Dr. Lowe was endorsing HashFast and the

8    BabyJet, HashFast "attempted to recruit others to provide the same or similar services." It then

9    concludes by referencing, as a purported example, Exhibit F. Exhibit F is a single email dated

10   October 12, 2013, purportedly from HashFast to someone named "Will" offering him $15 dollars

11   per hour for 1-2 supporting posts each day. (Delaglio Declaration Ex. F.)

12         This lone email and the related statement do not meet HashFast's burden either. At the

13   outset, it should be noted that there is no evidence that anyone else actually entered into an

14   agreement similar to the MOU – it only references unsuccessful attempts to recruit other

15   incomparable people for other services. It must also be noted that the attestation claims that the

16   email was sent "[a]t or about the time [Dr. Lowe] was endorsing the [HashFast and the

17   BabyJets]…" (Delaglio Declaration ¶ 10.) This statement is materially inaccurate. The email at

18   issue was sent on October 12, over two months after Dr. Lowe had commenced rendering services

19   and over one month after his services were complete and paid for in connection with the sale of the

20   first 550 BabyJets. The time discrepancy between early August 2013 (when Dr. Lowe was engaged

21   and started posting) and mid-October 2013 is critical because by mid-October, the BabyJet had been

22   successfully launched and sales were plentiful. Accordingly, it would seem to make sense that after

23   a successful product launch, future promoters would be compensated with less money because the

24   product was already established in the marketplace.

25         Second, even if the "Will" email had been sent in August or September when Dr. Lowe was

26   performing under the MOU, it begs the question, so what? It is not evidence of anything. Neither

27   the Delaglio Declaration nor the Motion to Attach submit any evidence or even argument who

28   "Will" is or that "Will's" endorsement would be of comparable value to Dr. Lowe's, one of the

most respected posters on Bitcointalk. (*See* Delaglio Declaration ¶ 10; Mot. at 9:7-17.) Nor is there any indication that "Will" or any of the other people who were supposedly offered endorsement contracts actually accepted HashFast's offer. In that case, it is fair to assume that it was rejected because it undervalued the services required of even "Will," particularly in light of HashFast's burden here.

Moreover, there is not even an argument that the purported services "Will" was to perform were sufficiently similar to those that Dr. Lowe did in fact perform, such that the difference in compensation was unreasonable. If anything, the evidence shows the opposite. Dr. Lowe was brought on during the crucial product launch, when the hardware was of most value and unknown in the marketplace. (Lowe Decl. ¶¶ 17-23.) He was brought in to create an explicit endorsement thread, and he provided other services. (Lowe Decl. ¶¶ 17-23.) In contrast, after this critical juncture had passed and when the initial run of the BabyJet had sold out, it appears the purported offer made to "Will" (and unidentified others) required merely a few supporting posts in preexisting threads. Finally, if Dr. Lowe gave reasonably equivalent value (as he did) for the services rendered, it does not matter what others were offered.

Overall, HashFast fails to meet its evidentiary burden for a myriad of reasons, and even if it could change that fact (which it cannot), it cannot do so at this stage because it is not permitted to offer new evidence. HashFast is stuck with its deficient "evidentiary" submission.

## II.     HashFast Has Not Carried Its Burden to Establish the Probable Validity of its Constructive Fraudulent Transfer Claims

In the Complaint, HashFast asserts three claims for relief (the Complaint's second through fourth claims) based upon allegations that the transfers at issue are avoidable as constructively fraudulent transfers (the "Fraudulent Transfer Claims"). The Fraudulent Transfer Claims are predicated upon 11 U.S.C. § 544 and California Civil Code § 3439.04(a)(2); California Civil Code § 3439.05; and 11 U.S.C. § 548(a)(1)(B). To obtain a writ of attachment pursuant to each of these statutes, at a minimum, HashFast must satisfy by a preponderance of the evidence (at least) these three prongs: (1) it was insolvent on the date of each transfer; (2) it did not receive reasonably

equivalent value in exchange for each transfer; and (3) there are/were present or future creditors whose claims remain unpaid. Here, HashFast has not satisfied any of the three prongs.

