KATTEN MUCHIN ROSENMAN LLP
Craig A. Barbarosh (SBN 160224)
craig.barbarosh@kattenlaw.com
650 Town Center Drive, Suite 700
Costa Mesa, CA 92626-7122
Telephone: (714) 966-6822

Jessica M. Mickelsen (SBN 277581)
jessica.mickelsen@kattenlaw.com
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
Telephone: (310) 788-4425
Facsimile: (310) 788-4471

Peter A. Siddiqui (*pro hac vice*)
peter.siddiqui@kattenlaw.com
525 W. Monroe Street
Chicago, IL 60661-3693
Telephone: (312) 902-5455
Facsimile: (312) 902-1061

Counsel for Debtors and Debtors-In-Possession
HashFast Technologies LLC and HashFast LLC

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re:<br><br>HASHFAST TECHNOLOGIES LLC, a California limited liability company,<br><br>    Debtor and Debtor-In-Possession<br>_____<br><br>☒ Affects HASHFAST LLC, a Delaware limited liability company,<br><br>    Debtor and Debtor-In-Possession<br>_____<br><br>HASHFAST TECHNOLOGIES LLC, a California limited liability company, and HASHFAST LLC, a Delaware limited liability company,<br><br>    Plaintiffs,<br><br>    vs.<br><br>MARC A. LOWE, an individual, *aka* | Case No. 14-30725<br><br>(Substantively Consolidated with In re HashFast LLC, Case No. 14-30866)<br><br>Chapter 11<br><br><br><br><br><br><br><br><br><br>Adversary Case No. 15-03011<br><br>**REPLY IN SUPPORT OF DEBTORS' MOTION FOR ISSUANCE OF RIGHT TO ATTACH ORDER AND WRIT OF ATTACHMENT [DOCKET NO. 5]**<br><br>[Cal. Code. Civ. P. § 484.090(a) and (b); Cal. Civ. Code § 3439.07(a)(2)] |

1

| | |
|---|---|
| 1  Cypherdoc and/or Cipherdoc, | ) Hearing Date: |
| 2      Defendant. | ) Date: April 24, 2015<br>) Time: 10:00 a.m. |
| 3 | ) Place: 235 Pine St., 19th Floor<br>)         San Francisco, CA 94104 |
| 4 | ) Judge: Honorable Dennis Montali. |

Debtors file this reply ("Reply") in support of their motion for a right to attach order and writ of attachment ("Motion") pursuant to CCP § 484.090(a) and (b) and CC § 3439.07(a)(2) as to certain Bitcoins ("BTC") fraudulently transferred to Defendant in or about September 2013, and respond as follows:[1]

## I. INTRODUCTION.

By and through the Motion and this Reply, Debtors have met the standards for a writ of attachment to issue against the BTCs. Debtors have shown that: (1) attachment may issue on their claims; (2) the probable validity of their claims; (3) attachment is not sought for a purpose other than recovery on the claims; and (4) the amount to be secured is greater than zero. Defendant primarily disputes the probable validity of Debtors' claims, and asserts that Debtors have not shown that attachment is appropriate to recover on Debtors' claims. Both disputes are easily addressed.

Through the Motion and this Reply, Debtors show that, at the time of the Transfers, they were hopelessly insolvent; Debtors were severely undercapitalized and incurring debts beyond their ability to repay; a creditor had claims against Debtors before or after the Transfers; Debtors did not receive reasonably equivalent value for the transfers (and Defendant submits nothing more than a self-serving declaration to opine that his compensation of approximately $11,370 per day or $2,274 per post was reasonable, when other parties were only offered a fraction of that amount);

---
[1]     Terms not otherwise defined herein are defined in the Debtors' Motion.

2

and Defendant will suffer no prejudice from attachment, as the BTCs have been sitting in a Wallet for the past year.

By contrast, Debtors will suffer great prejudice without a writ of attachment because the estate will be unable to recover the BTCs, or appreciation on the BTCs, if transferred. Debtors will show herein that, by law, the estate is entitled to the return of the BTCs and any appreciation thereon for the benefit of creditors. For all of the reasons set forth herein, and in the Motion, Debtors respectfully request that the Motion be granted, and Defendant's objections overruled and Motion to Strike denied.

