# EXHIBIT A

KATTEN MUCHIN ROSENMAN LLP
Craig A. Barbarosh (SBN 160224)
craig.barbarosh@kattenlaw.com
650 Town Center Drive, Suite 700
Costa Mesa, CA 92626-7122
Telephone: (714) 966-6822

Jessica M. Mickelsen (SBN 277581)
jessica.mickelsen@kattenlaw.com
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
Telephone: (310) 788-4425
Facsimile: (310) 788-4471

Peter A. Siddiqui (*pro hac vice*)
peter.siddiqui@kattenlaw.com
525 W. Monroe Street
Chicago, IL 60661-3693
Telephone: (312) 902-5455
Facsimile: (312) 902-1061

Counsel for Debtors and Debtors-In-Possession
Hashfast Technologies LLC and HashFast LLC

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### (SAN FRANCISCO DIVISION)

| | |
|---|---|
| In re: | Case No. 14-30725 |
| HASHFAST TECHNOLOGIES LLC, a California limited liability company, | (Substantively Consolidated with In re HashFast LLC, Case No. 14-30866) |
| Debtor and Debtor-In-Possession | Chapter 11 |
| ⊠ Affects HASHFAST LLC, a Delaware limited liability company, | |
| Debtor and Debtor-In-Possession | |
| HASHFAST TECHNOLOGIES LLC, a California limited liability company, and HASHFAST LLC, a Delaware limited liability company, | Adversary Case No. 15-03011 |
| Plaintiffs, | **FIRST AMENDED COMPLAINT FOR:** |
| vs. | **1. AVOIDANCE OF PREFERENTIAL TRANSFERS;** |
| | **2. AVOIDANCE OF FRAUDULENT TRANSFERS;** |
| MARC A. LOWE, an individual, *aka* Cypherdoc and/or Cipherdoc, | **3. AVOIDANCE OF FRAUDULENT TRANSFERS (CONSTRUCTIVE FRAUD); AND** |
| | **4. RECOVERY OF AVOIDED** |

Defendant.          )    **TRANSFERS**
)
)   [11 U.S.C. §§ 544, 547; 548, and 550 and Cal.
)   Civil Code §§ 3439.04, 3439.05, and 3439.07]
)
)   Status Conference:
)   Date:    TBD
)   Time:    TBD
)   Place:   Courtroom 22
)   U.S. Bankruptcy Court
)   235 Pine Street
)   San Francisco, CA 94104

Katten
Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel 310.788.4471 fax

## FIRST AMENDED COMPLAINT

HashFast Technologies LLC, a California limited liability company ("HashFast Technologies"), and HashFast LLC, a Delaware limited liability company ("HashFast", collectively with HashFast Technologies, the "Debtors" and each a "Debtor"), by and through its undersigned counsel, bring this complaint (the "Complaint") against Defendant Marc A. Lowe, an individual, a/k/a Cypherdoc and/or Cipherdoc (the "Defendant"), and in support of this Complaint state as follows:

### JURISDICTION

1.      This adversary proceeding arises out of and is related to the above-captioned, substantively consolidated bankruptcy cases (collectively, the "Bankruptcy Cases") of *In re HashFast Technologies, LLC*, case no. 14-30725 DM (the "HFT Bankruptcy Case"), and *In re HashFast, LLC*, case no. 14-30866 DM (the "HF Bankruptcy Case"), pending before the United States Bankruptcy Court for the Northern District of California, San Francisco Division (the "Court"), and/or the claims alleged herein arise under title 11 of the United States Code (the "Bankruptcy Code"). This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

2.      The causes of action set forth herein constitute core proceedings pursuant to 28 U.S.C. § 157(b)(2)(A), (H), and/or (O), and/or relate to the Bankruptcy Cases. To the extent the Court determines that any claim and/or cause of action alleged herein does not constitute a core proceeding, the Debtors hereby consent to this Court's adjudication of the claims and/or causes of action and to the entry of final orders and judgments in this adversary proceeding.

3.      Venue is appropriate pursuant to 28 U.S.C. §§ 1391, 1408, and 1409 as this is the district in which the Bankruptcy Cases are pending and in which the relevant conduct complained of herein took place.

4.      On May 9, 2014 (the "<u>Petition Date</u>"), certain petitioning creditors filed a chapter 7 Involuntary Petition in the Court against Hashfast Technologies under title 11 of the Bankruptcy Code [Lead Case Doc. No. 1].

5.      On June 3, 2014, HashFast Technologies filed its Conditional Consent to an Order for Relief [Doc. No. 36] and its Motion to Convert to Chapter 11 [Lead Case Doc. No. 35].

6.      The Bankruptcy Court entered its order converting HashFast Technologies' case to one under chapter 11 of the Bankruptcy Code on June 5, 2014 [Lead Case Doc. No. 40].

7.      On June 6, 2014, HashFast filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

## BACKGROUND

8.      The Debtors design, develop, manufacture and sell certain computer chips and equipment, including Application Specific Integrated Circuit, or ASIC, semiconductors, for the sole purpose of auditing transaction data for the Bitcoin networks, also known as "Bitcoin mining." On or about June 2013, the Debtors began designing their first generation Golden Nonce (the "<u>GN1</u>"), with the assistance of Sandgate Technologies ("<u>Sandgate</u>") and Uniquify, Inc. ("<u>Uniquify</u>"). Following the development of the GN1, the Debtors worked with DXCorr Design (the "<u>DXC</u>") to design and develop subsequent generations of the GN1.

9.      In or about July 2013, HFT began advertising a special purpose computer system built around the GN1 (the "<u>BabyJet</u>") for sale and started accepting orders for the "batch one" BabyJets in early August 2013. The BabyJet and GN1 chip sold well from the time they were launched—specifically, between July and December 2013, the Debtors sold approximately $13,000,000 in computers, chips, and accessories.

10.      On or about July 29, 2013, Defendant Marc A. Lowe ("<u>Defendant</u>") visited the Debtors' headquarters to ostensibly tour the facility and meet the members and employees of HFT prior to purchasing one or more of the Debtors' products. During the tour, the Defendant met with

Katten
Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel 310.788.4471 fax

1   Eduardo de Castro, the Chief Executive Officer of HFT and co-owner of HF.  As a result of the

2   visit, the Defendant purchased four terra-hash per second of hashing power through the acquisition

3   of eight GN1 chips or three to four fully assembled BabyJets (the "<u>Computers</u>") for the sum of

4   $36,000, inclusive of sales tax—a $7,150 discount off of the list price (the "<u>Sale</u>").  The Defendant

5   paid the discounted purchase price for the Computers by personal check dated July 29, 2013.

6       11.    Subsequent to the visit, a memorandum of understanding dated August 5, 2013 (the

7   "<u>MOU</u>") was executed by the Defendant and HFT.  By and through the MOU, the Defendant

8   agreed to endorse the Debtors and their products by posting comments and responding to certain

9   inquiries on various Bitcoin-related forums and/or message boards, including Bitcointalk.org.  In

10  exchange for such "services", the Defendant was to receive ten percent (10%) of the base sale

11  price (i.e., gross sale proceeds) for the first 550 "batch one" BabyJets sold by the Debtors, payable

12  in BTC (the "<u>MOU Compensation</u>").  According to the MOU, the Defendant was entitled to the

13  MOU Compensation regardless of whether the "endorsement" contributed in any way to the sale

14  of any BabyJet or other HFT product.  A true and correct copy of the MOU is attached hereto as

15  <u>Exhibit A</u> and is incorporated herein by reference.  At the time the MOU was executed, HFT was

16  offering the BabyJets for sale at a base price of approximately $5,600 or 56 BTC.

17      12.    The Debtors are informed and believe and based thereon allege that the Defendant

18  is a medical doctor without any experience marketing or advertising BTC mining hardware or

19  hardware manufacturers.

20      13.    In addition to the business relationship established by the MOU, the Defendant also

21  purports to have joined HFT's board of advisors in late-July or early-August 2013.   As the

22  Defendant stated in a post dated August 8, 2013: "I have also been asked to join [HFT's] Board of

23  Advisors."  A true and correct copy of the August 8, 2013 post is attached hereto at pages 1-3 of

24  <u>Exhibit B</u> and incorporated herein by reference.  The Debtors are informed and believe that the

25  Defendant had direct and regular contact with the Debtors' members, principals, directors, and

26  employees—individuals generally unavailable to ordinary customers and creditors—from whom

27  Defendant obtained inside information.

28      14.    On or about August 8, 2013, the Defendant began posting commentary regarding

Katten
Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

1   HFT and the Debtors' products on Bitcointalk.org under a thread titled "HashFast Endorsement."

2   Between August 8, 2013, and September 9, 2013, the Defendant posted approximately 160

3   comments and updates (an average of 5 posts per day) regarding, among other things, the roll-out

4   and sale of the BabyJet.  The Defendant's posts, however, were not limited to salient matters;

5   rather, the Defendant also engaged "trolls" in irrelevant and lengthy debate regarding numerous

6   topics, including, but not limited to, economics and the philosophy underlying BTC.  The

7   irrelevant commentary accounts for a substantial portion of the approximately 160 posts, a sample

8   of which is attached hereto at pages 3-227 of Exhibit B and incorporated herein by reference.

9       15.     In or about early September 2013, HFT pre-sold the first 550 BabyJets.  Thereafter,

10  on or about September 4, 2013, the Defendant requested payment in accordance with the MOU.  A

11  true and correct copy of the request is attached hereto as Exhibit C and incorporated herein by

12  reference.  The Defendant calculated that he was owed a total of $308,000 in BTC at the exchange

13  rate applicable on August 8, 2013, and requested payment of 3242.1 BTC within seven (7) days.

14      16.     The Debtors were unable to pay immediately the requested amount due to the

15  limited availability of funds and BTC.  Indeed, the Debtors did not make the first distribution of

16  BTC to the Defendant on account of the MOU until September 5, 2013.

17      17.     In total, the Debtors transferred 3000 BTC to the Defendant (the "MOU Payment")

18  from two different BTC wallets belonging to HFT.  The Debtors transferred the MOU Payment to

19  the Defendant via four deposits into a BTC wallet specified by and belonging to the Defendant[1]

20  bearing account number xUDJ9 (the "Wallet")—specifically: (a) 2000 BTC on September 5,

21  2013; (b) 250 BTC on September 14, 2013; (c) 250 BTC on September 22, 2013; and (d) 500

22  BTC on September 23, 2013 (collectively, the "Transfers").  A true and correct copy of the

23  transaction record is attached hereto as Exhibit D and incorporated herein by reference.  With the

24  exception of one BTC, the Transfers are currently in the Wallet and, to the best of the Debtors'

25  knowledge, have never been moved out of the Wallet.

26      18.     At the times of the Transfers, the BTC transferred to the Defendant were worth

---

[1] A true and correct copy of correspondence from the Defendant identifying the Wallet is attached hereto as Exhibit E and incorporated herein by reference.

