BRIAN E. KLEIN (SBN 258246)
BAKER MARQUART LLP
2029 Century Park East Suite 1600
Los Angeles, California 90067
Telephone:  (424) 652-7800
Facsimile:  (424) 652-7850
Email:      bklein@bakermarquart.com

DAVID M. POITRAS, APC (SBN 141309)
JEFFER MANGELS BUTLER & MITCHELL LLP
1900 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-4308
Telephone:  (310) 203-8080
Facsimile:  (310) 203-0567
Email:      dpoitras@jmbm.com

Attorneys for Defendant Dr. Marc A. Lowe

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: | Case No. 14-30725 |
| HASHFAST TECHNOLOGIES LLC, a California limited liability company, | (Substantively Consolidated with In re HashFast LLC, Case No. 14-30866) |
| Debtor and Debtor in Possession | Chapter 11 |
| | Adversary Case No. 15-03011 |
| MICHAEL G. KASOLAS, LIQUIDATING TRUST, Plaintiff, vs. | **DEFENDANT DR. MARC A. LOWE'S COMPENDIUM OF FEDERAL AUTHORITIES, GUIDELINES, AND REGULATIONS GOVERNING BITCOIN IN SUPPORT OF OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| MARC A. LOWE, an individual, aka Cypherdoc and/or Cipherdoc, Defendant. | Hearing: Date:    February 19, 2016 Time:    10:00 a.m. Place:   450 Golden Gate Avenue, 16th Floor         Courtroom 17         San Francisco, CA 94102 |

PRINTED ON
RECYCLED PAPER
LA 12593994v1

JMBM | Jeffer Mangels Butler & Mitchell LLP

1     Defendant Dr. Marc A. Lowe submits this Compendium of Federal Authorities, Guidelines,

2     and Regulations Governing Bitcoin in Support of his Opposition to Trustee's Motion for Partial

3     Summary Judgment:

4     **Tab 1**:  A true and correct copy of the U.S. Treasury Department's Financial Crimes Enforcement

5     Network's guidance memorandum covering bitcoin dated March 18, 2013.

6     **Tab 2**:  A true and correct copy of the Consumer Financial Protection Bureau's consumer advisory

7     memorandum on the subject of virtual currencies issued in August of 2014.

8     **Tab 3**:  A true and correct copy of the U.S. Commodity Futures Trading Commission's investor

9     alert, in which the CFTC states that it is responsible for regulating foreign currency trading.

10    **Tab 4**: A true and correct copy of the Complaint in the case *Securities and Exchange Commission*

11    *v. Trendon T. Shavers and Bitcoin Savings and Trust* in the Northern District of Texas, dated July

12    23, 2013, in which the SEC takes the position that bitcoin is a currency.

13    **Tab 5**: A true and correct copy of the court's ruling in the case *Securities and Exchange*

14    *Commission v. Trendon T. Shavers and Bitcoin Savings and Trust* case, in which the court found

15    that bitcoin is a currency.

16    **Tab 6**: A true and correct printout from the website www.spendbitcoin.com, which shows a few of

17    the 100,000 plus establishments where bitcoin may be spent like currency.

18

19

20

21

22

23

24

25

26

27

28

PRINTED ON

RECYCLED PAPER
LA 12591232v1

JMBM | Jeffer Mangels
       Butler & Mitchell LLP

1    **Tab 7**: A true and correct copy of a Internal Revenue Service revenue ruling regarding taxation of

2    forms of currency other than U.S. dollars.

3    Dated: February 5, 2016                    Respectfully submitted,

4                                                BAKER MARQUART LLP
5                                                BRIAN E. KLEIN

6                                                - and -

7                                                JEFFER MANGELS BUTLER & MITCHELL LLP
8                                                DAVID M. POITRAS, APC

9

10   By: _/s/ David M. Poitras_____
          DAVID M. POITRAS
11        Attorneys for Defendant
          Dr. Marc A. Lowe
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TAB 1



**Department of the Treasury**
**Financial Crimes Enforcement Network**

## Guidance

**FIN-2013-G001**

**Issued:** March 18, 2013

**Subject:** Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies

    The Financial Crimes Enforcement Network ("FinCEN") is issuing this interpretive guidance to clarify the applicability of the regulations implementing the Bank Secrecy Act ("BSA") to persons creating, obtaining, distributing, exchanging, accepting, or transmitting virtual currencies.[1] Such persons are referred to in this guidance as "users," "administrators," and "exchangers," all as defined below.[2] A user of virtual currency is *not* an MSB under FinCEN's regulations and therefore is not subject to MSB registration, reporting, and recordkeeping regulations. However, an administrator or exchanger *is* an MSB under FinCEN's regulations, specifically, a money transmitter, unless a limitation to or exemption from the definition applies to the person. An administrator or exchanger is not a provider or seller of prepaid access, or a dealer in foreign exchange, under FinCEN's regulations.

### Currency vs. Virtual Currency

    FinCEN's regulations define currency (also referred to as "real" currency) as "the coin and paper money of the United States or of any other country that [i] is designated as legal tender and that [ii] circulates and [iii] is customarily used and accepted as a medium of exchange in the country of issuance."[3] In contrast to real currency, "virtual" currency is a medium of exchange that operates like a currency in some environments, but does not have all the attributes of real currency. In particular, virtual currency does not have legal tender status in any jurisdiction. This guidance addresses "convertible" virtual currency. This type of virtual currency either has an equivalent value in real currency, or acts as a substitute for real currency.

---

[1] FinCEN is issuing this guidance under its authority to administer the Bank Secrecy Act. *See* Treasury Order 180-01 (March 24, 2003). This guidance explains how FinCEN characterizes certain activities involving virtual currencies under the Bank Secrecy Act and FinCEN regulations. It should not be interpreted as a statement by FinCEN about the extent to which those activities comport with other federal or state statutes, rules, regulations, or orders.

[2] FinCEN's regulations define "person" as "an individual, a corporation, a partnership, a trust or estate, a joint stock company, an association, a syndicate, joint venture, or other unincorporated organization or group, an Indian Tribe (as that term is defined in the Indian Gaming Regulatory Act), and all entities cognizable as legal personalities." 31 CFR § 1010.100(nnm).

[3] 31 CFR § 1010.100(m).

Case: 15-03011   Doc# 45   Filed: 02/05/16   Entered: 02/05/16 17:08:42   Page 5 of 46

## Background

On July 21, 2011, FinCEN published a Final Rule amending definitions and other regulations relating to money services businesses ("MSBs").[4]  Among other things, the MSB Rule amends the definitions of dealers in foreign exchange (formerly referred to as "currency dealers and exchangers") and money transmitters.  On July 29, 2011, FinCEN published a Final Rule on Definitions and Other Regulations Relating to Prepaid Access (the "Prepaid Access Rule").[5]  This guidance explains the regulatory treatment under these definitions of persons engaged in virtual currency transactions.

## Definitions of User, Exchanger, and Administrator

This guidance refers to the participants in generic virtual currency arrangements, using the terms "user," "exchanger," and "administrator."[6]  A *user* is a person that obtains virtual currency to purchase goods or services.[7]  An *exchanger* is a person engaged as a business in the exchange of virtual currency for real currency, funds, or other virtual currency.  An *administrator* is a person engaged as a business in issuing (putting into circulation) a virtual currency, and who has the authority to redeem (to withdraw from circulation) such virtual currency.

## Users of Virtual Currency

A user who obtains convertible virtual currency and uses it to purchase real or virtual goods or services is ***not*** an MSB under FinCEN's regulations.[8]  Such activity, in and of itself, does not fit within the definition of "money transmission services" and therefore is not subject to FinCEN's registration, reporting, and recordkeeping regulations for MSBs.[9]

---

[4] *Bank Secrecy Act Regulations – Definitions and Other Regulations Relating to Money Services Businesses*, 76 FR 43585 (July 21, 2011) (the "MSB Rule").  This defines an MSB as "a person wherever located doing business, whether or not on a regular basis or as an organized or licensed business concern, wholly or in substantial part within the United States, in one or more of the capacities listed in paragraphs (ff)(1) through (ff)(7) of this section. This includes but is not limited to maintenance of any agent, agency, branch, or office within the United States." 31 CFR § 1010.100(ff).

[5] *Final Rule – Definitions and Other Regulations Relating to Prepaid Access*, 76 FR 45403 (July 29, 2011),

[6] These terms are used for the exclusive purpose of this regulatory guidance.  Depending on the type and combination of a person's activities, one person may be acting in more than one of these capacities.

[7] How a person engages in "obtaining" a virtual currency may be described using any number of other terms, such as "earning," "harvesting," "mining," "creating," "auto-generating," "manufacturing," or "purchasing," depending on the details of the specific virtual currency model involved.  For purposes of this guidance, the label applied to a particular process of obtaining a virtual currency is not material to the legal characterization under the BSA of the process or of the person engaging in the process.