### a) HashFast Has Not Shown Insolvency At The Time Of Transfer (The First Prong)

The above fraudulent transfer statutes utilize one of three tests for insolvency, the balance sheet test, equitable insolvency, or the unreasonably small capital test. As set forth above, HashFast has failed to submit any evidence concerning solvency under either of these tests, admissible or not. HashFast has therefore failed to satisfy the first prong.

### b) HashFast Has Not Shown It Did Not Receive Reasonably Equivalent Value (The Second Prong)

1. <u>There is No Evidence to Support Lack of Reasonably Equivalent Value</u>. HashFast received more than reasonably equivalent value from Dr. Lowe. Although Dr. Lowe does not bear the burden here (HashFast does), the evidence included in this Opposition shows just that. Moreover, as set forth above, HashFast has failed to submit any evidence concerning value, admissible or not. Thus, HashFast has failed to satisfy the second prong.

2. <u>The Value Exchanged Only Needs to be Approximately Equivalent</u>. The above fraudulent transfer statutes define a critical element of a constructively fraudulent transfer as a transfer for which the debtor did not receive "reasonably equivalent value." To determine whether the transfers sought to be avoided by a trustee were constructively fraudulent, a court must determine the value of what the debtor transferred and the value of what the debtor received. A court must then determine whether the latter value is reasonably equivalent to the former. "Reasonable equivalence" does not require exact equality in value. *In re Carbaat*, 357 B.R. 553, 560 (Bankr. N.D. Cal. 2006). A balance must be struck between the need to not permit grantors to profoundly impair their ability to discharge obligations to creditors, and the reality that parties need leeway to make deals "some good, some not so good…" *Chomakos v. Allard Jr.*, 170 B.R. 585, 591 (Bankr. E.D. Mich. 1993). This is especially true when the valuation involves services instead of tangible goods as one to one comparisons of value are difficult. *Id.*

1    3.    Satisfaction of an Antecedent Debt is Not a Fraudulent Transfer. As conceded in the

2    Motion to Attach, "[u]nder California law, the satisfaction of an antecedent debt constitutes 'value.'

3    Cal. Civ. Code § 3439.03. In the instant case, the Transfer was paid to satisfy the amount owing

4    under the MOU (an antecedent debt). Thus, the Debtors received 'value' for the MOU Payment."

5    (*See* Mot. 8:8-11.) From this principle, it is generally held and understood that payments on

6    account of antecedent debts are not fraudulent transfers under both state and federal law.[18]

7    "Payment on an antecedent debt is ordinarily not recoverable as a fraudulent transfer, the debt being

8    deemed valid consideration for such payment. 11 U.S.C. § 548(d)(2)(A)." *In re United Energy*

9    *Corporation,* 102 B.R. 757, 763 (BAP 9th Cir. 1989); *see also Mayors v. Commissioner of Internal*

10   *Revenue,* 785 F.2d 757, 761 (9th Cir. 1986) (quoting *Bank of California v. Virtue & Scheck, Inc.,*

11   190 Cal.Rptr. 54, 65 (1983) (applying California law) ("[t]he essential issue before the jury was

12   whether the entire transaction was enacted in good faith. If the parties in good faith believed that

13   the promise was binding, then the consideration was good")); *Atlanta Shipping Corporation, Inc. v.*

14   *Chemical Bank,* 818 F.2d 240, 249-50 (2d Cir. 1987) ("[f]air consideration is given for an

15   obligation '[w]hen in exchange for such . . . obligation, as a fair equivalent therefor, and in good

16   faith . . . an antecedent debt is satisfied . . . .' In general, repayment of an antecedent debt

17   constitutes fair consideration unless the transferee is an officer, director or major shareholder of the

18   transferor."). Thus, the MOU payment itself cannot be a fraudulent transfer (and the Complaint

19   does not seek avoidance of the obligation), and therefore, the Motion to Attach must be denied.

20   4.    The Facts Do Not Support Any Claim That Reasonably Equivalent Value Was Not

21   Exchanged. Of course, promotion / advertising can be difficult to value as it encompasses both

22   direct and indirect benefits and the effects of advertising can be hard to quantify. However, even

23   applying the most restrictive standard, any purchasers who bought a BabyJet on account of Dr.