## II. DEBTORS HAVE MET THEIR BURDEN OF SHOWING THE PROBABLE VALIDITY OF THEIR CLAIMS.

Debtors have met their burden of proof by a preponderance of the evidence. Under California law, preponderance of the evidence merely requires that a fact be more likely to be true than not true, and Debtors have shown the existence of their facts to be more probable than not. *See, e.g., Tannehill v. Finch*, 188 Cal. App. 3d 224, 228 (Ct. App. 1986) ("A preponderance of the evidence standard . . . merely requires that the existence of a fact be more probable than not."); *see also Gdowski v. Gdowski*, 175 Cal.App.4th 128, 137 (2009).

Defendants main bases for relief are that: (1) Debtors have submitted no evidence to support a writ of attachment; and (2) Debtors are unlikely to prevail on a fraudulent transfer theory. (Motion, at page 11.) To the extent that the evidence submitted in support of Debtors' Motion was in any way insufficient, Debtors submit a Supplemental Declaration of Victor Delaglio to rectify any perceived evidentiary deficiencies and to clarify Debtors' insolvency and financial position at the time of the Transfers. As set forth in Mr. Delaglio's Supplemental Declaration, Debtors were insolvent at the time they made the Transfers; in fact, Mr. Delaglio believes that Debtors were insolvent at all times during their operational history, based upon his

3

extensive review of their books and records; and when the Transfers occurred, Debtors were incurring debts beyond their ability to pay.[2] V. Delaglio's Supp. Decl. at ¶¶ 7-10. In addition, a creditor's claims arose before or after the Transfers, namely, Pete Morici's claim, which is evidenced by a complaint that Mr. Morici filed attached hereto as <u>Exhibit "A."</u> Debtors also show that they received less than reasonably equivalent value for posts at a cost of $11,370 <u>per day</u> or $2,274 <u>per post</u>, and without any evidence (other than self-serving testimony of the Defendant himself) that the posts had any impact on Debtors' operations or sales. Thus, as further set forth below, Debtors have shown that their facts are more probable than not, and have submitted sufficient evidence to meet the standards of CC §§ 3439.04(a)(2), 3439.05 and 11 U.S.C. § 548(a)(1)(B).

In addition, Debtors have shown that attachment is sought for recovery of the BTCs only (and not for any other purpose). As shown below, Debtors are entitled to the BTC by law if they prevail, and they only seek to protect their recovery by the writ of attachment. Without a writ in place, the estate's ability to recover on behalf of its creditors, including receiving the benefit of appreciation of the BTCs, would be in great jeopardy.

### A. <u>At the time of the Transfers, Debtors were insolvent and were incurring debts beyond their ability to repay.</u>

Debtors were insolvent at the time of the Transfers. Mr. Delaglio attests that the Debtors' consolidated balance sheet showed a negative equity balance of approximately $1.3 million as of August 31, 2013, which grew to a negative equity balance of approximately $2.6 million as September 30, 2013. V. Delaglio's Supp. Decl. at ¶ 7. Debtors, thus, were hopelessly insolvent at the time of the transfers in September 2013 under CC § 3439.05 and 11 U.S.C. § 548(a)(1)(B).

---

[2] On April 17, 2015, Debtors filed a First Amended Complaint ("<u>FAC</u>") to clarify some of Debtors' allegations concerning their insolvency and financial position at the time of the Transfers, among other allegations, pursuant to a Stipulation reached with Defendant [Docket NO. 19].

4

In fact, Mr. Delaglio attests that, based upon his extensive review of Debtors' records and files, Debtors either have had a negative equity balance or were severely undercapitalized at all times during their operational history. That is because Debtors raised insufficient capital to operate their company, and they relied on capital from customer orders to research, design, and build their products. Debtors were unlikely to meet their production costs as of at least August 31, 2013 to fulfill orders when they came due. V. Delaglio's Supp. Decl. at ¶ 8.

At the time of the Transfers, Debtors were engaged, or were about to engage, in business operations for which their remaining assets were unreasonably small. Importantly, at the time of the Transfers, Debtors were subsisting on monies generated from customer orders. As Mr. Delaglio attests, funds generated from customer orders are a liability unless or until the product is delivered. When the Transfers occurred, Debtors had a negative equity balance; in other words, they did not have sufficient assets to satisfy their liabilities. V. Delaglio's Supp. Decl. at ¶ 9. Thus, at the time of the Transfers, Debtors were engaged or were about to engage in business operations for which their remaining assets were unreasonably small under CC § 3439.04(a)(2) and 11 U.S.C. § 548(a)(1)(B).