$363,861.43.[2] Based on the value of the BTC at the time of the Transfers, the Defendant received approximately $11,370 per day or $2,274 per post on the "HashFast Endorsement" thread on Bitcointalk.org. By contrast, the highest salary paid to any principal or employee of HFT and/or HF was $144,000 for the entire calendar year of 2013.

19. At or about the time the Defendant was "endorsing" the Debtors and their products, the Debtors attempted to recruit other persons to provide the same or similar services. A true and correct copy of such correspondence is attached hereto as Exhibit F and incorporated herein by reference. However, in stark contrast to the MOU Payment, the other parties were offered $150 or a little more than 1 BTC per week (approximately 0.0014% of the compensation paid to the Defendant) to post two to four comments per day on certain online discussion boards or forums— roughly $21.43 per day or $10.71 per post (based on two comments per day).

20. At the time of the Transfers, the Debtors owed substantial sums of money and/or equipment to numerous customers and/or vendors. Many of these obligations remain unpaid and constitute general unsecured claims against the Estate.

21. Additionally, at the time of the Transfers, the Debtors were incurring significant liabilities in the course of their operations that exceeded the Debtors' ability to repay. Despite an inability to deliver the BabyJet or GN1, the Debtors continued to accept orders for these products and promised guaranteed delivery dates that the Debtors failed to meet. In an effort to meet these timelines, the Debtors ordered products on expedited delivery schedules, which substantially increased the production costs of the GN1 and BabyJet. Due to the increased costs and other associated overhead, the Debtors were unable to realize a profit from their operations or meet their financial and/or delivery obligations.

22. At the time of the Transfers, Debtors had a negative equity balance based on their

---

[2] On September 5, 2013, one BTC was worth $120.5333 (US). On September 14, 2013, one BTC was worth $124.0813 (US). On September 22, 2013, one BTC was worth $122.651 (US). On September 23, 2013, one BTC was worth $122.2235 (US). See Historical Bitcoin Price Index, available at http://www.coindesk.com/price/ (last visited Dec. 22, 2014). As of January 14, 2015, the Transfers are worth approximately $555,000, which is based on a value of $185.00 (US) per BTC. See Historical Bitcoin Price Index, available at http://www.coindesk.com/price/ (last visited Jan. 14, 2015). As of the commencement of the HF Bankruptcy on May 9, 2014, the Transfers were worth approximately $1,344,705. Id. At the 1-year height in the BTC market in early-December 2013, the Transfers had a value in excess of $3,400,000. Id.

Katten
Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

consolidated balance sheet.   As of August 31, 2013, the Debtors' consolidated balance sheet showed a negative equity balance of approximately $1.3 million, which grew to a negative equity balance of approximately $2.6 million as September 30, 2013.   Debtors' consolidated balance sheet further showed a negative equity balance of approximately $7.1 million as of December 31, 2013, which continued or grew through the Petition Date.

23.   In fact, Debtors are informed and believe that they either have had a negative equity balance or were severely undercapitalized at all times during their operational history.  That is because Debtors raised insufficient capital to operate their company, and they relied on capital from customer orders to research, design, and build their products.  Debtors were unlikely to meet their production costs as of at least August 31, 2013 to fulfill orders when they came due.

24.   As a result of the inability to meet production costs, at the time of the Transfers, the Debtors were unable to fulfill many of the orders on or before the guaranteed delivery date (December 31, 2013), including, but not limited to, many of the "batch one" orders upon which the MOU Payment was premised.  As a result, many customers began demanding refunds for their purchases in or about January 2014.  As the Debtors lacked sufficient funds and/or BTC to pay all the refunds requested and remained unable to fill customer orders, multiple customers commenced lawsuits against the Debtors in an effort to obtain a refund in currency and/or BTC.

25.   Like many other customers, the Defendant requested a refund of the $36,000 he paid in association with the Sale in or about January 2014.  The Defendant, as an insider, received a full refund of the $36,000 purchase price plus a five percent (5%) bonus, for a total of $37,800, on January 10, 2014 (the "Refund").   Other creditors who requested refunds did not receive refunds.  The Defendant's insider status is alleged further below.  The Refund was paid from HFT's account at Silicon Valley Bank via a wire transfer to the Defendant.

26.   The Debtors are informed and believe and based thereon allege that the Defendant currently holds the specific BTC paid by HFT in the Wallet.

# FIRST CLAIM FOR RELIEF

## AVOIDANCE OF PREFERENTIAL TRANSFERS

### [11 U.S.C. § 547(b)]

27.    The Debtors repeat and reallege the allegations contained in Paragraphs 1 through 26 as if fully set forth herein.

28.    At the time of the Refund, the Defendant was a creditor of one or both of the Debtors by virtue of the Sale.

29.    The currency used to pay the Refund constituted property belonging to one or both of the Debtors at the time of its payment.

30.    The Refund was paid on account of an antecedent debt owing to the Defendant as a result of Debtors' inability to fulfill the Sale.  More precisely, upon the Debtors' failure to deliver the Computers on or before December 31, 2013, the Defendant became a creditor of the Debtors.

31.    Defendant also was an insider within the meaning of 11 U.S.C. §§ 101(31) at the time of the Refund, as he had access to inside information and was in a position to exercise control over the Debtors (and Debtors had the ability to exercise control over him).  First, the MOU evidences Defendant's insider relationship.  Defendant gained access to inside information as a result of his business relationship with the Debtors, pursuant to the MOU, whereby Defendant agreed to endorse the Debtors and their products.  Indeed, Defendant had direct access to and regular contact with the Debtors' members, principals, directors and employees – individuals generally unavailable to other creditors.  Defendant obtained inside information from these contacts, which he then used to convey his endorsements to his public forum, controlling dissemination of information of the Debtors.  Debtors likewise controlled the information conveyed to Defendant before it entered the public sphere.   Second, along with Defendant's access to inside information and ability to exercise control over the Debtors (and vice versa), Defendant was to receive the MOU Compensation for his services endorsing Debtors' products, regardless of whether the endorsements led to sales.  This was more than a mere close relationship; it was an inside job.  Third, Defendant's admitted invitation to join HFT's Advisory Board just three days after the MOU was signed evidences his insider relationship.  This sequence

Katten
Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel    310.788.4471 fax

of events shows more than mere closeness; it shows a level of trust indicative of an insider relationship.  <u>Fourth</u>, approximately five months later, the Refund was provided to Defendant, while other creditors did not receive any refund.  Defendant received the Refund, over other creditors, because he was an insider.

32.     The Refund was paid on or about January 10, 2014, within one year of the HFT Petition Date and HF Petition Date (the "<u>Preference Period</u>").  Other creditors demanding refunds were not paid.

33.     As a result of the Refund, the Defendant received payment in full on account of an antecedent debt that would have constituted a general unsecured claim against the Estate if not paid prepetition.

34.     At the time of the Refund, the Defendant was insolvent.  As further pled hereinabove, at the time of the Refund, Debtors' consolidated balance sheet showed a negative equity balance of approximately $7.1 million, which negative equity balance continued or grew through the Petition Date (and after).  Debtors, likewise, had no working capital at the time of the Refund (and before).

35.     If the Refund had not been paid within the Preference Period, the Defendant would not have received the full Refund in the context of a chapter 7 liquidation as the Debtors were and still are insolvent and unable to pay all general unsecured creditors in full, including, but not limited to, the claims relating to refund requests of non-insider creditors (who are otherwise similarly-situated to the Defendant).

36.     By reason of the foregoing, the Refund is avoidable pursuant to 11 U.S.C. § 547.

<u>**SECOND CLAIM FOR RELIEF**</u>

**AVOIDANCE OF FRAUDULENT TRANSFERS**

**[11 U.S.C. § 544 and Cal. Civil Code § 3439.04(a)(2)]**

37.     The Debtors repeat and reallege the allegations contained in Paragraphs 1 through 36 as if fully set forth herein.

38.     The Transfers occurred within the four-year period immediately preceding the HFT Petition Date and HF Petition Date.

Katten
Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel    310.788.4471 fax

Katten
Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

39.     The Defendant received the Transfers, and he continues to hold the BTC transferred in the Wallet.

40.     The BTC that comprised the Transfers constituted property belonging to one or both of the Debtors at the time of the Transfers.

41.     The Debtors received less than reasonably equivalent value in exchange for the Transfers.  Specifically, the value of the "services" that the Defendant provided and that the Debtors received (i.e., posting 160 comments on Bitcoin-related forums over a period of approximately one month) was less valuable than the consideration provided in exchange for such "services"—namely, BTC worth more than $350,000 at the time of the Transfers.

42.     Several customers and/or vendors held claims against the Debtors before or after the Transfers, including, but not limited to, Pete Morici.

43.     At the time of the Transfers, the Debtors were engaged or were about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.  Specifically, the Debtors were engaged in the designing, manufacture and sale of the GN1 and BabyJet.  The Debtors, however, lacked any working capital to maintain operations and meet production costs and, thus, had to subsist on customer, pre-purchase funds from orders and sell BTC.  When the Debtors entered into the MOU, and made the MOU Payment, they were engaging in a business or transaction for which their remaining assets were unreasonably small in relation to the business and the scale of the transactions required to maintain productivity—a deficiency that led to the failure of the business and bankruptcy.

44.     Additionally, at the time of the Transfers, the Debtors intended to incur, or believed or reasonably should have believed, that they would incur debts beyond their ability to pay as they became due.  At that time, the Debtors were unable to remain current with costs of production of the BabyJet or GN1 and meet delivery deadlines, and they had no working capital; yet, they still made the Transfers, incurring further debts, beyond their ability to pay.  Based on the Debtors' inability to meet production costs and delivery deadlines and complete lack of working capital, Debtors intended to incur, or believed, or reasonably should have believed, that the Transfers would result in debts to their creditors beyond their ability to pay, which in fact occurred.

45.     At present, the claims against the Estate total approximately $40,754,674.   The total assets presently held are insufficient to pay all the claims against the Estate.  Recovery of the Transfers is necessary to satisfy the claims of creditors asserted against the Estate.

46.     By reason of the foregoing, the Transfers are avoidable pursuant to 11 U.S.C. § 544 and Cal. Civil Code § 3439.04.

## THIRD CLAIM FOR RELIEF

### AVOIDANCE OF FRAUDULENT TRANSFERS (CONSTRUCTIVE FRAUD)

### [11 U.S.C. § 544 and Cal. Civil Code § 3439.05]

47.     The Debtors repeat and reallege the allegations contained in Paragraphs 1 through 46 as if fully set forth herein.

48.     The Transfers occurred within the four-year period immediately preceding the HFT Petition Date and HF Petition Date.

49.     The Defendant received the Transfers, and he continues to hold the BTC transferred in the Wallet.

50.     The BTC that comprised the Transfers constituted property belonging to one or both of the Debtors at the time of the Transfers.

51.     The Debtors received less than reasonably equivalent value in exchange for the Transfers.  Specifically, the value of the "services" provided by the Defendants and received by the Debtors (i.e., posting 160 comments on Bitcoin-related forums over a period of approximately one month) was less valuable than the consideration provided in exchange for such "services"— namely, BTC worth more than $350,000 at the time of the Transfers.