[8] As noted above, this should not be interpreted as a statement about the extent to which the user's activities comport with other federal or state statutes, rules, regulations, or orders.  For example, the activity may still be subject to abuse in the form of trade-based money laundering or terrorist financing.  The activity may follow the same patterns of behavior observed in the "real" economy with respect to the purchase of "real" goods and services, such as systematic over- or under-invoicing or inflated transaction fees or commissions.

[9] 31 CFR § 1010.100(ff)(1-7).

Case: 15-03011     Doc# 45     Filed: 02/05/16     Entered: 02/05/16 17:08:42     Page 6 of 46

## Administrators and Exchangers of Virtual Currency

An administrator or exchanger that (1) accepts and transmits a convertible virtual currency or (2) buys or sells convertible virtual currency for any reason *is* a money transmitter under FinCEN's regulations, unless a limitation to or exemption from the definition applies to the person.[10] FinCEN's regulations define the term "money transmitter" as a person that provides money transmission services, or any other person engaged in the transfer of funds. The term "money transmission services" means "the acceptance of currency, funds, or other value that substitutes for currency *from* one person *and* the transmission of currency, funds, or other value that substitutes for currency *to* another location or person by any means."[11]

The definition of a money transmitter does not differentiate between real currencies and convertible virtual currencies. Accepting and transmitting anything of value that substitutes for currency makes a person a money transmitter under the regulations implementing the BSA.[12] FinCEN has reviewed different activities involving virtual currency and has made determinations regarding the appropriate regulatory treatment of administrators and exchangers under three scenarios: brokers and dealers of e-currencies and e-precious metals; centralized convertible virtual currencies; and de-centralized convertible virtual currencies.

### a. *E-Currencies and E-Precious Metals*

The first type of activity involves electronic trading in e-currencies or e-precious metals.[13] In 2008, FinCEN issued guidance stating that as long as a broker or dealer in real currency or other commodities accepts and transmits funds solely for the purpose of effecting a *bona fide* purchase or sale of the real currency or other commodities for or with a customer, such person is not acting as a money transmitter under the regulations.[14]

However, if the broker or dealer transfers funds between a customer and a third party that is not part of the currency or commodity transaction, such transmission of funds is no longer a fundamental element of the actual transaction necessary to execute the contract for the purchase or sale of the currency or the other commodity. This scenario is, therefore, money

---

[10] FinCEN's regulations provide that whether a person is a money transmitter is a matter of facts and circumstances. The regulations identify six circumstances under which a person is not a money transmitter, despite accepting and transmitting currency, funds, or value that substitutes for currency. 31 CFR § 1010.100(ff)(5)(ii)(A)–(F).

[11] 31 CFR § 1010.100(ff)(5)(i)(A).

[12] Ibid.

[13] Typically, this involves the broker or dealer electronically distributing digital certificates of ownership of real currencies or precious metals, with the digital certificate being the virtual currency. However, the same conclusions would apply in the case of the broker or dealer issuing paper ownership certificates or manifesting customer ownership or control of real currencies or commodities in an account statement or any other form. These conclusions would also apply in the case of a broker or dealer in commodities other than real currencies or precious metals. A broker or dealer of e-currencies or e-precious metals that engages in money transmission could be either an administrator or exchanger depending on its business model.

[14] *Application of the Definition of Money Transmitter to Brokers and Dealers in Currency and other Commodities*, FIN-2008-G008, Sept. 10, 2008. The guidance also notes that the definition of money transmitter excludes any person, such as a futures commission merchant, that is "registered with, and regulated or examined by…the Commodity Futures Trading Commission."

Case: 15-03011    Doc# 45    Filed: 02/05/16    Entered: 02/05/16 17:08:42    Page 7 of 46

transmission.[15] Examples include, in part, (1) the transfer of funds between a customer and a third party by permitting a third party to fund a customer's account; (2) the transfer of value from a customer's currency or commodity position to the account of another customer; or (3) the closing out of a customer's currency or commodity position, with a transfer of proceeds to a third party. Since the definition of a money transmitter does not differentiate between real currencies and convertible virtual currencies, the same rules apply to brokers and dealers of e-currency and e-precious metals.

### b.    *Centralized Virtual Currencies*

The second type of activity involves a convertible virtual currency that has a centralized repository. The administrator of that repository will be a money transmitter to the extent that it allows transfers of value between persons or from one location to another. This conclusion applies, whether the value is denominated in a real currency or a convertible virtual currency. In addition, any exchanger that uses its access to the convertible virtual currency services provided by the administrator to accept and transmit the convertible virtual currency on behalf of others, including transfers intended to pay a third party for virtual goods and services, is also a money transmitter.

FinCEN understands that the exchanger's activities may take one of two forms. The first form involves an exchanger (acting as a "seller" of the convertible virtual currency) that accepts real currency or its equivalent from a user (the "purchaser") and transmits the value of that real currency to fund the user's convertible virtual currency account with the administrator. Under FinCEN's regulations, sending "value that substitutes for currency" to another person or to another location constitutes money transmission, unless a limitation to or exemption from the definition applies.[16] This circumstance constitutes transmission *to another location*, namely from the user's account at one location (e.g., a user's real currency account at a bank) to the user's convertible virtual currency account with the administrator. It might be argued that the exchanger is entitled to the exemption from the definition of "money transmitter" for persons involved in the sale of goods or the provision of services. Under such an argument, one might assert that the exchanger is merely providing the service of connecting the user to the administrator and that the transmission of value is integral to this service. However, this exemption does not apply when the only services being provided are money transmission services.[17]

The second form involves a *de facto* sale of convertible virtual currency that is not completely transparent. The exchanger accepts currency or its equivalent from a user and privately credits the user with an appropriate portion of the exchanger's own convertible virtual currency held with the administrator of the repository. The exchanger then transmits that

---

[15] In 2011, FinCEN amended the definition of money transmitter. The 2008 guidance, however, was primarily concerned with the core elements of the definition – accepting and transmitting currency or value – and the exemption for acceptance and transmission integral to another transaction not involving money transmission. The 2011 amendments have not materially changed these aspects of the definition.

[16] See footnote 11 and adjacent text.

[17] 31 CFR § 1010.100(ff)(5)(ii)(F).

Case: 15-03011    Doc# 45    Filed: 02/05/16    Entered: 02/05/16 17:08:42    Page 8 of 46

internally credited value to third parties at the user's direction. This constitutes transmission *to another person*, namely each third party to which transmissions are made at the user's direction. To the extent that the convertible virtual currency is generally understood as a substitute for real currencies, transmitting the convertible virtual currency at the direction and for the benefit of the user constitutes money transmission on the part of the exchanger.

### c. De-Centralized Virtual Currencies

A final type of convertible virtual currency activity involves a de-centralized convertible virtual currency (1) that has no central repository and no single administrator, and (2) that persons may obtain by their own computing or manufacturing effort.

A person that creates units of this convertible virtual currency and uses it to purchase real or virtual goods and services is a user of the convertible virtual currency and not subject to regulation as a money transmitter. By contrast, a person that creates units of convertible virtual currency and sells those units to another person for real currency or its equivalent is engaged in transmission to another location and is a money transmitter. In addition, a person is an exchanger and a money transmitter if the person accepts such de-centralized convertible virtual currency from one person and transmits it to another person as part of the acceptance and transfer of currency, funds, or other value that substitutes for currency.

## Providers and Sellers of Prepaid Access

A person's acceptance and/or transmission of convertible virtual currency cannot be characterized as providing or selling prepaid access because prepaid access is limited to real currencies.[18]

## Dealers in Foreign Exchange

A person must exchange the currency of two or more countries to be considered a dealer in foreign exchange.[19] Virtual currency does not meet the criteria to be considered "currency" under the BSA, because it is not legal tender. Therefore, a person who accepts real currency in

---

[18] This is true even if the person holds the value accepted for a period of time before transmitting some or all of that value at the direction of the person from whom the value was originally accepted. FinCEN's regulations define "prepaid access" as "access to funds or the value of funds that have been paid in advance and can be retrieved or transferred at some point in the future through an electronic device or vehicle, such as a card, code, electronic serial number, mobile identification number, or personal identification number." 31 CFR § 1010.100(ww). Thus, "prepaid access" under FinCEN's regulations is limited to "access to funds or the value of funds." If FinCEN had intended prepaid access to cover funds denominated in a virtual currency or something else that substitutes for real currency, it would have used language in the definition of prepaid access like that in the definition of money transmission, which expressly includes the acceptance and transmission of "other value that substitutes for currency." 31 CFR § 1010.100(ff)(5)(i) .