24   Lowe or became aware of the BabyJet on account of Dr. Lowe's activities provide readily definable

25   monetary value to HashFast. For the time period from when Dr. Lowe began endorsing the BabyJet

26

----

27   [18] Moreover, 11 U.S.C. § 548(d)(2)(A) specifically provides that "value" means the
     satisfaction or a present or antecedent debt.

28

1    on HashFast's behalf (on August 7, 2013), to the time the first batch of BabyJets sold out

2    (approximately 17 days later), HashFast has not put forward any evidence that anyone else

3    marketed or endorsed the BabyJet on HashFast's behalf during that time period. Nor has HashFast

4    put forward any evidence that might tend to show that Dr. Lowe was not a substantial factor in the

5    sales (not that there is any). Further, since Dr. Lowe was only getting a 10% commission on the

6    first 550 BabyJets sold, he does not need to show that he was a factor in all or even a large portion

7    of the sales, as HashFast suggests. (*See* Mot. at 9.) Moreover, HashFast ignores all the sales made

8    after the initial batch of BabyJets was sold, which amount to approximately $15 million in

9    additional sales. It is fair to say that Dr. Lowe's endorsements and postings, which had a material

10   positive impact on the sale of the first 550 units, carried over and positively influenced ongoing

11   sales, providing further significant value to HashFast.

12          As demonstrated above, other than a single random email, HashFast has made no effort to

13   present actual evidence that Dr. Lowe's services were not reasonably equivalent to the

14   compensation received. HashFast simply relies on the arguments of its attorneys, who are relying

15   on an inadmissible declaration, which presents no admissible or probative details regarding value.

16          Importantly, HashFast does not cite a single example of anyone with a similar reputation as

17   Dr. Lowe, performing similar services, for less pay, during a similar time period, and what that

18   person was paid. Nor has HashFast presented any evidence or legal authority that 10% of the

19   proceeds of the first 550 BabyJets sold is unreasonable, particularly when Dr. Lowe was apparently

20   the only outside party promoting the product. Instead, HashFast resorts to self-serving arguments

21   and entirely unsubstantiated pronouncements that it is "beyond reasonable dispute" that HashFast

22   did not receive such value. (*See, e.g.,* Mot. at 8:25.) This is obviously not even close to enough

23   evidence to meet their burden.

24          By contrast, Dr. Lowe has submitted evidence that certain people did purchase because of

25   his endorsements and other activities. (Lowe Decl. ¶ ¶ 21-22.) Not only did he repeatedly post on

26   Bitcointalk, he reached out to prospective purchasers from his newsletter, and there is credible

27   evidence that many of them purchased and/or became aware of the BabyJet on that basis. (Lowe

28   Decl. ¶ ¶ 21-22.)

1    Additionally, HashFast's motion contains an outright falsehood. HashFast claims that based
2    on a review of the message board, "it appears that few individuals reviewed the message board or
3    relied upon the [Dr. Lowe's] endorsement when purchasing a BabyJet..." (Mot. at 9:20-23.)
4    Initially, it should be noted that HashFast, provides no evidence to support this claim. It is yet
5    another, in a long line, of self-serving and entirely unsubstantiated statements. Setting that ongoing
6    problem aside, simply looking at the message board itself belies this claim. The partial thread they
7    submitted as Exhibit B (only one aspect of Dr. Lowe's efforts on behalf of HashFast) indicates that
8    it was read 25,661 times. That does not necessarily mean that it was read 25,661 times during the
9    relevant time period, but it is strong evidence that his endorsement generated thousands of views
10   when the BabyJet was for sale. This is especially important because the BabyJet was a niche
11   product for an extremely niche market, so thousands of views in a forum, that attracts the right
12   demographic, is substantial, against the sale of the 550 BabyJets at issue.