Moreover, based on Debtors' dire financial condition, Debtors believed or reasonably should have believed that the Transfers would result in Debtors incurring debts beyond their ability to repay – they had no ability to repay creditors nearly $400,000 without any capital or profits. Specifically, Mr. Delaglio attests that, at the time of the Transfers, the Debtors were unlikely to remain current with costs of production, and meet delivery expectations. When the Transfers were made, Debtors were incurring further debts beyond their ability to pay. V. Delaglio's Supp. Decl. at ¶ 10. Thus, at the time of the Transfers, Debtors either believed or reasonably should have believed they were incurring debts beyond their ability to repay under CC § 3439.04(a)(2) and 11 U.S.C. § 548(a)(1)(B). Debtors, therefore, have met their burden of

5

showing insolvency, unreasonably small assets, and that they believed or reasonably should have believed that Debtors were incurring debts beyond their ability to pay.

### B. Debtors have shown that a creditor existed before or after the Transfers at issue.

Debtors show, through a complaint filed by a creditor, Peter Morici, that he, as a creditor, held claims against the Debtors before or after the Transfers were made under CC §§ 3439.04(a) and 3439.05. *See* Exhibit "A" hereto.[3] That is but one example of a creditor who held a claim, which is all that Debtors must show. (The plain language of the California fraudulent transfer statutes refers to "a creditor" only.) Moreover, whether Mr. Morici held claims before or after the Transfers does not matter because Debtors would be entitled to recovery under CC § 3439.04(a), requiring existing or future creditors. Debtors, thus, have met their burden of showing the existence of a creditor before or after the Transfers.

### C. Debtors have shown a lack of reasonably equivalent value.

As further set forth in the Motion, and herein, Debtors did not receive "reasonably equivalent value" for the 3,000 BTCs transferred, amounting to at least $363,861.43 at the time of the transfers, in exchange for Defendant posting comments on Bitcointalk.org. V. Delaglio's Supp. Decl. at ¶ 11. That equates to approximately $11,370 per day or $2,274 per post, when other parties were only offered $150 or approximately 1 BTC per week—approximately 0.0014% of the compensation paid to the Defendant. Based upon Debtors offer to other parties, their dire

---

[3] Debtors respectfully request this Court to take judicial notice, pursuant to Federal Rules of Evidence ("FRE") 201, as made applicable to bankruptcy proceedings by Fed. R. Bankr. P. 9017, of Mr. Morici's Complaint, a copy of which is attached hereto as Exhibit "A". The federal court complaint is a matter of public record capable of accurate and ready determination that cannot be reasonably questioned, pursuant to FRE 201. Bankruptcy courts "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc., 971 F.2d 244, 248 (9th Cir. 1992) (taking judicial notice of the state court's final judgment and "related filings.").

financial situation at that time, the endorsement services that Defendant was to perform based upon the MOU, the Debtors' sales volumes, and Debtors' books and records, the amount paid to Defendant was unreasonably and disproportionately high in comparison to the services offered. V. Delaglio's Supp. Decl. at ¶ 11.

Defendant has submitted no evidence, other than his self-serving statements in his declaration about how valuable he thinks his services were, that show that he had any impact on Debtors' operations or sales. Debtors had begun advertising the BabyJet in July 2013. V. Delaglio's Supp. Decl. at ¶ 12. This was before Debtors met Defendant. Based on Debtors' records and files, the BabyJet and GN1 chips were selling well from the time they were launched—specifically, between July and December 2013, the Debtors sold approximately $13,000,000 in computers, chips, and accessories. V. Delaglio's Supp. Decl. at ¶ 13. Based on this, in Mr. Delaglio's opinion, there is no obvious connection between Defendant's endorsements and the Debtors' sales and operations thereafter. V. Delaglio's Supp. Decl. at ¶ 13.

In other words, the product was selling itself, and any sales can be attributed to a new and novel product that was entering the marketplace and in demand. In rebuttal, Defendant does not present a shred of evidence that his posts led to any of the sales. For example, Defendant submits no email threads whereby any followers stated that they were going to go out and purchase the BabyJet or GN1 based on information obtained from the posts. In fact, Debtors were already searching for other marketers to assist with the sales at a fraction of Defendant's price, showing that Debtors were not generating the sales needed based on Defendant's posts. *See* Exhibit F to V. Delaglio Decl, at ¶ 10.