52.     Several customers and/or vendors held claims against the Debtors that arose before the Transfers were made, including, but not limited to, Pete Morici.

53.     The Debtors were insolvent at that time or they became insolvent as a result of the Transfers.  Specifically, the Debtors were insolvent at the time of the Transfers, or they became insolvent as a result of the Transfers, to the Defendant on a consolidated balance sheet basis with a negative equity balance that grew from approximately $1.3 million as of August 31, 2013 to approximately $2.6 million as of September 30, 2013.  In other words, the fair value of the

11

Katten
Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

1
2
3

Debtors' debts was greater than all of the Debtors' assets. The Debtors likewise were unable to meet all of their obligations (including production costs) as they became due as of at least August 31, 2013.

4
5
6

54. At present, the claims against the Estate total approximately $40,754,674. The total assets presently held are insufficient to pay all the claims against the Estate. Recovery of the Transfers is necessary to satisfy the claims of creditors asserted against the Estate.

7
8

55. By reason of the foregoing, the Transfers are avoidable pursuant to 11 U.S.C. § 544 and Cal. Civil Code § 3439.05.

9

**FOURTH CLAIM FOR RELIEF**

10

**AVOIDANCE OF FRAUDULENT TRANSFERS (CONSTRUCTIVE FRAUD)**

11

**[11 U.S.C. § 548(a)(1)(B)]**

12
13

56. The Debtors repeat and reallege the allegations contained in Paragraphs 1 through 55 as if fully set forth herein.

14
15

57. The Transfers occurred within the two-year period immediately preceding the HFT Petition Date and HF Petition Date.

16
17

58. The Defendant received the Transfers, and he continues to hold the BTC transferred in the Wallet.

18
19

59. The BTC used to pay the MOU Payment constituted property belonging to one or both of the Debtors at the time of the Transfers.

20
21
22
23
24

60. The Debtors received less than reasonably equivalent value in exchange for the Transfers. Specifically, the value of the "services" that the Defendant provided and the Debtors received (i.e., posting 160 comments on Bitcoin-related forums over a period of approximately one month) was less valuable than the consideration provided in exchange for such "services"— namely, BTC worth more than $350,000 at the time of the Transfers.

25
26
27
28

61. The Debtors were insolvent at the time of the Transfers, or became insolvent as a result of the Transfers, to the Defendant with a negative equity balance that grew from approximately $1.3 million as of August 31, 2013 to approximately $2.6 million as of September 30, 2013 based on the consolidated balance sheet.

12

62.     At the time of the Transfers, the Debtors were engaged in the designing, manufacture and sale of the GN1 and BabyJet.  The Debtors had no capital to meet production costs and maintain operations and, as a result, had to use customer, pre-purchase funds and sell BTC in an effort to maintain operations.  When the Debtors entered into the MOU with Defendant, and made the MOU Payment, they were engaging in a business or transaction for which their remaining assets were unreasonably small in relation to the business and the scale of the transactions required to maintain productivity—a deficiency that led to the failure of the business and bankruptcy.

63.     Additionally, at the time of the Transfers, the Debtors intended to incur or believed that they would incur debts beyond their ability to pay as they became due.  At that time, the Debtors were unable to remain current with costs of production of the BabyJet or GN1 or meet delivery deadlines; yet, they made the Transfers, incurring further debts beyond their ability to pay.  Based on the Debtors' inability to meet production costs and delivery deadlines, and with a complete lack of working capital, Debtors intended to incur, or believed that the Transfers would result in, debts to their creditors beyond their ability to pay, which in fact happened.

64.     By reason of the foregoing, the Transfers are avoidable pursuant to 11 U.S.C. § 548(a)(1)(B).

## FIFTH CLAIM FOR RELIEF

## RECOVERY OF AVOIDED TRANSFERS

## [11 U.S.C. § 550]

65.     The Debtors repeat and reallege the allegations contained in Paragraphs 1 through 64 as if fully set forth herein.

66.     By reason of the foregoing, the Debtors are entitled to recover the Transfers and the Refund, or if the Court so orders, the value of the Transfers and Refund, for the benefit of the Estate pursuant to 11 U.S.C. § 550(a)(1).

Katten

Katten Muchin Rosenman LLP

2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel   310.788.4471 fax

## SIXTH CLAIM FOR RELIEF

### RECOVERY OF AVOIDED TRANSFERS

#### [Cal. Civil Code § 3439.07]

67. The Debtors repeat and reallege the allegations contained in Paragraphs 1 through 66 as if fully set forth herein.

68. By reason of the foregoing, the Debtors are entitled to recover the Transfers and the Refund, or if the Court so orders, the value of the Transfers and Refund, for the benefit of the Estate pursuant to California Civil Code § 3439.07.

## PRAYER FOR RELIEF

WHEREFORE, the Debtors pray as follows:

69. As to the First Claim for Relief, that the Refund be avoided for the benefit of the Estate;

70. As to the Second Claim for Relief, that the Transfers be avoided for the benefit of the Estate;

71. As to the Third Claim for Relief, that the Transfers be avoided for the benefit of the Estate;

72. As to the Fourth Claim for Relief, that the Transfers be avoided for the benefit of the Estate;

73. As to the Fifth Claim for Relief, that the Estate recover the Transfers and Refund, or if the Court so orders, the value of the Transfers and Refund, and be awarded damages and judgment be entered in the Estate's favor against the Defendant, plus interest at the maximum legal rate from the date of each of these payments, or such other amount as shall be shown by proof prior to judgment herein;

74. As to the Sixth Claim for Relief, that the Estate recover the Transfers and Refund, or if the Court so orders, the value of the Transfers and Refund, and be awarded damages and judgment be entered in the Estate's favor against the Defendant, plus interest at the maximum legal rate from the date of each of these payments, or such other amount as shall be shown by proof prior to judgment herein; and

**Katten**
Katten Muchin Rosenman LLP
2029 Century Park East, Suite 2600
Los Angeles, CA 90067-3012
310.788.4400 tel    310.788.4471 fax

1    75.    Any and all additional and further relief as this Court may deem just and proper.

2   Dated:  April 17, 2015                    Katten Muchin Rosenman LLPJessica M. Mickelsen
3                                             Peter A. Siddiqui

4                                             By:/s/ Jessica M. Mickelsen
5                                             Counsel for Debtors and Debtors-In-Possession
6                                             HashFast Technologies LLC and HashFast LLC

# EXHIBIT B

1  BRIAN E. KLEIN (SBN 258246)
   BAKER MARQUART LLP
2  10990 Wilshire Boulevard, Fourth Floor
   Los Angeles, California 90024
3  Telephone:  (424) 652-7800
   Facsimile:  (424) 652-7850
4  Email:      bklein@bakermarquart.com

5
   DAVID M. POITRAS, APC (SBN 141309)
6  JEFFER MANGELS BUTLER & MITCHELL LLP
   1900 Avenue of the Stars, 7th Floor
7  Los Angeles, California 90067-4308
   Telephone:  (310) 203-8080
8  Facsimile:  (310) 203-0567
9  Email:      dpoitras@jmbm.com

10 Attorneys for Defendant Dr. Marc A. Lowe

11              **UNITED STATES BANKRUPTCY COURT**
12              **NORTHERN DISTRICT OF CALIFORNIA**
                   **SAN FRANCISCO DIVISION**
13

| | |
|---|---|
| 14  In re: | Case No. 14-30725 |
| 15  HASHFAST TECHNOLOGIES LLC,<br>a California limited liability company, | (Substantively Consolidated with<br>In re HashFast LLC, Case No. 14-30866) |
| 16      Debtor and Debtor in Possession | Chapter 11 |
| 17  ☐ Affects HASHFAST LLC,<br>    a Delaware limited liability company, | Adversary Case No. 15-03011 |
| 18      Debtor and Debtor in Possession | |
| 19  HASHFAST TECHNOLOGIES LLC,<br>a California limited liability company, and | **ANSWER TO FIRST AMENDED<br>COMPLAINT** |
| 20  HASHFAST LLC, a Delaware limited liability<br>company, | **DEMAND FOR JURY TRIAL** |
| 21      Plaintiffs, | |
| 22  vs. | **Status Conference:**<br>Date:  June 17, 2015 |
| 23  MARC A. LOWE, an individual, aka<br>Cypherdoc and/or Cipherdoc, | Time:  10:00 a.m.<br>Place:  235 Pine St., 22nd Floor |
| 24 |        San Francisco, CA 94104 |
| 25      Defendant. | Judge:  Honorable Dennis Montali |

26

27

28

PRINTED ON
RECYCLED PAPER
LA 11997935v1

1    Defendant Dr. Marc A. Lowe ("Dr. Lowe"), through his undersigned attorneys, for himself

2    and no other defendant, responds to and answers the First Amended Complaint [Docket No.

3    24]("FAC") of plaintiffs and debtors and debtors-in-possession HashFast Technologies LLC and

4    HashFast LLC (collectively, "Plaintiffs"), as set forth below.  Except to the limited extent expressly

5    admitted below, Dr. Lowe denies each and every allegation, matter, statement, and thing contained

6    in the FAC.

### JURISDICTION

7

8         1.    In answering paragraph 1 of the FAC, Dr. Lowe admits that the Bankruptcy Court or

9    the United States District Court has jurisdiction over this matter since the matter is related to the

10   above-captioned bankruptcy cases.  Dr. Lowe denies each of the remaining allegations stated in

11   paragraph 1 of the FAC.

12        2.    Paragraph 2 of the FAC is comprised of legal conclusions, argument and

13   unsupported conclusory statements for which no answer is necessary.  To the extent that the Court

14   determines that an answer is necessary, Dr. Lowe denies the allegations stated in paragraph 2 of the

15   FAC.

16        3.    Dr. Lowe agrees that venue is proper in the Bankruptcy Court but denies that the

17   relevant conduct complained of in the FAC took place in this judicial district.

18        4.    Dr. Lowe lacks knowledge or information sufficient to admit or deny the allegations

19   stated in paragraph 4 of the FAC and therefore such allegations are denied.

20        5.    Dr. Lowe lacks knowledge or information sufficient to admit or deny the allegations

21   stated in paragraph 5 of the FAC and therefore such allegations are denied.

22        6.    Dr. Lowe lacks knowledge or information sufficient to admit or deny the allegations

23   stated in paragraph 6 of the FAC and therefore such allegations are denied.

24        7.    Dr. Lowe lacks knowledge or information sufficient to admit or deny the allegations

25   stated in paragraph 7 of the FAC and therefore such allegations are denied.

### BACKGROUND

26

27        8.    Dr. Lowe lacks knowledge or information sufficient to admit or deny the allegations

28   stated in paragraph 8 of the FAC and therefore such allegations are denied.

PRINTED ON
RECYCLED PAPER
LA 11997935v1

JMBM | Jeffer Mangels
Butler & Mitchell LLP

9.     Dr. Lowe lacks knowledge or information sufficient to admit or deny the allegations stated in paragraph 9 of the FAC and therefore such allegations are denied.