[19] FinCEN defines a "dealer in foreign exchange" as a "person that accepts the currency, or other monetary instruments, funds, or other instruments denominated in the currency, of one or more countries in exchange for the currency, or other monetary instruments, funds, or other instruments denominated in the currency, of one or more other countries in an amount greater than $1,000 for any other person on any day in one or more transactions, whether or not for same-day delivery." 31 CFR § 1010.100(ff)(1).

5

exchange for virtual currency, or *vice versa*, is not a dealer in foreign exchange under FinCEN's regulations.

* * * * *

Financial institutions with questions about this guidance or other matters related to compliance with the implementing regulations of the BSA may contact FinCEN's Regulatory Helpline at (800) 949-2732.

6

# TAB 2

# Risks to consumers posed by virtual currencies

## What are virtual currencies? And, as a consumer, what risks should you be aware of?

You may have heard about virtual currencies like Bitcoin, XRP, and Dogecoin. You may have heard you can buy them online. In some circumstances, you can send them to other people or use them to pay for goods and services. You may also have heard that some people buy them as speculative investments or that you can "mine" them with your computer.

But what are virtual currencies? And, as a consumer, what risks should you be aware of? In a nutshell, while virtual currencies offer the potential for innovation, a lot of big issues have yet to be resolved – some of which are critical.

If you are interested in using or buying virtual currencies, you should be aware of the associated risks:

- **Hackers.** Virtual currencies are targets for highly sophisticated hackers, who have been able to breach advanced security systems.

- **Fewer protections.** If you trust someone else to hold your virtual currencies and something goes wrong, that company may not offer you the kind of help you expect from a bank or debit or credit card provider.

- **Cost.** Virtual currencies can cost consumers much more to use than credit cards or even regular cash.

- **Scams.** Fraudsters are taking advantage of the hype surrounding virtual currencies to cheat people with fake opportunities.

So before you get involved, it's important to know what can go wrong.

## What are virtual currencies?

Virtual currencies are a kind of electronic money. That means when you buy a virtual currency you don't get an actual coin or bill that you can hold in your hands. Instead, you receive electronic units that many people may agree to accept and treat like dollars, euros, or other forms of money.

But virtual currencies aren't regular money. To begin with, virtual currencies are not issued or backed by the United States or any other government or central bank. No one is required to accept them as payment or to exchange them for traditional currencies. To work, they depend on the processing power of vast networks of unidentified, private computers around the world, which maintain and update a public ledger called the "blockchain." (Think of it as a public spreadsheet.)



Consumer Financial
Protection Bureau

Case: 15-03011    Doc# 45    Filed: 02/05/16    Entered: 02/05/16 17:08:42    Page 12 of 46

According to online accounts, after learning about a **Bitcoin exchange** from an internet search, Nicole* transferred cash to a bank account designated by the exchange's representative, Jackson, who she had e-mailed with and even spoken to on the phone. Nicole never received her Bitcoins, however. When Nicole tried to call Jackson again, the line was disconnected.

*All names have been changed.

Further, virtual currencies are not kept in banks or credit unions. In order to use virtual currencies, you need to store them in a "digital wallet," which are identified by your "public keys." To access the virtual currency in your digital wallet, you use "private keys." (Your private keys are random sequences of 64 letters and numbers that should be kept secret; your public keys are corresponding letter/number sequences that everyone can see on the blockchain.) If you want to send someone your virtual currency, for example as payment, you use the private keys to unlock your digital wallet.

In many ways, your private keys **are** your virtual currency so keeping your private keys secret is critical to owning and using virtual currency. You can store and protect your private keys yourself or entrust them to a company called a wallet provider to protect them for you.

You can learn more about how virtual currencies work at http://www.fatf-gafi.org/topics/methodsandtrends/documents/virtual-currency-definitions-aml-cft-risk.html. And before you decide to use virtual currencies, here are some of the things you should consider:

## If you are buying virtual currencies

### Know who you're dealing with if you decide to buy.

If something goes wrong with your purchase of virtual currencies, do you know how to contact the seller? Some virtual currency exchanges do not identify their owners, their phone numbers and addresses, or even the countries where they are located. Ask yourself: In any other business transaction, would you trust these people with your money? Do you know what your contractual rights would be (or how you would enforce them) if the seller doesn't deliver what you purchased?

**Virtual currency exchanges**, including those using kiosks, are required to register with the Financial Crimes Enforcement Network—which is part of the U.S. Treasury Department—as money services businesses.

Before you do business with an exchange, you can verify that it has registered by checking www.fincen.gov/financial_institutions/msb/msbstateselector.html.

(Note, though, that though it is illegal for a virtual currency exchange to operate without registering with FinCEN, the registration does not, on its own, mean that an exchange is trustworthy.)

Exchanges may also need to be licensed with your State as money transmitters or currency exchanges. You can check with your State's financial regulators to make sure that an exchange is licensed.



Consumer Financial
Protection Bureau

Case: 15-03011     Doc# 45     Filed: 02/05/16     Entered: 02/05/16 17:08:42     Page 13 of 46

## Understand what the actual costs will be.

For example, do you know what the relevant exchange rate will be and how it was determined? Are there any mark-ups to the exchange rate or other fees? How long will the transaction take to complete? Do you know what will happen if rates change before the exchange is made?

## Bitcoin "ATMs" are not ATMs at all.

Bitcoin kiosks are machines, connected to the Internet, that allow you to insert cash in exchange for Bitcoins (which they can give you as a slip of paper or by moving money to your public key on the blockchain). They may look like traditional ATMs, but unlike ATMs that you may associate with your checking and savings accounts, Bitcoin kiosks do not connect to your bank and may lack many of the safeguards you would expect. They may also charge high transaction fees – media reports describe transaction fees as high as 7% and exchange rates $50 over rates you could get elsewhere.

## Be prepared to weather very large price fluctuations.

In 2013, Bitcoin's price fell as much as 61% in a single day. In 2014, the one-day price drop has been as big as 80%.

## Virtual currencies are still experimental.

Virtual currencies, like Bitcoin, are still in active development. There are big issues that have yet to be resolved. In particular, the critical component of the entire system—the public ledger known as the blockchain—is maintained by vast unidentified private computer networks spread all over the world. It is possible that elements of these networks could abuse the power that comes with maintaining the ledger, for example by undoing transactions that you thought were finalized.

## If it seems too good to be true, it may be.

Many criminals have seized upon the press and enthusiasm relating to virtual currency to create new versions of old scams. In early 2014, the U.S. Securities and Exchange Commission sued the organizer of an alleged Ponzi scheme in Texas that purportedly advertised an "investment opportunity" that promised up to 7% interest per week. Instead, invested Bitcoins were allegedly used to pay existing investors and the organizer's personal expenses. Like any other investment, do your due diligence before giving someone money. The U.S. Securities and Exchange Commission has issued important warnings about virtual currency investment scams, which you can read at www. sec.gov/investor/alerts/ia_virtualcurrencies.pdf and www.sec.gov/oiea/investor-alerts-bulletins/ investoralertsia_bitcoin.html.

## Bitcoin transactions may not be entirely anonymous.

Information about each and every Bitcoin transaction is publicly shared and stored forever. Persistent, motivated people will likely be able to link your transactions to, among other things, your other transactions and public keys, as well as to your computer's IP address. So it is possible that others will be able to estimate both how much Bitcoin you own and where you are.



Consumer Financial
Protection Bureau

Case: 15-03011    Doc# 45    Filed: 02/05/16    Entered: 02/05/16 17:08:42    Page 14 of 46

# If you store virtual currencies by yourself

## You can be hacked.

If you use virtual currency, the data on your computer or phone can be an attractive target to hackers. If someone gets access to your computer (for example, using a "Trojan Horse" virus or other malware), they can get your private keys and, thereby, steal your virtual currency.

## You are on your own.

With a traditional bank account or payment card, if someone breaches your account, your bank or payment card company will help you recover some or all of your funds. If you're storing your virtual currencies on your own computer, you're basically on your own if your virtual currency is stolen. There is no other party to help you.

## If you lose your private keys, you've lost your funds forever.

If you store your virtual currency yourself, you can lose your funds without being hacked. If you lose your private keys, you have lost all access to your funds. No one can help you with password reminders and no one will refund your loss. Some people store their private keys offline on a USB key, external hard drive, or even paper. But if they haven't made a backup copy and they lose that USB key, hard drive, or piece of paper (or spill a glass of water on it), they lose those funds forever.

According to news reports, James mistakenly discarded a computer hard drive containing his **private keys** for 7,500 Bitcoin in 2013. As of July 2014, that amount of Bitcoin was valued at nearly $5 million. James didn't back up the drive and has not been able to locate the drive at the city dump. Consequently, he has lost all his funds.