13       Moreover, between Dr. Lowe's endorsement and the end of the thread, where he announces
14   he is no longer being paid, contains well over 500 unique postings. Dr. Lowe's unique postings
15   were critical because posts only stay towards the top of the forum (and thus are relevant from a
16   marketing prospective) to the extent that other users read or post on a given thread. (Lowe Decl. ¶¶
17   18-19.) There is no basis to assert, as HashFast appears to do, that few individuals reviewed the
18   message board, especially in light of the product being repeatedly endorsed (which naturally
19   appealed to a small highly selective target demographic). Of course, this does not even take into
20   account all the users who personally messaged Dr. Lowe on Bitcointalk after seeing the thread; or
21   any of the other substantial work performed by Dr. Lowe to generate customers for HashFast.
22   (Lowe Decl. ¶¶ 17-23.)

23       Simply put, HashFast submitted no evidence that might tend to show Dr. Lowe's services
24   were ineffective or not reasonably equivalent to the value received. Instead, the Motion to Attach
25   relies on, at best, unsupported allegations. Dr. Lowe, on the other hand, has submitted such
26   evidence, even though it is unnecessary to do so because the burden here is on HashFast. Tellingly,
27   HashFast is not even confident enough in its theory to definitively give an opinion that his services
28   were ineffectual. Instead, HashFast merely states that Dr. Lowe's services were "potentially"

| | |
|---|---|
| 1 | ineffectual. (Mot. at 2:18.) Certainly, depriving a defendant of his property prior to due process of |
| 2 | the law should require more than a half-hearted statement that he "might not" have earned it. |
| 3 |       **c) HashFast Has Not Shown The Existence of Creditors (The Third Prong)** |
| 4 | To have standing to pursue a fraudulent transfer claim, HashFast must prove the existence of |
| 5 | creditors with unpaid claims. The Motion to Attach includes no evidence on this issue. |
| 6 | Accordingly, HashFast has failed to satisfy the third prong |
| 7 | **III.   Any Judgment or Attachment is Limited to the Value of the Transfers as of the Date of Transfers** |
| 8 | |
| 9 | It is unclear from the Complaint whether HashFast is seeking the return of the bitcoins |
| 10 | themselves or the amount the parties otherwise agreed as reasonable consideration, the $300,000 |
| 11 | paid pursuant to the MOU. If HashFast is entitled to any recovery, which it is not, it may only |
| 12 | recover the dollar value on the date of transfer which the Court may find exceeds the value received |
| 13 | by HashFast. As the Motion to Attach acknowledges, "[t]he determination of reasonable |
| 14 | equivalence must be made at the time of the transfer." *In re Brobeck, Phleger & Harrison, LLP,* |
| 15 | 408 B.R. 340, 342 (Bankr. N.D. Cal. 2009), *citing BFP v. Resolution Trust Corp.,* 511 U.S. 531, |
| 16 | 546 (1994); *see also In re Pajaro Dunes Rental Agency, Inc.,* 174 B.R. 557, 578 (Bankr. N.D.Cal. |
| 17 | 1994)("all assets involved in the contested transfer should be measured at their market value at the |
| 18 | time of transfer."); *In re Ozark Restaurant Equipment Co., Inc.,* 850 F.2d 342, 344-45 (8th Cir. |
| 19 | 1988). Neither appreciation nor depreciation in the value of the assets after the transfer affects the |
| 20 | calculation of consideration. *In re Newman,* 15 B.R. 658, 660 (S.D.N.Y. 1981); 4 *Collier* ¶ 548.09 |
| 21 | at 548-116."); *see also* Cal. Civil Code §3439.08 and 11 U.S.C. §548(c). |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

1

**CONCLUSION**

2    For all of the foregoing reasons, the Motion to Attach must be denied. HashFast has failed

3    to meet its burden. Dr. Lowe prays for relief in accordance with the foregoing and for such other

4    and further relief as the Court may deem just and proper.

5                                         Respectfully submitted,

6                                         BAKER MARQUART LLP
                                          BRIAN E. KLEIN
7
                                          - and -
8
9    Dated: April 10, 2015               JEFFER MANGELS BUTLER & MITCHELL LLP
                                          DAVID M. POITRAS, APC
10
11                                        By: _/s/ David M. Poitras_
12                                           DAVID M. POITRAS
                                             Attorneys for Defendant
13                                           Dr. Marc A. Lowe

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28