Defendant does cite to a "paper" that supposedly claims he is an influential member of the Bitcoin community, but that paper makes no mention of Defendant. See Motion, at ¶ 8. In fact, Defendant admits that Defendant is not named in the paper, and only references a "Hero member"

7

status. Any review of this allegedly supporting paper makes plain that there is no apparent connection to Defendant and does not in the least tout Defendant's status or contributions to the community, whatever they may be.

In short, Defendant cannot justify his humongous payday, while Debtors were insolvent, severely undercapitalized, and were incurring debts beyond their ability to repay, and while at least one other creditor (though of course there were more) had a claim against Debtors. This payment cannot be justified, as Defendant alludes, based on a reasonable business judgment. There is nothing reasonable about this scenario, and Debtors have met their burden of showing the probable validity of their claims by a preponderance of the evidence to justify issuing a writ.

## III. DEBTORS HAVE MET THEIR BURDEN OF SHOWING THAT ATTACHMENT IS SOUGHT PURELY TO RECOVER THE 3000 BTCs TRANSFERRED ON THEIR CLAIMS.

As set forth in the Motion, the Debtors seek to recover the MOU Payment in BTC, to which they are entitled by law. See, e.g., In re Brun, 360 B.R. 669, 673-74 (C.D. Bank. 2007) (holding that the debtor could recover property fraudulently transferred, plus any appreciation in the property, under § 550(a) for the benefit of the estate, "irrespective of any recovery limitations imposed by California law"); see generally 5 Collier's on Bankruptcy ¶ 550.02[3][a] (Alan N. Resnick & Henry J. Sommer eds.,16th ed.) (providing that "[a]t least two courts have held that the trustee should be entitled to recover the greater of the value of the transferred property at the transfer date or the value at the time of the recovery").

Return of the BTCs, including any appreciation thereon, is consistent with the two goals of Section 550 of the Bankruptcy Code: (1) restoration – returning the estate to the position it would have been in but for the transfers; and (2) restorative justice – discouraging a "'wait and see' approach' by transferee defendants holding property, such as stock [or in our case BTC], that may

8

be subject to wide, rapid swings in value on account of volatile markets." 5 Collier's on Bankruptcy ¶ 550.02[3][a] (Alan N. Resnick & Henry J. Sommer eds.,16th ed.); see also In re Taylor, 599 F.3d 880, 892-93 (9th Cir. 2010) (noting that section 550 of the Bankruptcy Code gives the Court discretion to award either of two remedy options).

Debtors seek to attach the 3000 BTC in the Wallet to ensure that 3000 BTC are available to satisfy any judgment obtained in the Adversary Proceeding. Debtors are informed that the 3000 BTC have been in the Wallet for at least one year, and thus no prejudice will result from attachment. V. Delaglio Decl, at ¶ 9. This is not a property that Defendant needs to use on a daily, weekly, monthly or even yearly basis. Indeed, the BTCs would just continue to sit in the Wallet, as they have been doing for one year. Thus, Defendant would suffer no prejudice as a result of attachment.

By contrast, without a writ of attachment in place, the 3000 BTC can be easily transferred from the Wallet (a moveable product), and Debtors would suffer great prejudice through loss of the BTC and any appreciation to which Debtors are entitled. By Defendant's own admission, the BTCs have appreciated to approximately $750,000. Thus, the only purpose of the attachment is to safeguard the estate's property for the benefit of its creditors, and Debtors are not seeking to attach the BTC in the Wallet for any other purpose.

9

## IV. CONCLUSION.

For all of the reasons set forth herein and in Motion, and based upon oral argument made on the record at the hearing, Debtors respectfully request the Court to grant its Motion and issue the writ of attachment so that the estate may recover what it is rightfully due (or at least not have its recovery compromised by any transfers in the interim).

Dated: April 17, 2015           KATTEN MUCHIN ROSENMAN LLP
                                Peter A. Siddiqui
                                Jessica M. Mickelsen

                                By: /s/Jessica M. Mickelsen
                                Counsel for Debtors and Debtors-In-Possession
                                HashFast Technologies LLC and HashFast LLC

10