10.    In answering paragraph 10 of the FAC, Dr. Lowe admits: (a) that on or about July 29, 2013 he visited Plaintiffs' headquarters, (b) that during said visit he met with Eduardo de Castro, (c) that on that same day he paid Plaintiffs $36,000.00 for Order #1 of Batch 1 of the BabyJet, and (d) that he paid the $36,000.00 by personal check.  Except to the limited extent admitted above, Dr. Lowe denies each and every allegation set forth in paragraph 10 of the FAC.

11.    In answering paragraph 11 of the FAC, Dr. Lowe admits: (a) that a Memorandum of Understanding dated August 5, 2013 was executed by him and Plaintiffs (the "MOU"); (b) that he agreed to endorse Plaintiffs' product generally known as the BabyJet; (c) that pursuant to the MOU he was entitled to be paid an amount equal to ten percent (10%) of the base sale price for the first 550 "batch one" BabyJets sold by the Plaintiffs; and (d) that at the time the MOU was executed, Plaintiffs were offering the BabyJet for sale at a base price of approximately $5,600.  Except to the limited extent admitted above, Dr. Lowe denies each and every allegation set forth in paragraph 11 of the FAC.

12.    In answering paragraph 12 of the FAC, Dr. Lowe admits that he is a medical doctor. Except to the limited extent admitted above, Dr. Lowe denies each and every allegation set forth in paragraph 12 of the FAC.

13.    In answering paragraph 13 of the FAC, Dr. Lowe admits that he was asked to join Plaintiffs' board of advisors.  Except to the limited extent admitted above, Dr. Lowe denies each and every allegation set forth in paragraph 13 of the FAC.

14.    In answering paragraph 14 of the FAC, Dr. Lowe admits that on or about August 8, 2013, he began posting commentary regarding the BabyJet on numerous threads, including Bitcointalk.org under a thread titled "HashFast Endorsement."  Dr. Lowe also endorsed Plaintiffs and the BabyJet through numerous email messages and private messages.  Except to the limited extent admitted above, Dr. Lowe denies each and every allegation set forth in paragraph 14 of the FAC.

PRINTED ON RECYCLED PAPER
LA 11997935v1

- 3 -

JMBM | Jeffer Mangels
Butler & Mitchell LLP

15.     In answering paragraph 15 of the FAC, Dr. Lowe is informed and believes that Plaintiffs pre-sold the first 550 BabyJets by August 25, 2013.  Dr. Lowe admits that he requested payment in accordance with the MOU.  In answering the balance of paragraph 15 of the FAC, Dr. Lowe states that the referenced Exhibit C "speaks for itself" and requires no answer.  To the extent that the Court determines that an answer is necessary, except to the limited extent set forth above, Dr. Lowe denies the allegations stated in paragraph 15 of the FAC.

16.     In answering paragraph 16 of the FAC, Dr. Lowe admits that Plaintiffs did not make any payment to him pursuant to the MOU until September 5, 2013.  Except to the limited extent admitted above, Dr. Lowe denies each and every allegation set forth in paragraph 16 of the FAC.

17.     In answering paragraph 17 of the FAC, Dr. Lowe admits that he was paid 3,000 bitcoins for his services rendered in accordance with the express terms of the MOU and that he was paid in the amounts and on the dates stated in paragraph 17 of the FAC.  Except to the limited extent admitted above, Dr. Lowe denies each and every allegation set forth in paragraph 17 of the FAC.

18.     Dr. Lowe denies the allegations stated in paragraph 18 of the FAC.

19.     Dr. Lowe lacks knowledge or information sufficient to admit or deny the allegations stated in paragraph 19 of the FAC and therefore such allegations are denied.

20.     Dr. Lowe lacks knowledge or information sufficient to admit or deny the allegations stated in paragraph 20 of the FAC and therefore such allegations are denied.

21.     Dr. Lowe lacks knowledge or information sufficient to admit or deny the allegations stated in paragraph 21 of the FAC and therefore such allegations are denied.

22.     Dr. Lowe lacks knowledge or information sufficient to admit or deny the allegations stated in paragraph 22 of the FAC and therefore such allegations are denied.

23.     Dr. Lowe lacks knowledge or information sufficient to admit or deny the allegations stated in paragraph 23 of the FAC and therefore such allegations are denied.

24.     Dr. Lowe lacks knowledge or information sufficient to admit or deny the allegations stated in paragraph 24 of the FAC and therefore such allegations are denied.

PRINTED ON
RECYCLED PAPER
LA 11997935v1

1    25.    In answering paragraph 25 of the FAC, Dr. Lowe admits that he requested a refund

2    of $36,000 from Plaintiffs in January 2014 and that he received a refund in the amount of

3    $37,800.00 on or about January 10, 2014. Except to the limited extent admitted above, Dr. Lowe

4    denies each and every allegation set forth in paragraph 25 of the FAC.

5    26.    Dr. Lowe denies the allegations stated in paragraph 26 of the FAC.

6    **FIRST CLAIM FOR RELIEF**

7    **(AVOIDANCE OF PREFERENTIAL TRANSFERS)**

8    27.    Dr. Lowe incorporates by reference his answers to paragraphs 1 through 26 of the

9    FAC as if fully set forth in response to this claim.

10   28.    Paragraph 28 of the FAC is comprised of legal conclusions, argument and

11   unsupported conclusory statements for which no answer is necessary. To the extent that the Court

12   determines that an answer is necessary, Dr. Lowe denies the allegations stated in paragraph 28 of

13   the FAC.

14   29.    Dr. Lowe lacks knowledge or information sufficient to admit or deny the allegations

15   stated in paragraph 29 of the FAC and based therefore such allegations are denied.

16   30.    Paragraph 30 of the FAC is comprised of legal conclusions, argument and

17   unsupported conclusory statements for which no answer is necessary. To the extent that the Court

18   determines that an answer is necessary, Dr. Lowe denies the allegations stated in paragraph 30 of

19   the FAC.

20   31.    Paragraph 31 of the FAC is comprised of legal conclusions, argument and

21   unsupported conclusory statements for which no answer is necessary. To the extent that the Court

22   determines that an answer is necessary, Dr. Lowe denies the allegations stated in paragraph 31 of

23   the FAC.

24   32.    Dr. Lowe admits that the referenced refund was paid on or about January 10, 2014

25   and that January 10, 2014 is within one year of the petition date. Except to the limited extent

26   admitted above, Dr. Lowe denies each and every allegation set forth in paragraph 32 of the FAC.

27

28

JMBM | Jeffer Mangels
Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER
LA 11997935v1

1   33.     Paragraph 33 of the FAC is comprised of legal conclusions, argument and

2   unsupported conclusory statements for which no answer is necessary.  To the extent that the Court

3   determines that an answer is necessary, Dr. Lowe denies the allegations stated in paragraph 33 of

4   the FAC.

5   34.     Dr. Lowe lacks knowledge or information sufficient to admit or deny the allegations

6   stated in paragraph 34 of the FAC and based therefore such allegations are denied.

7   35.     Dr. Lowe lacks knowledge or information sufficient to admit or deny the allegations

8   stated in paragraph 35 of the FAC and therefore such allegations are denied.

9   36.     Paragraph 36 of the FAC is comprised of legal conclusions, argument and

10  unsupported conclusory statements for which no answer is necessary.  To the extent that the Court

11  determines that an answer is necessary, Dr. Lowe denies the allegations stated in paragraph 36 of

12  the FAC.

13                          **SECOND CLAIM FOR RELEIF**

14                  **(AVOIDANCE OF FRAUDULENT TRANSFERS)**

15  37.     Dr. Lowe incorporates by reference his answers to paragraphs 1 through 36 of the

16  FAC as if fully set forth in response to this claim.

17  38.     Dr. Lowe admits the allegations stated in paragraph 38 of the FAC.

18  39.     Dr. Lowe denies the allegations stated in paragraph 39 of the FAC.

19  40.     Dr. Lowe lacks knowledge or information sufficient to admit or deny the allegations

20  stated in paragraph 40 of the FAC and therefore such allegations are denied.

21  41.     Dr. Lowe denies the allegations stated in paragraph 41 of the FAC.

22  42.     Dr. Lowe lacks knowledge or information sufficient to admit or deny the allegations

23  stated in paragraph 42 of the FAC and therefore such allegations are denied.

24  43.     Dr. Lowe lacks knowledge or information sufficient to admit or deny the allegations

25  stated in paragraph 43 of the FAC and therefore such allegations are denied.

26  44.     Dr. Lowe lacks knowledge or information sufficient to admit or deny the allegations

27  stated in paragraph 44 of the FAC and therefore such allegations are denied.

28

JMBM | Jeffer Mangels
Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER
LA 11997935v1

45.     Dr. Lowe lacks knowledge or information sufficient to admit or deny the allegations stated in paragraph 45 of the FAC and therefore such allegations are denied.

46.     Paragraph 46 of the FAC is comprised of legal conclusions, argument and unsupported conclusory statements for which no answer is necessary. To the extent that the Court determines that an answer is necessary, Dr. Lowe denies the allegations stated in paragraph 46 of the FAC.

<u>**THIRD CLAIM FOR RELEIF**</u>

**(AVOIDANCE OF FRAUDULENT TRANSFERS (CONSTRUCTIVE FRAUD))**

47.     Dr. Lowe incorporates by reference his answers to paragraphs 1 through 46 of the FAC as if fully set forth in response to this claim.

48.     Dr. Lowe admits the allegations stated in paragraph 48 of the FAC.

49.     Dr. Lowe denies the allegations stated in paragraph 49 of the FAC.

50.     Dr. Lowe lacks knowledge or information sufficient to admit or deny the allegations stated in paragraph 50 of the FAC and therefore such allegations are denied.

51.     Dr. Lowe denies the allegations stated in paragraph 51 of the FAC.

52.     Dr. Lowe lacks knowledge or information sufficient to admit or deny the allegations stated in paragraph 52 of the FAC and therefore such allegations are denied.

53.     Dr. Lowe lacks knowledge or information sufficient to admit or deny the allegations stated in paragraph 53 of the FAC and therefore such allegations are denied.

54.     Dr. Lowe lacks knowledge or information sufficient to admit or deny the allegations stated in paragraph 54 of the FAC and therefore such allegations are denied.

55.     Paragraph 55 of the FAC is comprised of legal conclusions, argument and unsupported conclusory statements for which no answer is necessary. To the extent that the Court determines that an answer is necessary, Dr. Lowe denies the allegations stated in paragraph 55 of the FAC.

JMBM

Jeffer Mangels
Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER
LA 11997935v1

## FOURTH CLAIM FOR RELIEF

## (AVOIDANCE OF FRAUDULENT TRANSFERS (CONSTRUCTIVE FRAUD))

56.     Dr. Lowe incorporates by reference his answers to paragraphs 1 through 55 of the FAC as if fully set forth in response to this claim.

57.     Dr. Lowe admits the allegations stated in paragraph 57 of the FAC.

58.     Dr. Lowe denies the allegations stated in paragraph 58 of the FAC.

59.     Dr. Lowe lacks knowledge or information sufficient to admit or deny the allegations stated in paragraph 59 of the FAC and therefore such allegations are denied.