# If you trust someone else to store your virtual currencies

## The government does not insure virtual currency accounts (or "wallets").

The Federal Deposit Insurance Corporation or the National Credit Union Share Insurance Fund typically protects your funds if a bank or credit union fails. But this doesn't apply to virtual currency accounts. So, if an exchange or wallet company fails—and many have failed—the government won't cover your losses.

According to media accounts, Kat had Bitcoin valued at nearly $10,000 stolen from an account she maintained with a major Bitcoin company. When it happened the first time, they refunded her money. When it happened again a month later, they told her that she didn't qualify for a refund.

The same media accounts note that when Larry had $5,000 worth of Bitcoin stolen, his hosted wallet company would not help him with a refund because Larry hadn't set up their strongest security settings.


Case: 15-03011    Doc# 45    Filed: 02/05/16    Entered: 02/05/16 17:08:42    Page 15 of 46

### You still have to be prepared to protect yourself from hackers.

Are you using your wallet provider's recommended practices on securing your login and password? Are you careful to avoid sharing your access credentials, inadvertently or otherwise? Watch out for fake websites or e-mails that may try to trick you into turning over your login and password, by mimicking your wallet's website (sometimes referred to as "phishing" or "smishing"). The Federal Trade Commission offers useful additional information about phishing scams at www.consumer.ftc.gov/media/game-0011-phishing-scams.

### Even if you use best practices, anything that connects to the Internet—even big companies—can be hacked.

Do you know how your wallet company stores its customers' virtual currencies or if their security systems have been audited? There have already been numerous reports of hackers successfully getting access to peoples' phones and computers, allowing them to bypass systems that require both forms of identity authentication.

### If you have linked your bank account or payment card to your digital wallet, they may also be at risk.

Hackers that compromise your digital wallet account may not just empty it of your virtual currency – they may also pull funds (like U.S. dollars) from your traditional bank account if you have linked it to your digital wallet.

### Read your agreement with your wallet provider carefully.

With a traditional bank account or payment card, the bank or payment card company will generally return your funds or reverse your charges if someone makes an unauthorized transfer from your account. In contrast, virtual currency wallet companies may disclaim responsibility for replacing your virtual currency if it is stolen on their watch.

### Really, read your agreement with your wallet provider carefully.

If your wallet company does promise to reimburse you for unauthorized transactions, will they make the refund in virtual currency or U.S. dollars? What happens if there's been a big exchange rate increase or decrease in the interim – who gets the benefit of the difference in exchange rates, you or your wallet provider? If your wallet provider offers insurance, what exactly does the insurance cover and what does it provide when the coverage applies?

---

In February 2014, Japanese Bitcoin exchange Mt. Gox froze customers' Bitcoin accounts and the Mt. Gox website disappeared, as was widely reported in the news. Shortly thereafter, Mt. Gox announced that it had lost almost $400 million of customer funds, which was nearly 6% of all Bitcoin then in circulation. Customers' only recourse was to file claims in Mt. Gox's later bankruptcy proceeding. To date, customers have not recovered any of the missing funds.

---


Case: 15-03011    Doc# 45    Filed: 02/05/16    Entered: 02/05/16 17:08:42    Page 16 of 46

## If you use virtual currencies to pay for things or send funds to other people

### Mistakes can be extremely costly.

When using virtual currencies to pay for goods or services, if you don't enter the recipient's 64-character public key perfectly, you will send the funds to the wrong person. If you're not using a hosted wallet provider (a service that helps manage your private keys), there's no mechanism for stopping the payment or getting the money back. And if you do use a hosted wallet provider, the provider may disclaim responsibility for helping you get your funds back.

### Virtual currencies don't have status as legal tender in any jurisdiction.

No party is required by law to accept payment in virtual currencies. While the number of stores and online retailers that accept virtual currencies as payment is increasing, the current universe is still very limited.

Also, the tax treatment can be complicated. If you spend (or sell) your virtual currency, you have to keep track of your taxable gains (and possibly your losses) so you can report them on your tax filings. The Internal Revenue Service has issued important guidance relating to virtual currencies, which you can access at www.irs.gov/uac/Newsroom/IRS-Virtual-Currency-Guidance.

## If you pay for things with virtual currencies, know how the merchant does business.

If you buy something with virtual currency you may be paying more than you would pay if you paid in dollars. Know how the merchant sets its exchange rate and look for mark-ups or other fees. Further, not all merchants that accept virtual currency have policies outlining guarantees for consumers when purchases go wrong. If you request a refund, are they going to reimburse you in virtual currency or U.S. dollars? Again, who gets the benefit of a large exchange rate spike or drop in the interim - you or the merchant?

If you encounter a problem with virtual currency or a virtual currency company, let us know. Submit a complaint online at www.consumerfinance.gov/complaint. Submitting a complaint takes only a few minutes.



Consumer Financial
Protection Bureau

Learn more at **consumerfinance.gov.**

Case: 15-03011    Doc# 45    Filed: 02/05/16    Entered: 02/05/16 17:08:42    Page 17 of 46

# TAB 3

**U.S. COMMODITY FUTURES TRADING COMMISSION**

### Foreign Exchange Currency Fraud: CFTC/NASAA Investor Alert

### BEWARE OF FOREIGN CURRENCY TRADING FRAUDS

The advertisements seem too good to pass up. They tout high returns coupled with low risks from investments in foreign currency (forex) contracts. Sometimes they even offer lucrative employment opportunities in forex trading.

Do these deals sound too good to be true? Unfortunately, they are, and investors need to be on guard against these scams. They may look like a new sophisticated form of investment opportunity, but in reality they are the same old trap—financial fraud in fancy garb.

Forex trading can be legitimate for governments and large institutional investors concerned about fluctuations in international exchange rates, and it can even be appropriate for some individual investors. But the average investor should be wary when it comes to forex offers.

The Commodity Futures Trading Commission (CFTC) and the North American Securities Administrators Association (NASAA) warn that off-exchange forex trading by retail investors is at best extremely risky, and at worst, outright fraud.

### WHAT ARE FOREX CONTRACTS?

Forex contracts involve the right to buy or sell a certain amount of a foreign currency at a fixed price in U.S. dollars. Profits or losses accrue as the exchange rate of that currency fluctuates on the open market. It is extremely rare that individual traders actually see the foreign currency. Instead, they typically close out their buy or sell commitments and calculate net gains or losses based on price changes in that currency relative to the dollar over time.

Forex markets are among the most active markets in the world in terms of dollar volume. The participants include large banks, multinational corporations, governments, and speculators. Individual traders comprise a very small part of this market. Because of the volatility in the price of foreign currency, losses can accrue very rapidly, wiping out an investor's down payment in short order.

### HOW DO THE SCAMS WORK?

Forex scams attract customers with sophisticated-sounding offers placed in newspaper advertisements, radio promotions, or on Internet sites. Promoters often lure investors with the concept of leverage: the right to "control" a large amount of foreign currency with an initial payment representing only a fraction of the total cost. Coupled with predictions about supposedly inevitable increases in currency prices, these contracts are said to offer huge returns over a short time, with little or no downside risk.

In a typical case, investors may be assured of reaping tens of thousands of dollars in just a few weeks or months, with an initial investment of only $5,000. Often, the investor's money is never actually placed in the market through a legitimate dealer, but simply diverted— stolen— for the personal benefit of the con artists.

### WHAT ARE REGULATORS DOING?

The CFTC is the Federal agency with the primary responsibility for overseeing the commodities markets, including foreign currency trading. Many state securities regulators also have the right under their state laws to take action against illegal commodities investments. Sometimes the CFTC and the states work together on cases. Examples include:

- In 2005, the CFTC and the Commissioner of Corporations of the State of California sued National Investment Consultants, Inc., and others in U.S. District Court for the Northern District of California for engaging in a forex scam involving approximately $2 million in

Case: 15-03011    Doc# 45    Filed: 02/05/16    Entered: 02/05/16 17:08:42    Page 19 of 46

customer funds. In 2006, the Court ordered restitution and fines amounting to $3.4 million.