60.     Dr. Lowe denies the allegations stated in paragraph 60 of the FAC.

61.     Dr. Lowe lacks knowledge or information sufficient to admit or deny the allegations stated in paragraph 61 of the FAC and therefore such allegations are denied.

62.     Dr. Lowe lacks knowledge or information sufficient to admit or deny the allegations stated in paragraph 62 of the FAC and therefore such allegations are denied.

63.     Dr. Lowe lacks knowledge or information sufficient to admit or deny the allegations stated in paragraph 63 of the FAC and therefore such allegations are denied.

64.     Paragraph 64 of the FAC is comprised of legal conclusions, argument and unsupported conclusory statements for which no answer is necessary.  To the extent that the Court determines that an answer is necessary, Dr. Lowe denies the allegations stated in paragraph 64 of the FAC.

## FIFTH CLAIM FOR RELEIF

## (RECOVERY OF AVOIDED TRANSFERS)

65.     Dr. Lowe incorporates by reference his answers to paragraphs 1 through 64 of the FAC as if fully set forth in response to this claim.

66.     Paragraph 66 of the FAC is comprised of legal conclusions, argument and unsupported conclusory statements for which no answer is necessary.  To the extent that the Court determines that an answer is necessary, Dr. Lowe denies the allegations stated in paragraph 66 of the FAC.

JMBM

Jeffer Mangels
Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER
LA 11997935v1

JMBM
Jeffer Mangels
Butler & Mitchell LLP

1

## SIXTH CLAIM FOR RELIEF

2

### (RECOVERY OF AVOIDED TRANSFERS)

3        67.      Dr. Lowe incorporates by reference his answers to paragraphs 1 through 67 of the

4    FAC as if fully set forth in response to this claim.

5        68.      Paragraph 68 of the FAC is comprised of legal conclusions, argument and

6    unsupported conclusory statements for which no answer is necessary.  To the extent that the Court

7    determines that an answer is necessary, Dr. Lowe denies the allegations stated in paragraph 68 of

8    the FAC.

9

### AFFIRMATIVE AND OTHER DEFENSES

10       69.      Without assuming the burden of proof on any matter for which the burden rests upon

11   Plaintiffs or waiving defenses not raised below that he need not plead at this time, Dr. Lowe asserts

12   the following defenses with respect to the FAC.

13

### FIRST AFFIRMATIVE DEFENSE

14   70.      The FAC fails to state a claim upon which relief can be granted.

15

### SECOND AFFIRMATIVE DEFENSE

16   71.      The claims alleged in the FAC are barred by the applicable statute(s) of limitations.

17

### THIRD AFFIRMATIVE DEFENSE

18   72.      The claims alleged in the FAC are barred by the doctrines of waiver and/or laches.

19

### FOURTH AFFIRMATIVE DEFENSE

20   73.      The claims alleged in the FAC are barred by estoppel.

21

### FIFTH AFFIRMATIVE DEFENSE

22   74.      The claims alleged in the FAC are barred or reduced by setoff and/or recoupment.

23

### SIXTH AFFIRMATIVE DEFENSE

24       75.      Plaintiffs may not recover in this action because its damages, if any, are speculative,

25   vague, based on guesswork and conjecture, and are impossible to ascertain or allocate.

26

27

28

PRINTED ON
RECYCLED PAPER
LA 11997935v1

## SEVENTH AFFIRMATIVE DEFENSE

76.     Dr. Lowe alleges that the transfers at issue in the FAC are not avoidable by Plaintiffs to the extent that such transfer(s) was intended by Plaintiffs and Dr. Lowe to be a contemporaneous exchange for new value given to Plaintiffs and was in fact a substantially contemporaneous exchange, all as more fully set out in 11 U.S.C. § 547(c)(1).

## EIGHTH AFFIRMATIVE DEFENSE

77.     Dr. Lowe alleges that the transfers at issue in the Complaint are not avoidable by the Plaintiffs to the extent that such transfer(s) was in payment of a debt incurred by Plaintiffs in the ordinary course of business or financial affairs of Plaintiffs and Dr. Lowe and such transfer(s) was made in the ordinary course of business or financial affairs of Plaintiffs and Dr. Lowe, or the transfer(s) was made according to ordinary business terms, as more fully set out in 11 U.S.C. § 547(c)(2).

## NINTH AFFIRMATIVE DEFENSE

78.     Dr. Lowe alleges that the transfers at issue in the FAC are not avoidable by Plaintiffs to the extent that such transfer(s) was to or for the benefit of Dr. Lowe,  and after such transfer(s), Dr. Lowe gave new value to or for the benefit of Plaintiffs, and the transfer(s) was not secured by an otherwise unavoidable security interest, and on account of which new value Plaintiffs did not make an otherwise unavoidable transfer to or for the benefit of Dr. Lowe, all as more fully set out in 11 U.S.C. § 547(c)(4).

## TENTH AFFIRMATIVE DEFENSE

79.     The claims alleged in the FAC are barred, in whole or in part, by California Civil Code §§ 3439.04(a)(2) and 3439.06 and 11 U.S.C. § 548(a)(1)(B), in that the Plaintiffs will be unable to prove: (a) that Plaintiffs received less than reasonably equivalent value in exchange for the alleged transfers; (b) that Plaintiffs were insolvent when the alleged transfers were made, were rendered insolvent as a result of the alleged transfers, possessed unreasonably small capital, or intended or believed they would incur debts beyond their ability to pay such debts as they matured; or (c) that Plaintiffs were engaged, or about to engage, in a business or transaction for which their remaining property would constitute unreasonably small capital.

PRINTED ON
RECYCLED PAPER
LA 11997935v1

JMBM   Jeffer Mangels
Butler & Mitchell LLP

JMBM | Jeffer Mangels<br>Butler & Mitchell LLP

1

**ELEVENTH AFFIRMATIVE DEFENSE**

2      80.     The claims alleged in the FAC are barred, in whole or in part, because of the

3  statutory savings clauses in 11 U.S.C. § 550(b) and relevant provisions of the Uniform Fraudulent

4  Transfer Act under California law.  Specifically, Dr. Lowe took the alleged transfers in good faith

5  without knowledge of their alleged avoidability.

6

**TWELFTH AFFIRMATIVE DEFENSE**

7      81.     The claims alleged in the FAC are barred, in whole or in part, because of 11 U.S.C.

8  § 548(c) and relevant provisions of the Uniform Fraudulent Transfer Act under California law.

9  Specifically, Dr. Lowe took the alleged transfers in good faith for value and has a lien on or may

10  retain any interest transferred.

11

**DEFENSES RESERVED**

12      82.     Dr. Lowe has alleged the affirmative defenses of which he is currently aware.  Dr.

13  Lowe may become aware of additional affirmative defenses available to him after further discovery

14  and/or investigation.   Accordingly, Dr. Lowe reserves the right to assert additional affirmative

15  defenses once such defenses have been fully ascertained.

16

17

18

19

20

21

22

23

24

25

26

27

28

PRINTED ON

RECYCLED PAPER
LA 11997935v1

1    **BASED UPON THE FOREGOING,** Dr. Lowe prays for judgment against Plaintiffs as
2    follows:

3        A.      That Plaintiffs take nothing by way of the FAC;

4        B.      That Dr. Lowe be awarded his costs of suit incurred herein including attorneys' fees;
5    and

6        C.      That Dr. Lowe be awarded such other and further relief as the Court may deem just
7    and proper.

8                                        Respectfully submitted,

9                                        BAKER MARQUART LLP
                                         BRIAN E. KLEIN
10
                                         - and -
11
     Dated: May 28, 2015                 JEFFER MANGELS BUTLER & MITCHELL LLP
12                                        DAVID M. POITRAS, APC

13

14                                       By: _/s/ David M. Poitras_____
                                             DAVID M. POITRAS APC
15                                           Attorneys for Defendant,
                                             Dr. Marc A. Lowe
16

17

18

19

20

21

22

23

24

25

26

27

28

PRINTED ON
RECYCLED PAPER
LA 11997935v1

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Federal Rule of Bankruptcy Procedure 9015, and B.L.R. 9015-2(c) and (e), Dr. Lowe demands a trial by jury in this action of all issues so triable. Dr. Lowe consents to have the jury trial conducted by the Bankruptcy Court and consents to the entry of a final order or judgment by the Bankruptcy Court.

Respectfully submitted,

BAKER MARQUART LLP
BRIAN E. KLEIN

- and -

Dated: May 28, 2015

JEFFER MANGELS BUTLER & MITCHELL LLP
DAVID M. POITRAS, APC

By: /s/ David M. Poitras
    DAVID M. POITRAS APC
    Attorneys for Defendant,
    Dr. Marc A. Lowe

1  BRIAN E. KLEIN (SBN 258486)
   BAKER MARQUART LLP
2  10990 Wilshire Boulevard, Fourth Floor
   Los Angeles, California 90024
3  Telephone: (424) 652-7800/Facsimile: (424) 652-7850
4  Email: bklein@bakermarquart.com

5  DAVID M. POITRAS APC (SBN 141309)
   JEFFER MANGELS BUTLER & MITCHELL LLP
6  1900 Avenue of the Stars, 7th Floor
   Los Angeles, California 90067-4308
7  Telephone: (310) 203-8080/Facsimile: (310) 203-0567
8  Email: dpoitras@jmbm.com

9  Attorneys for Defendant Dr. Marc A. Lowe

10              UNITED STATES BANKRUPTCY COURT
11              NORTHERN DISTRICT OF CALIFORNIA
                   SAN FRANCISCO DIVISION
12

| | |
|---|---|
| In re: | Case No. 14-30725 |
| HASHFAST TECHNOLOGIES LLC, a California limited liability company, | (Substantively Consolidated with In re HashFast LLC, Case No. 14-30866) |
| Debtor and Debtor in Possession | Chapter 11 |
| ☐ Affects HASHFAST LLC, a Delaware limited liability company, | Adversary Case No. 15-03011 |
| Debtor and Debtor in Possession | |
| HASHFAST TECHNOLOGIES LLC, a California limited liability company, and HASHFAST LLC, a Delaware limited liability company, | **PROOF OF SERVICE RE ANSWER TO FIRST AMENDED COMPLAINT** |
| Plaintiffs, | **DEMAND FOR JURY TRIAL** |
| vs. | Status Conference: |
| MARC A. LOWE, an individual, aka Cypherdoc and/or Cipherdoc, | Date: June 17, 2015 Time: 10:00 a.m. |
| Defendant. | Place: 235 Pine St., 22nd Floor San Francisco, CA 94104 Judge: Honorable Dennis Montali |

26

27

28

PRINTED ON
RECYCLED PAPER
LA 12001970v1

# PROOF OF SERVICE
## STATE OF CALIFORNIA, CITY AND COUNTY OF LOS ANGELES

I am employed in the City and County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is: 1900 Avenue of the Stars, 7th Floor, Los Angeles, CA 90067.