- Also in 2005, the CFTC and the Texas State Securities Board (TSSB) engaged in a cooperative enforcement effort against Premium Income Corp. (PIC) and its principals. The CFTC and Securities and Exchange Commission (SEC) filed an action in U.S. District Court for the Northern District of Texas and the TSSB filed an administrative action charging PIC and its principals with engaging in an illegal $11 million forex operation. To date, the federal court has found three corporate defendants liable to pay restitution of $12 million and each was assessed a fine of $37 million. The State of Texas also has obtained cease and desist orders along with various criminal indictments and convictions. PIC's president is currently incarcerated on charges stemming from his forex scam.
- In 2004, Gregory Blake Baldwin of Utah pleaded guilty to fraud after his firm, Sunstar Funding, accepted $228,500 from 33 investors for placement into the foreign currency market. The investors' money was not placed in the foreign currency market but was used to pay some past investors and for personal expenses of Baldwin.
- In 2003, the CFTC and the State of Oregon Department of Consumer and Business Services sued Orion International, Inc., and its principals in U.S. District Court for the District of Oregon for fraudulently soliciting over $40 million to participate in a purported forex fund. Orion, and its president Russell Cline, misappropriated virtually all the customer funds. In 2006, the Court entered fines and restitution orders against the defendants totaling almost $150 million. Cline is currently incarcerated on charges stemming from his forex scam.
- In 2002, the CFTC, the SEC and the State of Utah filed an action against a company known as "4NExchange" for violations of state and Federal laws as the firm's principals illegally offered foreign currency contracts through an alleged Ponzi scheme that cost investors nearly $15 million.

## WHAT ARE THE WARNING SIGNS OF FRAUD?

If you are solicited by a company that claims to trade foreign currencies and asks you to invest funds, you should be very careful. Watch out for the following warning signs:

1. Be wary of promises that sound too good to be true: "You can make six figure profits within a year; forex investments are very low risk; You can double your money." Get-rich-quick schemes, including those involving foreign currency trading, tend to be frauds.

2. Be skeptical about unsolicited phone calls offering investments, especially those from out-of-state salespersons or companies that are unfamiliar.

3. Be especially cautious if you have acquired a large sum of cash recently and are looking for an investment vehicle. In particular, retirees with access to their retirement funds may be attractive targets for fraudulent operators. Getting your money back once it is gone can be difficult or impossible.

4. Be wary of high-pressure efforts to convince you to send or transfer cash immediately to the firm, via overnight delivery or the Internet.

5. Be smart about the money you do put at risk. Even when purchased through the most reputable dealer, forex investments are extremely risky. If you are tempted to invest, make sure you understand these products and above all, only invest what you can afford to lose. Don't invest your rent money in a forex contract.

## INVESTIGATE BEFORE YOU INVEST

Investors should make sure that anyone offering a forex investment is properly licensed and has a reputable business history. The public can obtain information about any firm or individual registered with the CFTC, including any actions taken against a registrant, through the National Futures Association (NFA) Background Affiliation Status Information Center (BASIC), available on the NFA website at: http://www.cftc.gov/exit/index.htm? http://www.nfa.futures.org/basicnet/. You can also find out if someone is registered by calling the National Futures Association at 1-800-676-4632.

The CFTC's Division of Enforcement has established a toll-free telephone number to assist members of the public in reporting possible violations of the commodities laws. Call 866-FON-CFTC (866-366-2382). In addition, if you think that you have been a victim of a forex scam, you can report suspicious activities or information to the CFTC in the online form on the this website, or by mail addressed to the Office of Cooperative Enforcement, CFTC, 1155 21st Street, NW, Washington, D.C. 20581.

The securities regulator in your state or province also may be able to help. Visit NASAA's

Case: 15-03011    Doc# 45    Filed: 02/05/16    Entered: 02/05/16 17:08:42    Page 20 of
46

website at www.nasaa.org to contact your state or provincial securities regulator.

Case: 15-03011    Doc# 45    Filed: 02/05/16    Entered: 02/05/16 17:08:42    Page 21 of 46

# TAB 4

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | CIVIL ACTION NO.: |
| -- against -- | JURY TRIAL DEMANDED |
| TRENDON T. SHAVERS AND BITCOIN SAVINGS AND TRUST, | |
| Defendants. | |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against defendants Trendon T. Shavers ("Shavers") and Bitcoin Savings and Trust ("BTCST," and together with Shavers, "Defendants") alleges as follows:

## SUMMARY

1.     This case involves fraudulent offers and sales of securities by Shavers and BTCST, a Bitcoin-denominated Ponzi scheme founded and operated by Shavers.

2.     Bitcoin ("BTC") is a virtual currency that may be traded on online exchanges for conventional currencies, including the U.S. dollar, or used to purchase goods and services online. BTC has no single administrator, or central authority or repository.

3.     From at least September 2011 to September 2012 ("relevant period"), Shavers, operating under the Internet name "pirateat40," offered and sold BTCST investments over the Internet, raising more than 700,000 BTC in principal investments from BTCST investors, or more than $4.5 million based on the daily average price of BTC when the BTCST investors purchased their BTCST investments.

4.     Shavers falsely promised investors up to 7% interest weekly based on BTCST's purported BTC market arbitrage activity, including selling BTC to individuals who wished to buy BTC "off the radar," quickly, or in large quantities.

5.     In reality, the BTCST offering was a sham and a Ponzi scheme whereby Shavers used new BTCST investors' BTC to pay the promised returns on outstanding BTCST investments and misappropriated BTCST investors' BTC for his personal use.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action pursuant to Sections 20 and 22 of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t and 77v] and Sections 21 and 27 of the Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u and 78aa].

7.     Venue is proper in this district under Section 22(a) of the Securities Act and Section 27 of the Exchange Act [15 U.S.C. §§ 77v(a) and 78aa] because Defendants may be found in and are inhabitants of McKinney, Texas; and because certain of the acts, practices, transactions and courses of business alleged herein occurred within the Eastern District of Texas.

## DEFENDANTS

8.     **Trendon T. Shavers**, age 30, who resides in McKinney, Texas, is the founder and operator of BTCST.

9.     **BTCST**, formerly known as First Pirate Savings & Trust, is an unincorporated entity with no brick and mortar presence. The BTCST investments Defendants offered and sold to the investing public as alleged herein constitute "securities" as defined by Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. §

77c(a)(10)]. BTCST's securities were not traded on any exchange and BTCST has not filed any registration statements as to its securities with the Commission.

## FACTS

### *Defendants' BTCST Offering and Misrepresentations to Investors*

10.     On or about November 3, 2011, Shavers, under the Internet name pirateat40, posted a general solicitation for BTCST, entitled "Looking for Lenders," on the Bitcoin Forum, an online forum dedicated to BTC where, among other things, numerous BTC-denominated investment opportunities were posted. The solicitation stated that a minimum of 50 BTC was required to invest.

11.     In the November 3, 2011 solicitation on the Bitcoin Forum, Shavers wrote that he was in the business of "selling BTC to a group of local people" and offered investors up to 1% interest daily "until either you withdraw the funds or my local dealings dry up and I can no longer be profitable."

12.     On or about November 11, 2011, when asked by another participant on the Bitcoin Forum how he was able to make such high profits, Shavers replied: "Groups of people that want to be off the radar, buy large quantities, and instant availability. I would say it's the Hard Money sector of Bitcoin."

13.     On or about November 13, 2011, in a post on the Bitcoin Forum, Shavers wrote: "Hey all, I have some big orders coming in this week. I just wanted to thank all of my investors as I'm able to fulfill them without the risk of them going elsewhere. Still looking for about 1,000

Case: 15-03011    Doc# 45    Filed: 02/05/16    Entered: 02/05/16 17:08:42    Page 25 of
46

BTC total in lenders based on negotiations with my buyers in the coming weeks. It's growing, it's growing!"

14.  On or about November 22, 2011, in a post on the Bitcoin Forum, Shavers wrote: "As with any movements in the market up or down I have enough order activity going on that my risk is very limited. In most cases the coins go uncovered less than a few hours, I have yet to come close to taking a loss on any deal. With that said, in the event there was a huge change in the market and I needed to personally cover the difference I am more than willing to do so."

15.  On or about December 19, 2011, in a post on the Bitcoin Forum, Shavers wrote: "My clients deal in cash only and I don't move a single coin until the cash is in hand and I'm out of harms [sic] way (just in case :) ). So risk is almost 0." On the same day, in a subsequent post on the Bitcoin Forum, Shavers wrote: "The prices for picking up coins from my clients selling coins is set prior to the purchases most of the time. Anything not covered is hedged or I take the risk personally."

16.  On or about January 19, 2012, in a post on the Bitcoin Forum, Shavers wrote: "If my business is illegal then anyone trading coins for cash and back to coins is doing something illegal. :)"

17.  On or about February 9, 2012, in a post on the Bitcoin Forum, Shavers announced that the required minimum to open a new BTCST account was being raised to 100 BTC.

18.  On or about February 10, 2012, in response to a question by another participant on the Bitcoin Forum, Shavers wrote that BTCST investors could have their BTCST account set up to automatically reinvest rather than pay out earnings.