On <u>May 29, 2015</u> I served the document(s) described as **ANSWER TO FIRST AMENDED COMPLAINT- DEMAND FOR JURY TRIAL;** in this action addressed as follows:

☐     (BY MAIL) True and correct copies of the aforementioned document(s) were deposited, in a sealed envelope with postage thereon fully prepaid, with the U.S. Postal Service on that same day to be mailed via first class mail at San Francisco, California. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☒     (TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)) Pursuant to the controlling Rules, the aforementioned document(s) will be served by the court via NEF and proper link(s) to the document(s). On May 29, 2015, I checked the appropriate CM/ECF docket for this case or proceeding and determined that the aforementioned person(s) has/have consented to receive NEF transmission at the aforementioned electronic addresses. **See Attached Service List**

☐     (BY FAX) The parties have consented in writing to receive service by facsimile transmission. On ____, I transmitted the above-described document(s) by facsimile machine to the above-listed fax number(s). The transmission originated from facsimile phone number (310) 203-0567 and was reported as complete and without error. The facsimile machine properly issued a transmission report, a copy of which is attached.

☒     (BY ELECTRONIC SERVICE) On May 29, 2015, I transmitted the aforementioned document(s) as PDF attachments to the aforementioned electronic notification address(es). The transmission originated from my electronic notification address, which is bt@jmbm.com, and was reported as complete and without error. **See Attached Service List**

☐     (BY PERSONAL SERVICE) I placed the aforementioned document(s) in a sealed envelope and I delivered such envelope by hand to the offices of the addressee.

☒     (BY OVERNIGHT DELIVERY) I placed the aforementioned document(s) in a sealed envelope with postage thereon fully prepaid and I caused said envelope to be delivered overnight via an overnight delivery service in lieu of delivery by mail to the addressee(s). **See Attached Service List**

Executed on May 29, 2015 at Los Angeles, California.

I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Billie Terry

_____
*Printed Name*

_____
*Signature*

PRINTED ON
RECYCLED PAPER
LA 12001970v1

# SERVICE LIST

**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**

- Ashley McDow amcdow@bakerlaw.com, SGaeta@bakerlaw.com
- Jessica M. Mickelsen jessica.mickelsen@kattenlaw.com
- David M. Poitras dpoitras@jmbm.com
- 

**BY ELECTRONIC SERVICE**

Office of the U.S. Trustee/SF
235 Pine Street, Suite 700
San Francisco, CA 94101
Email: USTPRegion17.SF.ECF@usdoj.gov, ltroxas@hotmail.com

**BY OVERNIGHT DELIVERY**

The Honorable Dennis Montali
Chambers Courtesy Copy
United States Bankruptcy Court
Northern Division of California
235 Pine Street, 19th Floor
San Francisco, CA 94104

PRINTED ON
RECYCLED PAPER
LA 12001970v1

# EXHIBIT C

UNITED STATES OF AMERICA
Before the
COMMODITY FUTURES TRADING COMMISSION

RECEIVED CFTC

Office of Proceedings
Proceedings Clerk
*1:58 pm, Sep 17, 2015*

|  |  |
|---|---|
| In the Matter of: | ) |
| | ) |
| | ) |
| Coinflip, Inc., d/b/a Derivabit, and | ) |
| Francisco Riordan, | ) CFTC Docket No. 15-29 |
| | ) |
| Respondents. | ) |
| | ) |
| | ) |

ORDER INSTITUTING PROCEEDINGS PURSUANT TO
SECTIONS 6(c) AND 6(d) OF THE COMMODITY EXCHANGE ACT, MAKING
FINDINGS AND IMPOSING REMEDIAL SANCTIONS

**I.**

The Commodity Futures Trading Commission ("Commission") has reason to believe that from in or about March 2014 to at least August 2014 (the "Relevant Period"), Coinflip, Inc., d/b/a Derivabit ("Coinflip") and Francisco Riordan ("Riordan") (the "Respondents") violated Sections 4c(b) and 5h(a)(1) of the Commodity Exchange Act, as amended (the "Act"), 7 U.S.C. §§ 6c(b) and 7b-3(a)(1) (2012), and Commission Regulations 32.2 and 37.3(a)(1), 17 C.F.R. § 32.2 and 37.3(a)(1) (2014). Therefore, the Commission deems it appropriate and in the public interest that public administrative proceedings be, and hereby are, instituted to determine whether the Respondents engaged in the violations set forth herein and to determine whether any order should be issued imposing remedial sanctions.

**II.**

In anticipation of the institution of an administrative proceeding, the Respondents have submitted an Offer of Settlement ("Offer"), which the Commission has determined to accept. Without admitting or denying any of the findings or conclusions herein, Respondents consent to the entry of this Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings and Imposing Remedial Sanctions ("Order") and acknowledge service of this Order.[1]

---

[1] Respondents consent to the entry of this Order and to the use of these findings in this proceeding and in any other proceeding brought by the Commission or to which the Commission is a party; provided, however, that Respondents do not consent to the use of the Offer, or the findings or conclusions in the Order consented to in the Offer, as the sole basis for any other proceeding brought by the Commission, other than in a proceeding in bankruptcy or to enforce the terms of this Order. Nor do Respondents consent to the use of the Offer or the Order, or the findings or conclusions in this Order consented to in the Offer, by any other party in any other proceeding.

# III.

The Commission finds the following:

## A. Summary

During the Relevant Period, Respondents violated Sections 4c(b) and 5h(a)(1) of the Act and Commission Regulations 32.2 and 37.3(a)(1) by conducting activity related to commodity options contrary to Commission Regulations and by operating a facility for the trading or processing of swaps without being registered as a swap execution facility or designated contract market. Specifically, during the Relevant Period, Respondents operated an online facility named Derivabit, offering to connect buyers and sellers of Bitcoin option contracts.[2]

## B. Respondents

**Coinflip, Inc.** is a Delaware corporation with a principal place of business in San Francisco, California. During the Relevant period, Coinflip operated Derivabit and its website derivabit.com. Coinflip has never been registered with the Commission.

**Francisco Riordan** is an individual residing in San Francisco, California. Riordan is a founder, the chief executive officer, and controlling person of Coinflip. Riordan has never been registered with the Commission.

## C. Facts

### Coinflip Conducted Activity Related to Illegal Commodity Options

Beginning in March 2014, Coinflip advertised Derivabit as a "risk management platform . . . that connects buyers and sellers of standardized Bitcoin options and futures contracts." During this period, Coinflip designated numerous put and call options contracts as eligible for trading on the Derivabit platform.[3] For these contracts, Coinflip listed Bitcoin as the asset underlying the option and denominated the strike and delivery prices in US Dollars. According to the derivabit.com website, a customer could place orders by registering as a user and depositing Bitcoin into an account in the user's name. Premiums and payments of settlement of the option contracts were to be paid using Bitcoin at a spot rate determined by a designated third-party Bitcoin currency exchange. Users had the ability to, and in fact did, post bids or offers for

---

[2] Bitcoin is a "virtual currency," defined here as a digital representation of value that functions as a medium of exchange, a unit of account, and/or a store of value, but does not have legal tender status in any jurisdiction. Bitcoin and other virtual currencies are distinct from "real" currencies, which are the coin and paper money of the United States or another country that are designated as legal tender, circulate, and are customarily used and accepted as a medium of exchange in the country of issuance.

[3] Although referenced it its solicitation materials, Coinflip did not offer any futures contracts during the Relevant Period.

the designated options contracts. Coinflip confirmed the bid or offer by communicating it to all users through its website.[4]

During the Relevant Period, Derivabit had approximately 400 users.

Riordan Controlled Coinflip and Directed Its Operations

Riordan was the founder, engineer and Chief Executive Officer of Coinflip. He exercised control over Coinflip's daily operations and possessed the power or ability to control all aspects of the Derivabit platform. Riordan participated in key aspects of Coinflip's illegal activity, including designing and implementing the Derivabit trading platform. Riordan's control enabled him to make design and substantive changes to Coinflip's operations, including the transition from offering Bitcoin options to OTC Bitcoin Forward Contracts. Ultimately, Riordan possessed the power and ability to direct Coinflip to cease operating the Derivabit platform.

## LEGAL DISCUSSION

### A.    Virtual Currencies Such as Bitcoin are Commodities

Section 1a(9) of the Act defines "commodity" to include, among other things, "all services, rights, and interests in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9). The definition of a "commodity" is broad. *See, e.g., Board of Trade of City of Chicago v. SEC*, 677 F. 2d 1137, 1142 (7th Cir. 1982). Bitcoin and other virtual currencies are encompassed in the definition and properly defined as commodities.

### B.    Coinflip Violated Sections 4c(b) Act and Commission Regulation 32.2

Section 4c(b) of the Act makes it unlawful for any person to "offer to enter into, enter into or confirm the execution of, any transaction involving any commodity . . . which is of the character of, or is commonly known to the trade as, an 'option' . . . , 'bid', 'offer', 'put', [or] 'call' . . . contrary to any rule, regulation, or order of the Commission prohibiting any such transaction." Section 1.3(hh) defines a "commodity option transaction" and "commodity option" to "mean any transaction or agreement in interstate commerce which is or is held out to be of the character of, or is commonly known to the trade as, an 'option,' 'privilege,' 'indemnity,' 'bid,' 'offer,' 'call,' 'put,' 'advance guaranty,' or 'decline guaranty,' and which is subject to regulation under the Act and these regulations." Section 32.2 of the Commission's Regulations, in turn,

---

[4] In July 2014, Coinflip began to offer what it characterized as "OTC Bitcoin Forward Contracts" for trading. Under this model, a Derivabit user would be matched through competitive bidding with a counterparty to execute a contract to exchange US Dollars for Bitcoins at a predetermined price and date. As part of its services, Coinflip would calculate and hold initial and maintenance margin payments and would also calculate and facilitate the transfer of final settlements at maturity or early termination. Coinflip advertised that the users could choose to institute an early termination at any time if its position was "in the money." Although the price would be expressed as an exchange rate between US Dollars and Bitcoins, Coinflip required all settlements and margin payments to be transacted in Bitcoins. No bids or offers were posted by Derivabit users for these contracts. Although these activities may have violated, or led to violations of, the Commodity Exchange Act, the Commission does not address this conduct here.

3

provides that it shall be unlawful for any person to "offer to enter into, enter into, confirm the execution of, maintain a position in, or otherwise conduct activity related to any transaction in interstate commerce that is a commodity option transaction unless: (a) [s]uch transaction is conducted in compliance with and subject to the provisions of the Act, including any Commission rule, regulation, or order thereunder, otherwise applicable to any other swap, or (b) [s]uch transaction is conducted pursuant to [Regulation] 32.3."

Between at least March 2014 and July 2014, Respondents conducted activity related to commodity option transactions, offered to enter into commodity option transactions and/or confirmed the existence of commodity option transactions. The options transactions were not conducted in compliance with Section 5h(a)(1) of the Act or Regulation 37.3(a)(1), a section of the Act and a Commission regulation otherwise applicable to swaps (*see infra* Section C) and were not conducted pursuant to Regulation 32.3.[5] Accordingly, Coinflip violated Section 4c(b) of the Act and Commission Regulation 32.2.