SEC v. Trendon T. Shavers, et al                                                          4
COMPLAINT

19. On or about February 12, 2012, in a post on the Bitcoin Forum, Shavers wrote that anyone wishing to open a new BTCST account needed a referral, although he did not indicate whether the referral had to be from an existing BTCST investor or someone else.

20. On or about April 10, 2012, Shavers launched a website for BTCST that allowed investors to track their BTCST investments online and changed the name from First Pirate Savings & Trust to BTCTS.

21. On or about May 21, 2012, in a post on the Bitcoin Forum, Shavers wrote that BTCST was not a Ponzi scheme. Later the same day, in response to the question by another Bitcoin Forum participant, "Would you be willing to disclose anything about your actual profit margins over the 7% weekly you pay for use of the funds?," Shavers wrote: "I net gross 10.65% per week and payout 5.98% on average and it really depends on how much I want to work."

22. In or about early July 2012, in a post on the Bitcoin Forum, Shavers wrote that, beginning August 1, 2012, interest payments on BTCST investments would be lowered to 3.9% weekly.

23. On or about July 23, 2012, in a post on the Bitcoin Forum, Shavers announced that he was eliminating the referral requirement to open a new BTCST account.

24. In August 2012, as the scheme collapsed, Shavers made preferential redemptions to friends and longtime BTCST investors.

25. During the relevant period, Shavers conducted BTCST business under the Internet name pirateat40 and all statements made on the Bitcoin Forum by pirateat40 were made by Shavers.

26.    Shavers began selling BTCST investments at least as early as September 2011.

27.    During the relevant period, directly or indirectly, Shavers sold BTCST investments over the Internet to at least 66 investors, including investors residing in Connecticut, Hawaii, Illinois, Louisiana, Massachusetts, North Carolina, and Pennsylvania.

28.    Contrary to representations made to BTCST investors and potential investors, BTCST was a sham and a Ponzi scheme, and Shavers misappropriated BTCST investors' BTC, among other things, for his personal use.

29.    At the time Shavers offered and sold the BTCST securities, Shavers knew, or was reckless in not knowing, that BTCST did not sell BTC to individuals who wanted to buy BTC off the radar, quickly or in large quantities; BTCST was not in the business of buying and selling BTC; and BTCST did not generate returns for its investors through such BTC market arbitrage.

30.    At the time Shavers offered and sold the BTCST securities, Shavers knowingly or recklessly used new BTCST investor BTC to pay withdrawals and purported interest payments on outstanding BTCST investments; used BTCST investors' BTC for, among other things, his personal use; and made preferential redemptions to friends and longtime BTCST investors.

*Misappropriation of Investor Funds*

31.    During the relevant period, Shavers obtained at least 700,467 BTC in principal investments from BTCST investors, or $4,592,806 when converted to U.S. dollars based on the daily average price of BTC when the BTCST investors purchased their BTCST investments.

32.    During the relevant period, Shavers returned at least 507,148 BTC to BTCST investors as withdrawals or purported interest payments.

33.     During the relevant period, Shavers transferred at least 150,649 BTC to his personal account at an online BTC currency exchange which, among other things, he then sold or used to day-trade (converting BTC to U.S. dollars and vice versa). As a result of this activity, Shavers suffered a net loss from his day-trading, but realized net proceeds of $164,758 from his net sales of 86,202 BTC.

34.     During the relevant period, Shavers transferred $147,102 from his personal account at the online BTC currency exchange to accounts he controlled at an online payment processor and his personal checking account, which he then used for, among other things, his personal expenses, including rent, car-related expenses, utilities, retail purchases, casinos, and meals.

### FIRST CLAIM FOR RELIEF
#### Violations of Section 17(a) of the Securities Act

35.     The Commission re-alleges and incorporates paragraphs 1 through 34 by reference as if fully set forth herein.

36.     Defendants, directly or indirectly, singly or in concert, in the offer and sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails, have (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact, or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices, or courses of business which operate or would operate as a fraud or deceit upon the purchasers of securities.

SEC v. Trendon T. Shavers, et al                                    7
COMPLAINT

37. By reason of the foregoing, Defendants, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder

38. The Commission re-alleges and incorporates paragraphs 1 through 34 by reference as if fully set forth herein.

39. Defendants directly or indirectly, singly or in concert, in connection with the purchase and sale of securities, by use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, have: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact, or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operate or would operate as a fraud or deceit upon other persons.

40. By reason of the foregoing, Defendants, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

## THIRD CLAIM FOR RELIEF
### Violations of Section 5(a) and 5(c) of the Securities Act

41. The Commission re-alleges and incorporates paragraphs 1 through 34 by reference as if fully set forth herein.

42. Defendants, directly or indirectly, singly or in concert, have made use of the means or instruments of transportation or communication in interstate commerce, or the mails, to offer and sell securities when no registration statements was filed or in effect as to such securities and when no exemption from registration was applicable.

43. By reason of the foregoing, Defendants have violated and, unless enjoined, will again violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c).]

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court enter a Final Judgment:

(a) Finding that Defendants each violated the securities laws as alleged herein;

(b) Permanently restraining and enjoining Defendants, and their officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with them, who receive actual notice of the Final Judgment, by personal service or otherwise, and each of them, from violating Sections 5 and 17(a) of the Securities Act [15 U.S.C. §§ 77e and 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

(c) Ordering Defendants to disgorge their ill-gotten gains received as a result of their violations of the federal securities laws and to pay pre-judgment interest thereon;

Case: 15-03011    Doc# 45    Filed: 02/05/16    Entered: 02/05/16 17:08:42    Page 31 of
46

(d)     Ordering Defendants to pay civil money penalties pursuant to Section

20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the

Exchange Act [15 U.S.C. § 78u(d)(3)]; and

(e)     Granting such other and further relief to the Commission as this Court

may deem just and proper.

Dated: July 23, 2013                    By: /s/ *Jessica B. Magee*
                                        JESSICA B. MAGEE
                                        Lead Attorney
                                        Texas Bar No. 24037757
                                        Matthew J. Gulde
                                        Illinois Bar No. 6272325
                                        SECURITIES AND EXCHANGE COMMISSION
                                        Burnett Plaza, Suite 1900
                                        801 Cherry Street, Unit 18
                                        Fort Worth, TX  76102
                                        (817) 978-6465
                                        (817) 978-4927 (fax)
                                        MageeJ@sec.gov

                                        ATTORNEYS FOR PLAINTIFF
                                        SECURITIES AND EXCHANGE COMMISSION

Of Counsel:

Andrew M. Calamari* (CalamariA@sec.gov)
Valerie A. Szczepanik* (SzczepanikV@sec.gov)
Philip Moustakis* (MoustakisP@sec.gov)
SECURITIES AND EXCHANGE COMMISSION
NEW YORK REGIONAL OFFICE
3 World Financial Center
New York, NY 10281-1022
Ph:  (212) 336-0542

*not admitted in the E.D. Tex.*

# TAB 5

2013 WL 4028182
United States District Court, E.D. Texas, Sherman
Division

Securities and Exchange Commission,
v.
Trendon T. Shavers and Bitcoin Savings and Trust.

CASE NO. 4:13–CV–416
|
Filed August 6, 2013

## Attorneys and Law Firms

Jessica B. Magee, Matthew Gulde, Philip Moustakis,
United Sates Securities and Exchange Commission, 801
Cherry Street, Ste. 1900, Fort Worth, TX 76102, for
Plaintiff Securities and Exchange Commission.

Trendon T. Shavers, 2305 South Custer, Apt. 1507
McKinney, TX 75070, Pro Se, for Defendant.

## *MEMORANDUM OPINION REGARDING THE COURT'S SUBJECT MATTER JURISDICTION*

AMOS L. MAZZANT, UNITED STATES
MAGISTRATE JUDGE.

\*1 The question currently before the Court is whether or
not it has subject matter jurisdiction over this action
pursuant to Sections 20 and 22 of the Securities Act of
1933 (the "Securities Act") [15 U.S.C. §§ 77t and 77v]
and Sections 21 and 27 of the Exchange Act of 1934 (the
"Exchange Act") [15 U.S.C. §§ 78u and 78aa]. On
August 5, 2013, the Court conducted a hearing at which
Defendant, Trendon T. Shavers ("Shavers"), challenged
the Court's subject matter jurisdiction over this case.

Shavers is an individual residing in McKinney, Texas,
and is the founder and operator of Bitcoin Savings and
Trust ("BTCST"), formerly known as First Pirate Savings
& Trust. According to the facts stated by the SEC,[1]
Shavers made a number of solicitations aimed at enticing
lenders to invest in Bitcoin-related investment
opportunities.