## C.   Coinflip Violated Section 5h(a)(1) of the Act

Section 5h(a)(1) of the Act forbids any person from operating "a facility for the trading or processing of swaps unless the facility is registered as a swap execution facility or as a designated contract market . . . ." 7 U.S.C. § 7b-3(a)(1). Section 1a(47) of the Act's definition of "swap" includes option contracts. 7 U.S.C. § 1a(47)(A)(i). Regulation 37.3(a)(1) similarly requires that any "person operating a facility that offers a trading system or platform in which more than one market participant has the ability to execute or trade swaps with more than one other market participant on the system or platform shall register the facility as a swap execution facility under this part or as a designated contract market under part 38 of this chapter." 17 C.F.R. § 37.3(a)(1) (2014).

During the Relevant Period, Coinflip operated a facility for the trading of swaps. However, Coinflip did not register the facility as a swap execution facility or designated contract market. Accordingly, Coinflip violated Section 5h(a)(1) of the Act and Regulation 37.3(a)(1).

## D.   Riordan Is Liable for Coinflip's Violations as Its Controlling Person Under Section 13(b) of the Act

Riordan controlled Coinflip, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Coinflip's acts in violation of the Act and Regulations; therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012), Riordan is liable for Coinflip's violations of Sections 4c(b) and 5h(a)(1) of the Act, 7 U.S.C. §§ 6c(b) and 7b-3(a)(1) (2012) and Regulations 32.2 and 37.3(a)(1), 17 C.F.R. §§ 32.2 and 37.3(a)(1) (2014).

---

[5] To take advantage of the "trade option" exemptions set forth in Regulation 32.3, the offeror of the option must be an eligible contract participant as defined in Section 1a(18) of the Act or "producer, processor, or commercial user of, or a merchant handling the commodity," and have a reasonable basis to believe that the offeree was a "producer, processor, or commercial user of, or a merchant handling the commodity that is the subject of the commodity option transaction, or the products or by-products thereof, and such offeree is offered or entering into the commodity option transaction solely for purposes related to its business as such." 17 C.F.R. §§ 32.3(a)(1)(i)-(ii) and 32.3(a)(2).

4

## IV.

## FINDINGS OF VIOLATIONS

Based on the foregoing, the Commission finds that, during the Relevant Period, Respondents violated Sections 4c(b) and 5h(a)(1) of the Act, 7 U.S.C. §§ 4c(b) and 7b-3(a)(1) (2012), and Commission Regulations 32.2 and 37.3(a)(1), 17 C.F.R. §§ 32.2 and 37.3(a)(1) (2014).

## V.

## OFFER OF SETTLEMENT

Respondents have submitted an Offer in which they, without admitting or denying the findings and conclusions herein:

A.  Acknowledge receipt of service of this Order;

B.  Admit the jurisdiction of the Commission with respect to all matters set forth in this Order and for any action or proceeding brought or authorized by the Commission based on violation of or enforcement of this Order;

C.  Waive:

   1.  the filing and service of a complaint and notice of hearing;

   2.  a hearing;

   3.  all post-hearing procedures;

   4.  judicial review by any court;

   5.  any and all objections to the participation by any member of the Commission's staff in the Commission's consideration of the Offer;

   6.  any and all claims that they may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 (2012) and 28 U.S.C. § 2412 (2012), and/or the rules promulgated by the Commission in conformity therewith, Part 148 of the Commission's Regulations, 17 C.F.R. §§ 148.1-30 (2014), relating to, or arising from, this proceeding;

   7.  any and all claims that they may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, §§ 201-253, 110 Stat. 847, 857-868 (1996), as amended by Pub. L. No. 110-28, § 8302, 121 Stat. 112, 204-205 (2007), relating to, or arising from, this proceeding; and

8.     any claims of Double Jeopardy based on the institution of this proceeding or the entry in this proceeding of any order imposing a civil monetary penalty or any other relief;

D.     Stipulate that the record basis on which this Order is entered shall consist solely of the findings contained in this Order to which Respondents have consented in the Offer;

E.     Consent, solely on the basis of the Offer, to the Commission's entry of this Order that:

1.     makes findings by the Commission that Respondents violated Sections 4c(b) and 5h(a)(1) of the Act, 7 U.S.C. §§ 6c(b) and 7b-3(a)(1) (2012), and Commission Regulations 32.2 and 37.3(a)(1), 17 C.F.R. §§ 32.2 and 37.3(a)(1) (2014);

2.     orders Respondents to cease and desist from violating Sections 4c(b) and 5h(a)(1) of the Act and Commission Regulations 32.2 and 37.3(a)(1); and

3.     orders Respondents and their successors and assigns to comply with the conditions and undertakings consented to in the Offer and as set forth in Part VI of this Order.

Upon consideration, the Commission has determined to accept Respondents' Offer.

## VI.

## ORDER

**Accordingly, IT IS HEREBY ORDERED THAT:**

A.     Respondents shall cease and desist from violating Sections 4c(b) and 5h(a)(1) of the Act, 7 U.S.C. §§ 6c(b) and 7b-3(a)(1) (2012), and Commission Regulations 32.2 and 37.3(a)(1), 17 C.F.R. §§ 32.2 and 37.3(a)(1) (2014).

B.     Respondents and their successors and assigns shall comply with the following conditions and undertakings set forth in the Offer:

1.     Public Statements:  Respondents agree that neither they nor any of their successors and assigns, agents, or employees under their authority or control shall take any action or make any public statement denying, directly or indirectly, any findings or conclusions in the Order or creating, or tending to create, the impression that the Order is without a factual basis; provided, however, that nothing in this provision shall affect Respondents' (i) testimonial obligations; or (ii) right to take legal positions in other proceedings to which the Commission is not a party.  Respondents and their successors and assigns shall undertake all steps necessary to ensure that all of their agents and/or employees under their authority or control understand and comply with this agreement.

2.     Cooperation with the Commission:  Respondents shall cooperate fully and expeditiously with the Commission, including the Commission's Division of

6

Enforcement, and any other governmental agency in this action, and in any investigation, civil litigation, or administrative matter related to the subject matter of this action or any current or future Commission investigation related thereto.

**The provisions of this Order shall be effective as of this date.**

By the Commission.

Christopher J. Kirkpatrick
Secretary of the Commission
Commodity Futures Trading Commission

Dated: September 17, 2015

7

# EXHIBIT D



U.S. COMMODITY FUTURES TRADING COMMISSION
ENSURING THE INTEGRITY OF THE FUTURES & OPTIONS MARKETS

RELEASE: PR7231-15

**September 17, 2015**

**CFTC Orders Bitcoin Options Trading Platform Operator and its CEO to Cease Illegally Offering Bitcoin Options and to Cease Operating a Facility for Trading or Processing of Swaps without Registering**

**In First Action against an Unregistered Bitcoin Options Trading Platform, CFTC Holds that Bitcoin and Other Virtual Currencies Are a Commodity Covered by the Commodity Exchange Act**

**Washington, DC** – The U.S. Commodity Futures Trading Commission (CFTC) today issued an Order filing and simultaneously settling charges against **Coinflip, Inc.** d/b/a **Derivabit** (Coinflip) and its chief executive officer **Francisco Riordan** for conducting activity related to commodity options transactions without complying with the Commodity Exchange Act (CEA) and CFTC Regulations, specifically, by operating a facility for the trading or processing of commodity options without complying with the CEA or CFTC Regulations otherwise applicable to swaps or conducting the activity pursuant to the CFTC's exemption for trade options. Coinflip is based in San Francisco, California, and Riordan resides in San Francisco.

The Order finds that, from in or about March 2014 to at least August 2014, Coinflip and Riordan operated an online facility named **Derivabit**, offering to connect buyers and sellers of Bitcoin option contracts.

The Order requires Coinflip and Riordan to cease and desist from further violations of the CEA and Regulations, as charged, and to comply with specified undertakings.

Aitan Goelman, the CFTC's Director of Enforcement, commented: "While there is a lot of excitement surrounding Bitcoin and other virtual currencies, innovation does not excuse those acting in this space from following the same rules applicable to all participants in the commodity derivatives markets."

The CFTC Order finds that Coinflip designated put and call options for the delivery of Bitcoins as eligible for trading on the Derivabit platform. Under Section 4c of the CEA and Part 32 of the CFTC's Regulations, commodity option transactions must either be conducted in compliance with provisions of the CEA or Regulations otherwise applicable to swaps, or conducted pursuant to Regulation 32.3, the "trade option" exemption. In the Order, the CFTC for the first time finds that Bitcoin and other virtual currencies are properly defined as commodities. The Order further finds that the activities related to commodity option transactions were not conducted in compliance with a provision of the CEA or a provision of the Regulations otherwise applicable to swaps, and were not conducted pursuant to the Regulation 32.3 "trade option" exemption.

Additionally, the Order finds that Coinflip operated a facility for the trading of swaps but did not register the facility as a Swap Execution Facility or Designated Contract Market, as required. The CEA's definition of "swap" includes option contracts. Accordingly, Coinflip violated Section 5h(a)(1) of the CEA and Regulation 37.3(a)(1). Because Riordan controlled Coinflip, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Coinflip's acts in violation of the CEA and Regulations, Riordan is liable for all of Coinflip's violations of the CEA and Regulations, the Order finds.

Coinflip and Riordan cooperated with the Division of Enforcement's investigation.

CFTC Division of Enforcement staff members responsible for this action are David W. Oakland, K. Brent Tomer, Lenel Hickson, Jr., and Manal M. Sultan.

**Media Contact**
Dennis Holden
202-418-5088

Last Updated: September 17, 2015

Case: 15-03011   Doc# 42-3   Filed: 01/22/16   Entered: 01/22/16 11:20:26   Page 43 of 50

# EXHIBIT E

1

Notice 2014-21

SECTION 1. PURPOSE

This notice describes how existing general tax principles apply to transactions using virtual currency. The notice provides this guidance in the form of answers to frequently asked questions.

SECTION 2. BACKGROUND

The Internal Revenue Service (IRS) is aware that "virtual currency" may be used to pay for goods or services, or held for investment. Virtual currency is a digital representation of value that functions as a medium of exchange, a unit of account, and/or a store of value. In some environments, it operates like "real" currency -- i.e., the coin and paper money of the United States or of any other country that is designated as legal tender, circulates, and is customarily used and accepted as a medium of exchange in the country of issuance -- but it does not have legal tender status in any jurisdiction.

Virtual currency that has an equivalent value in real currency, or that acts as a substitute for real currency, is referred to as "convertible" virtual currency. Bitcoin is one example of a convertible virtual currency. Bitcoin can be digitally traded between users and can be purchased for, or exchanged into, U.S. dollars, Euros, and other real or virtual currencies. For a more comprehensive description of convertible virtual currencies to date, see Financial Crimes Enforcement Network (FinCEN) *Guidance on the Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies* (FIN-2013-G001, March 18, 2013).