Bitcoin is an electronic form of currency unbacked by any
real asset and without specie, such as coin or precious

metal. Derek A. Dion, *I'll Glady Trade You Two Bits on
Tuesday for a Byte Today: Bitcoin, Regulating Fraud in
the E–Conomy of Hacker–Cash*, 2013 U. Ill. J.L. Tech &
Pol'y 165, 167 (2013). "It is not regulated by a central
bank or any other form of governmental authority;
instead, the supply of Bitcoins is based on an algorithm
which structures a decentralized peer-to-peer transaction
system." *Id.* Bitcoin was designed to reduce transaction
costs, and allows users to work together to validate
transactions by creating a public record of the chain of
custody of each Bitcoin. *Id.* Bitcoin can be used to
purchase items online, and some retail establishments
have begun accepting Bitcoin in exchange for gift cards
or other purchases. The value of Bitcoin is volatile and
ranges from less than $2 per Bitcoin to more than $260
per Bitcoin (Dkt. # 3 at 1).

Beginning in November of 2011, Shavers began
advertising that he was in the business of "selling Bitcoin
to a group of local people" and offered investors up to 1
% interest daily "until either you withdraw the funds or
my local dealings dry up and I can no longer be
profitable" (Dkt. # 3 at 3). During the relevant period,
Shavers obtained at least 700,467 Bitcoin in principal
investments from BTCST investors, or $4,592,806 in U.S.
dollars, based on the daily average price of Bitcoin when
the BTCST investors purchased their BTCST investments
(Dkt. # 3 at 4). The BTCST investors who suffered net
losses (compared to investors who received more in
withdrawals and purported interest payments than they
invested in principal), collectively lost 263,104 Bitcoin in
principal, that is $1,834,303 based on the daily average
price of Bitcoin when they purchased their BTCST
investments, or in excess of $23 million based on
currently available Bitcoin exchange rates. *Id.*

The SEC asserts that Shavers made a number of
misrepresentations to investors regarding the nature of the
investments and that he defrauded investors. However,
the question currently before the Court is whether the
BTCST investments in this case are securities as defined
by Federal Securities Laws. Shavers argues that the
BTCST investments are not securities because Bitcoin is
not money, and is not part of anything regulated by the
United States. Shavers also contends that his transactions
were all Bitcoin transactions and that no money ever
exchanged hands. The SEC argues that the BTCST
investments are both investment contracts and notes, and,
thus, are securities.

\*2 The term "security" is defined as "any note, stock,
treasury stock, security future, security-based swap, bond
... [or] investment contract ..."15 U.S.C. § 77b. An

Case: 15-03011 Doc# 45 Filed: 02/05/16 Entered: 02/05/16 17:08:42 Page 34 of
46

investment contract is any contract, transaction, or scheme involving (1) an investment of money, (2) in a common enterprise, (3) with the expectation that profits will be derived from the efforts of the promoter or a third party. *SEC v. W.J. Howey & Co.,* 328 U.S. 293, 298-99 (1946); *Long v. Shultz Cattle Co,* 881 F.2d 129, 132 (1989). First, the Court must determine whether the BTCST investments constitute an investment of money. It is clear that Bitcoin can be used as money. It can be used to purchase goods or services, and as Shavers stated, used to pay for individual living expenses. The only limitation of Bitcoin is that it is limited to those places that accept it as currency. However, it can also be exchanged for conventional currencies, such as the U.S. dollar, Euro, Yen, and Yuan. Therefore, Bitcoin is a currency or form of money, and investors wishing to invest in BTCST provided an investment of money.

Next, the Court looks at whether there is a common enterprise. To show a common enterprise, the Fifth Circuit requires interdependence between the investors and the promotor, which "may be demonstrated by the investors' collective reliance on the promotor's expertise even where the promotor receives only a flat fee or commission rather than a share in the profits of the venture." *Long,* 881 F.2d at 141. That interdependence is established in this case because the investors here were dependent on Shavers' expertise in Bitcoin markets and his local connections. In addition, Shavers allegedly promised a substantial return on their investments as a result of his trading and exchanging Bitcoin. Therefore, the Court finds that there is a common enterprise.

Finally, the Court considers whether there is an expectation that profits will be derived from the efforts of the promotor or third party. The Court finds that this prong is also met. At the outset, Shavers allegedly promised up to 1% interest daily, and at some point during the relevant period the interest promised was at 3.9%. Clearly any investors participating in the BTCST investments were expecting profits from the efforts of Shavers.

## CONCLUSION

Therefore, the Court finds that the BTCST investments meet the definition of investment contract, and as such, are securities.[2] For these reasons, the Court finds that it has subject matter jurisdiction over this matter, pursuant to Sections 20 and 22 of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§ 77t and 77v] and Sections 21 and 27 of the Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78u and 78aa].

## All Citations

Not Reported in F.Supp.2d, 2013 WL 4028182, Fed. Sec. L. Rep. P 97,596

### Footnotes

1    These facts were not challenged at the hearing on August 5, 2013.

2    Having found that the BTCST investments are "investment contracts" and, thus, securities, the Court will not consider whether the BTCST investments are also "notes."

End of Document

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 6



Educational Services, Hosting, Online Services, Tutoring Centers, Vocational & Technical School

SpendBitcoins. Don't let the name fool you, this course trains anyone how to make money online, from affiliate marketers to bloggers to full-on merchant websites Click here to see SpendBitcoins founder Jeremy West's full endorsement of Wealthy A.f...



NewEgg.com

Computers, Electronics

NewEgg now accepts bitcoin!Providing computer parts and hardware, hard drives, cameras and software as well as electronics, tools, appliances, sporting goods, jewelry, watches, gaming, and much more. With fast-shipping! Once you know, you Newegg!...



Overstock.com

Other, Shopping

overstock.com Let Overstock.com help you discover designer brands and home goods at the lowest prices online. See for yourself why shoppers love our selection and award-winning customer service.



Spend Bitcoins at Amazon - Easy Workaround

Gift Cards

As Amazon is the largest internet store in the world, many people want to spend bitcoins at Amazon. You can. Here's how:Amazon does not yet accept bitcoins directly yet. But it is very easy to spend bitcoins at Amazon. Just follow these three easy steps.1. Add items to ...



Shopify

Shopping

shopify.com Our mission is simple: make commerce better. At Shopify, we help emerging small businesses get off the ground and grow into successful companies. We do this by creating great technology and by making it accessible to people that previously wouldn't be able to afford it. We're pleased ...



Aliexpress.com

Men's Clothing, Shopping, Women's Clothing

aliexpress.comFind More Industrial Computer & Accessories Information about New arrival USB 330mh/s speed bitcoin mining asic miner not like repair toolsHigh Quality new tool kitChina tool mould Suppliers Cheap repair tool from Sinosigma Technology LTD on Aliexpress.com...



HostMonster

Hosting

hostmonster.com Hostmonster - Top rated web hosting provider - Free 1 click installs For blogs shopping carts and more. Get a free domain name real NON-outsourced 24/7 support and superior speed. web hosting provider php hosting cheap web hosting Web hosting domain names front page hosting email hos...



DepositFiles

Online Services

depositfiles.com DepositFiles provides you with a legitimate technical solution which enables you to upload store access and download text software scripts images sounds videos animations and any other materials in form of one or several electronic files. To pay with bitcoin, choose a bitcoin accept...

DinoDirect

Online Services West Midlands, CV1 2F

dinodirect.com Huge online store. Currently accepting Bitcoin for orders under 100$ with the USD or EUR currency.

Case: 15-03011    Doc# 45    Filed: 02/05/16    Entered: 02/05/16 17:08:42    Page 37 of 46



**Online Services**



**Envato Marketplaces**

**Gaming, Online Services**

activeden.net With thousands of Flash Components Files and Templates ActiveDen is the largest library of stock Flash online. Starting at just $2 and by a huge community of authors!

**MarketGlory**

**Gaming, Social Networks**

marketglory.com MarketGlory is a strategy game economic political social and military strategy game in which you have possibility to convert your virtual currency into real money.

**HitLeap - Traffic Exchange**

**Arts & Entertainment** HitLeap Ltd, Kau Yuk Road, (Hong Kong)

hitleap.com Submit your website and receive a large number of visitors.



**WordPress**

**Software**

WordPress is free, open-source software, but the company Automattic offers paid-for features such as blog designs, custom domains, hosting partnerships, and anti-spam measures.   WordPress accepts bitcoins as payment, "Whatever the reason, we don't think an individual blogger from Haiti, Et...



**Fiverr**

**Graphic Design, Online Services, Software**

Fiverr is the world's largest marketplace for services starting at $5 Now accepts bitcoin!