SECTION 3. SCOPE

In general, the sale or exchange of convertible virtual currency, or the use of convertible virtual currency to pay for goods or services in a real-world economy transaction, has tax consequences that may result in a tax liability. This notice addresses only the U.S. federal tax consequences of transactions in, or transactions that use, convertible virtual currency, and the term "virtual currency" as used in Section 4 refers only to convertible virtual currency. No inference should be drawn with respect to virtual currencies not described in this notice.

The Treasury Department and the IRS recognize that there may be other questions regarding the tax consequences of virtual currency not addressed in this notice that warrant consideration. Therefore, the Treasury Department and the IRS request comments from the public regarding other types or aspects of virtual currency transactions that should be addressed in future guidance.

Comments should be addressed to:

Internal Revenue Service
Attn: CC:PA:LPD:PR (Notice 2014-21)
Room 5203
P.O. Box 7604
Ben Franklin Station
Washington, D.C. 20044

or hand delivered Monday through Friday between the hours of 8 A.M. and 4 P.M. to:

Courier's Desk
Internal Revenue Service
Attn: CC:PA:LPD:PR (Notice 2014-21)
1111 Constitution Avenue, N.W.
Washington, D.C. 20224

Alternatively, taxpayers may submit comments electronically via e-mail to the following address: Notice.Comments@irscounsel.treas.gov. Taxpayers should include "Notice 2014-21" in the subject line. All comments submitted by the public will be available for public inspection and copying in their entirety.

For purposes of the FAQs in this notice, the taxpayer's functional currency is assumed to be the U.S. dollar, the taxpayer is assumed to use the cash receipts and disbursements method of accounting and the taxpayer is assumed not to be under common control with any other party to a transaction.

SECTION 4. FREQUENTLY ASKED QUESTIONS

**Q-1: How is virtual currency treated for federal tax purposes?**

**A-1:** For federal tax purposes, virtual currency is treated as property. General tax principles applicable to property transactions apply to transactions using virtual currency.

**Q-2: Is virtual currency treated as currency for purposes of determining whether a transaction results in foreign currency gain or loss under U.S. federal tax laws?**

**A-2:** No. Under currently applicable law, virtual currency is not treated as currency that could generate foreign currency gain or loss for U.S. federal tax purposes.

**Q-3: Must a taxpayer who receives virtual currency as payment for goods or services include in computing gross income the fair market value of the virtual currency?**

**A-3:** Yes. A taxpayer who receives virtual currency as payment for goods or services must, in computing gross income, include the fair market value of the virtual currency,

measured in U.S. dollars, as of the date that the virtual currency was received. See Publication 525, *Taxable and Nontaxable Income,* for more information on miscellaneous income from exchanges involving property or services.

**Q-4: What is the basis of virtual currency received as payment for goods or services in Q&A-3?**

**A-4:** The basis of virtual currency that a taxpayer receives as payment for goods or services in Q&A-3 is the fair market value of the virtual currency in U.S. dollars as of the date of receipt. See Publication 551, *Basis of Assets,* for more information on the computation of basis when property is received for goods or services.

**Q-5: How is the fair market value of virtual currency determined?**

**A-5:** For U.S. tax purposes, transactions using virtual currency must be reported in U.S. dollars. Therefore, taxpayers will be required to determine the fair market value of virtual currency in U.S. dollars as of the date of payment or receipt. If a virtual currency is listed on an exchange and the exchange rate is established by market supply and demand, the fair market value of the virtual currency is determined by converting the virtual currency into U.S. dollars (or into another real currency which in turn can be converted into U.S. dollars) at the exchange rate, in a reasonable manner that is consistently applied.

**Q-6: Does a taxpayer have gain or loss upon an exchange of virtual currency for other property?**

**A-6:** Yes. If the fair market value of property received in exchange for virtual currency exceeds the taxpayer's adjusted basis of the virtual currency, the taxpayer has taxable gain. The taxpayer has a loss if the fair market value of the property received is less than the adjusted basis of the virtual currency. See Publication 544, *Sales and Other Dispositions of Assets*, for information about the tax treatment of sales and exchanges, such as whether a loss is deductible.

**Q-7: What type of gain or loss does a taxpayer realize on the sale or exchange of virtual currency?**

**A-7:** The character of the gain or loss generally depends on whether the virtual currency is a capital asset in the hands of the taxpayer. A taxpayer generally realizes capital gain or loss on the sale or exchange of virtual currency that is a capital asset in the hands of the taxpayer. For example, stocks, bonds, and other investment property are generally capital assets. A taxpayer generally realizes ordinary gain or loss on the sale or exchange of virtual currency that is not a capital asset in the hands of the taxpayer. Inventory and other property held mainly for sale to customers in a trade or

business are examples of property that is not a capital asset. See Publication 544 for more information about capital assets and the character of gain or loss.

**Q-8: Does a taxpayer who "mines" virtual currency (for example, uses computer resources to validate Bitcoin transactions and maintain the public Bitcoin transaction ledger) realize gross income upon receipt of the virtual currency resulting from those activities?**

**A-8:** Yes, when a taxpayer successfully "mines" virtual currency, the fair market value of the virtual currency as of the date of receipt is includible in gross income. See Publication 525, *Taxable and Nontaxable Income*, for more information on taxable income.

**Q-9: Is an individual who "mines" virtual currency as a trade or business subject to self-employment tax on the income derived from those activities?**

**A-9:** If a taxpayer's "mining" of virtual currency constitutes a trade or business, and the "mining" activity is not undertaken by the taxpayer as an employee, the net earnings from self-employment (generally, gross income derived from carrying on a trade or business less allowable deductions) resulting from those activities constitute self-employment income and are subject to the self-employment tax. See Chapter 10 of Publication 334, *Tax Guide for Small Business*, for more information on self-employment tax and Publication 535, *Business Expenses,* for more information on determining whether expenses are from a business activity carried on to make a profit.

**Q-10: Does virtual currency received by an independent contractor for performing services constitute self-employment income?**

**A-10:** Yes. Generally, self-employment income includes all gross income derived by an individual from any trade or business carried on by the individual as other than an employee. Consequently, the fair market value of virtual currency received for services performed as an independent contractor, measured in U.S. dollars as of the date of receipt, constitutes self-employment income and is subject to the self-employment tax. See FS-2007-18, April 2007, *Business or Hobby? Answer Has Implications for Deductions,* for information on determining whether an activity is a business or a hobby.

**Q-11: Does virtual currency paid by an employer as remuneration for services constitute wages for employment tax purposes?**

**A-11:** Yes. Generally, the medium in which remuneration for services is paid is immaterial to the determination of whether the remuneration constitutes wages for employment tax purposes. Consequently, the fair market value of virtual currency paid as wages is subject to federal income tax withholding, Federal Insurance Contributions

Act (FICA) tax, and Federal Unemployment Tax Act (FUTA) tax and must be reported on Form W-2, *Wage and Tax Statement.* See Publication 15 (Circular E), *Employer's Tax Guide*, for information on the withholding, depositing, reporting, and paying of employment taxes.

**Q-12: Is a payment made using virtual currency subject to information reporting?**

**A-12:** A payment made using virtual currency is subject to information reporting to the same extent as any other payment made in property. For example, a person who in the course of a trade or business makes a payment of fixed and determinable income using virtual currency with a value of $600 or more to a U.S. non-exempt recipient in a taxable year is required to report the payment to the IRS and to the payee. Examples of payments of fixed and determinable income include rent, salaries, wages, premiums, annuities, and compensation.

**Q-13: Is a person who in the course of a trade or business makes a payment using virtual currency worth $600 or more to an independent contractor for performing services required to file an information return with the IRS?**

**A-13:** Generally, a person who in the course of a trade or business makes a payment of $600 or more in a taxable year to an independent contractor for the performance of services is required to report that payment to the IRS and to the payee on Form 1099-MISC, *Miscellaneous Income.* Payments of virtual currency required to be reported on Form 1099-MISC should be reported using the fair market value of the virtual currency in U.S. dollars as of the date of payment. The payment recipient may have income even if the recipient does not receive a Form 1099-MISC. See the Instructions to Form 1099-MISC and the General Instructions for Certain Information Returns for more information. For payments to non-U.S. persons, see Publication 515, *Withholding of Tax on Nonresident Aliens and Foreign Entities*.

**Q-14: Are payments made using virtual currency subject to backup withholding?**

**A-14:** Payments made using virtual currency are subject to backup withholding to the same extent as other payments made in property. Therefore, payors making reportable payments using virtual currency must solicit a taxpayer identification number (TIN) from the payee. The payor must backup withhold from the payment if a TIN is not obtained prior to payment or if the payor receives notification from the IRS that backup withholding is required. See Publication 1281, *Backup Withholding for Missing and Incorrect Name/TINs,* for more information.

**Q-15: Are there IRS information reporting requirements for a person who settles payments made in virtual currency on behalf of merchants that accept virtual currency from their customers?**

**A-15:** Yes, if certain requirements are met. In general, a third party that contracts with a substantial number of unrelated merchants to settle payments between the merchants and their customers is a third party settlement organization (TPSO). A TPSO is required to report payments made to a merchant on a Form 1099-K, *Payment Card and Third Party Network Transactions*, if, for the calendar year, both (1) the number of transactions settled for the merchant exceeds 200, and (2) the gross amount of payments made to the merchant exceeds $20,000. When completing Boxes 1, 3, and 5a-1 on the Form 1099-K, transactions where the TPSO settles payments made with virtual currency are aggregated with transactions where the TPSO settles payments made with real currency to determine the total amounts to be reported in those boxes. When determining whether the transactions are reportable, the value of the virtual currency is the fair market value of the virtual currency in U.S. dollars on the date of payment.

See The Third Party Information Reporting Center, http://www.irs.gov/Tax-Professionals/Third-Party-Reporting-Information-Center, for more information on reporting transactions on Form 1099-K.

**Q-16: Will taxpayers be subject to penalties for having treated a virtual currency transaction in a manner that is inconsistent with this notice prior to March 25, 2014?**

**A-16:** Taxpayers may be subject to penalties for failure to comply with tax laws. For example, underpayments attributable to virtual currency transactions may be subject to penalties, such as accuracy-related penalties under section 6662. In addition, failure to timely or correctly report virtual currency transactions when required to do so may be subject to information reporting penalties under section 6721 and 6722. However, penalty relief may be available to taxpayers and persons required to file an information return who are able to establish that the underpayment or failure to properly file information returns is due to reasonable cause.

SECTION 5. DRAFTING INFORMATION

The principal author of this notice is Keith A. Aqui of the Office of Associate Chief Counsel (Income Tax & Accounting). For further information about income tax issues addressed in this notice, please contact Mr. Aqui at (202) 317-4718; for further information about employment tax issues addressed in this notice, please contact Mr. Neil D. Shepherd at (202) 317- 4774; for further information about information reporting issues addressed in this notice, please contact Ms. Adrienne E. Griffin at (202) 317-6845; and for further information regarding foreign currency issues addressed in this notice, please contact Mr. Raymond J. Stahl at (202) 317- 6938. These are not toll-free calls.