**AddThis Social Bookmarking Sharing Button Widget**

**Advertising, Online Services**

AddThis is a free way to boost traffic back to your site by making it easier for visitors to share your content

- 1
- 2
- 3
- 4
- ..
- 414
- Next

Showing 1 - 24 of 9,924 Results

Case: 15-03011     Doc# 45     Filed: 02/05/16     Entered: 02/05/16 17:08:42     Page 38 of 46

# TAB 7

Part I

Section 988.--Treatment of Certain Foreign Currency Transactions

26 CFR 1.988-1: Certain definitions and special rules.
(Also § 1.988-2.)

Rev. Rul. 2008-1

ISSUE

What is the characterization for U.S. federal tax purposes of an instrument
(described further below) that is issued and redeemed for U.S. dollars, but that
provides an economic return that is determined by reference to the euro and
market interest rates in respect of the euro?

FACTS

Assume that on January 1, 2007, the spot rate of exchange of U.S. dollars
for euros was $1 = €0.75. On January 1, 2007, Holder delivered $100 to Issuer
in exchange for the Issuer's obligation (the "Instrument") to deliver to Holder, on
January 1, 2010, the U.S. dollar equivalent of an amount of euros (the "U.S.
Dollar Equivalent Amount"). The U.S. Dollar Equivalent Amount is determinable
on January 1, 2010, and is the sum of the following amounts translated into U.S.
dollars at the spot rate on January 1, 2010: (i) €75, and (ii) an amount of euros
calculated by reference to a compound stated rate of return applied to €75 from
January 1, 2007, until January 1, 2010. The compound stated rate of return is

the excess of a rate based on euro interest rates over a rate labeled as a "fee" for the benefit of the Issuer. (The U.S. Dollar Equivalent Amount to be paid by Issuer to Holder on January 1, 2010, may also be determined by reference to a mathematical formula that generates the same substantive effect as the methodology described above.)

Holder and Issuer expect that Issuer will pay the U.S. Dollar Equivalent Amount on January 1, 2010. The legal remedies provided in the Instrument are not materially different than legal remedies associated with instruments that are debt for federal tax purposes.

The U.S. dollar is the functional currency of Holder.

There is a significant possibility that the U.S. Dollar Equivalent Amount payable by Issuer to Holder on January 1, 2010, may be significantly less than $100.

ANALYSIS

An instrument that requires payments to be made in a foreign currency (that is, nonfunctional currency) can be debt for U.S. federal income tax purposes. See, e.g., section 988(c)(1)(B)(i) of the Internal Revenue Code. Thus, although nonfunctional currency is considered to be "property" for U.S. federal tax purposes (see, e.g., Philip Morris Inc. v. Commissioner, 71 F.3d 1040 (2d Cir. 1995), aff'g 104 T.C. 61 (1995); National-Standard Company v. Commissioner, 749 F.2d 369 (6th Cir. 1984), aff'g 80 T.C. 551 (1983)), it is treated like money for purposes of determining the amount and timing of interest that accrues on debt. See §1.988-2(b)(2) of the Income Tax Regulations; S.

Rep. No. 313, 99th Cong., 2d Sess., 1986-3 (Vol. 3) C.B. 461-463 (1986).
Section 988 and regulations thereunder also provide that the acquisition of a debt
instrument or becoming the obligor under a debt instrument is a section 988
transaction if the amount that a taxpayer is entitled to receive or is required to
pay is determined by reference to the value of a nonfunctional currency. See,
e.g., section 988(c)(1); §§ 1.988-1(a)(1) (flush language), 1.988-2(b)(2)(i)(B)(2).
These provisions indicate that a financial instrument all the payments of which
are determined by reference to a single currency can be debt, notwithstanding
the fact that (i) all actual payments due under the instrument are made in a
different payment currency, and (ii) the amount of the different payment currency
that the issuer pays at maturity may be less than the amount of the different
payment currency that was initially advanced. Indeed, section 988 was adopted,
in part, to negate suggestions "that U.S. tax consequences can be manipulated
by arranging to repay a foreign-currency denominated loan in U.S. dollars
equivalent in value at repayment to the foreign currency borrowed." S. Rep. No.
313, 99th Cong., 2d Sess., 1986-3 (Vol. 3) C.B. 451 (1986). See also H.R. Rep.
No. 426, 99th Cong. 1st Sess. 1986-3 (Vol. 2) C.B. 466 (1985) and General
Explanation of the Tax Reform Act of 1986, 100th Cong., 1st Sess., 1087 (1987).

The Instrument, in form, resembles a U.S. dollar denominated derivative
contract in which the Holder prepays its obligations under the contract, and is
entitled to receive a return based exclusively on the value of property at maturity.
(See Notice 2008-2, 2008-2 I.R.B., dated January 14, 2008, requesting
comments with respect to these types of derivative contracts.) However, the

U.S. Dollar Equivalent Amount that is payable at maturity by the Issuer under the terms of the Instrument is determined exclusively by reference to (i) the U.S. dollar value of the euros at issuance and at maturity, and (ii) market interest rates in respect of the euro. At inception (on January 1, 2007), the Holder delivers the U.S. dollar equivalent of €75, and at maturity (on January 1, 2010) the Issuer is required to pay the U.S. dollar equivalent of €75, plus the U.S. dollar value at maturity of a return based on euro interest rates. The fact that intervening currency fluctuations may cause the amount of U.S. dollars that Holder receives at maturity (on January 1, 2010) to be less than the amount of U.S. dollars that the Holder paid for the Instrument (on January 1, 2007) does not affect the characterization of the Instrument as debt, which is based on an analysis of payments with respect to the euro. The Issuer's translation of U.S. dollars into euros (on January 1, 2007) and euros into U.S. dollars (on January 1, 2010) is not relevant to the Instrument's characterization.

HOLDING

For U.S. federal tax purposes, the Instrument is euro-denominated indebtedness of Issuer. This result is not affected if the Instrument is (i) privately offered, (ii) publicly offered, or (iii) traded on an exchange.

DRAFTING INFORMATION

The principal authors of this revenue ruling are John W. Rogers III of the Office of the Associate Chief Counsel (Financial Institutions & Products) and Margaret Harris of the Office of Associate Chief Counsel (International). For

further information regarding this revenue ruling contact Mr. Rogers at (202) 622-3950 or Ms. Harris at 202-622-3870 (not toll-free calls).

# PROOF OF SERVICE

## STATE OF CALIFORNIA, CITY AND COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is: 1900 Avenue of the Stars, 7th Floor, Los Angeles, California 90067.

On February 5, 2016 I served the document(s) described as **DEFENDANT DR. MARC A. LOWE'S COMPENDIUM OF FEDERAL AUTHORITIES, GUIDELINES, AND REGULATIONS GOVERNING BITCOIN IN SUPPORT OF OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT**, in this action addressed as follows:

### SEE ATTACHED LIST

☒ (BY MAIL) True and correct copies of the aforementioned document(s) were deposited, in a sealed envelope with postage thereon fully prepaid, with the U.S. Postal Service on that same day to be mailed via first class mail at Los Angeles, California. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☒ (TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)) Pursuant to the controlling Rules, the aforementioned document(s) will be served by the court via NEF and proper link(s) to the document(s). On February 5, 2016, I checked the appropriate CM/ECF docket for this case or proceeding and determined that the aforementioned person(s) has/have consented to receive NEF transmission at the aforementioned electronic addresses.

☐ (BY FAX) The parties have consented in writing to receive service by facsimile transmission. On _____, I transmitted the above-described document(s) by facsimile machine to the above-listed fax number(s). The transmission originated from facsimile phone number (310) 203-0567 and was reported as complete and without error. The facsimile machine properly issued a transmission report, a copy of which is attached.

☐ (BY ELECTRONIC SERVICE) On _____, I transmitted the aforementioned document(s) as PDF attachments to the aforementioned electronic notification address(es). The transmission originated from my electronic notification address, which is bt@jmbm.com, and was reported as complete and without error.

☐ (BY PERSONAL SERVICE) I placed the aforementioned document(s) in a sealed envelope and I delivered such envelope by hand to the offices of the addressee.

☐ (BY OVERNIGHT DELIVERY) I placed the aforementioned document(s) in a sealed envelope with postage thereon fully prepaid and I caused said envelope to be delivered overnight via an overnight delivery service in lieu of delivery by mail to the addressee(s).

Executed on February 5, 2016 at Los Angeles, California.

I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Dated: February 5, 2016

Billie Terry

_ADDITIONAL SERVICE INFORMATION_

(TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING

- Geoffrey A. Heaton    gheaton@duanemorris.com
- Ashley McDow     amcdow@bakerlaw.com, SGaeta@bakerlaw.com
- Aron M. Oliner     roliner@duanemorris.com
- David M. Poitras    dpoitras@jmbm.com

(BY MAIL)

United States Trustee, Region 17
United States Department of Justice
235 Pine Street, Suite 700
San Francisco, CA 94104-2736